# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **ROLAND T. DAVIS,** | : |
| | : |
| **Petitioner,** | : **Case No. 2:10-cv-107** |
| | : |
| **v.** | : **Judge Sargus** |
| | : |
| **DAVID BOBBY, WARDEN** | : **Magistrate Judge King** |
| | : |
| **Respondent.** | : **DEATH PENALTY CASE** |
| | : |

_____

## ROLAND T. DAVIS' PETITION FOR
## WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254
_____

David Stebbins (0005839)
  *Trial Attorney*
Carol A. Wright (0029782)
Allen L. Bohnert (0081544)
Assistant Federal Public Defenders
10 West Broad Street, Suite 1020
Columbus, OH 43215
Telephone: 614.469.2999
Fax: 614.469.5999
David_Stebbins@fd.org
Carol_Wright@fd.org
Allen_Bohnert@fd.org

Kort Gatterdam (0040434)
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: 614.365.4100
Facsimile: 614.365.9145
gatterdam@carpenterlipps.com

*Counsel for Petitioner Roland Davis*

# TABLE OF CONTENTS

**Page**

PREFACE ...................................................................................................1

PETITION FOR WRIT OF HABEAS CORPUS—28 U.S.C. § 2254 ......................2

JURISDICTION.............................................................................................3

PROCEDURAL BACKGROUND......................................................................4

    A. Charges, Convictions, and Sentences ..............................................4

    B. Counsel ........................................................................................5

PRELIMINARY FACTS ...............................................................................20

PRETRIAL GROUNDS FOR RELIEF ............................................................30

  First Ground for Relief: .........................................................................30

ROLAND DAVIS WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL, TO COUNSEL, TO
PRESENT A DEFENSE AND TO PRESENT MITIGATION AND HAVE THAT
MITIGATION EVIDENCE CONSIDERED AND GIVEN EFFECT BY THE JURY WHEN
THE TRIAL COURT ORDERED HIM TO WEAR A STUN BELT DEVICE ON HIS ARM
WITHOUT FIRST HOLDING A HEARING ON THE NECESSITY FOR SHACKLING. ........30

JURY SELECTION GROUNDS FOR RELIEF ..................................................33

  Second Ground for Relief:......................................................................33

ROLAND DAVIS WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL
AND AN IMPARTIAL JURY CONTRARY TO THE FIFTH, SIXTH, AND FOURTEENTH
AMENDMENTS WHEN HE WAS FORCED TO STAND TRIAL IN LICKING COUNTY,
OHIO, AMIDST PERVASIVE PRE-TRIAL PUBLICITY. .................................33

  Third Ground for Relief: ........................................................................36

DAVIS WAS DENIED A TRIAL BY JURY DRAWN FROM A FAIR CROSS SECTION OF
THE COMMUNITY AND EQUAL PROTECTION UNDER THE FIFTH, SIXTH, EIGHTH,
AND FOURTEENTH AMENDMENTS BECAUSE OF THE UNDER-REPRESENTATION OF
AFRICAN-AMERICANS ON HIS JURY. ....................................................36

  Fourth Ground for Relief:.......................................................................38

THE JURY SELECTION PROCESS IN ROLAND DAVIS' TRIAL DENIED HIM AN
OPPORTUNITY TO ENSURE THAT A FAIR AND IMPARTIAL JURY, FREE FROM BIAS
OR PRECONCEIVED OPINIONS ABOUT GUILT OR PUNISHMENT, WAS SEATED, IN
VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS. .................................................................................38

i

# TABLE OF CONTENTS

**Page**

A. Davis was denied the thorough and adequate voir dire necessary to develop the factual bases for challenges for cause and to exercise peremptory challenges of jurors who were exposed to extensive pretrial publicity or who were biased on questions of guilt, innocence, or sentence.........................................................................................38

B. The trial court applied an improper standard in excusing prospective jurors who expressed objections to capital punishment but who were not unequivocally opposed to capital punishment under all circumstances and could fairly consider death as a sentence. ...............................................45

C. Trial counsel failed to fully examine jurors about whether their opinions on the death penalty would prevent them from following the court's instructions and fairly considering the imposition of the death penalty.....................................................................................................47

D. The trial court refused to permit counsel to fully examine prospective jurors about potential mitigating evidence, about whether they could consider a life sentence for someone who had killed an elderly woman in her home or whether they would automatically vote for death upon a showing of guilt. The failure to fully examine on these subjects resulted in jurors who would automatically vote for the death penalty and who would not consider mitigating evidence.......................................................49

E. Comments by the prosecutor during voir dire misled the jurors about their role in the determination of sentence and prevented the jury from considering compelling mitigating evidence.................................................51

F. The trial court failed to excuse jurors who knew too much about the crime, the victim or Roland Davis.................................................................57

G. The prosecutor and the trial court impermissibly sought commitments from the prospective jurors that they impose the death penalty....................59

H. The court and counsel failed to question a juror about personal problems that would distract from performing duties as a juror and failed to remove that juror. .....................................................................................62

I. Conclusion................................................................................................64

# TABLE OF CONTENTS

**Page**

TRIAL PHASE GROUNDS FOR RELIEF ............................................................65

Fifth Ground for Relief:..............................................................................65

UNQUALIFIED OPINION TESTIMONY CONCERNING THE TRUTHFULNESS OF A
WITNESS OR A DECLARANT USURPED THE FUNCTION OF THE JURY AND DENIED
DAVIS DUE PROCESS, A FAIR TRIAL THE RIGHT OF CONFRONTATION, AND THE
EFFECTIVE ASSISTANCE OF COUNSEL. ...................................................65

Sixth Ground for Relief:..............................................................................76

THE TRIAL COURT'S REFUSAL TO GRANT DAVIS' REQUEST TO ADMIT REPORTS
PREPARED AND RELIED UPON BY THE WITNESS OF A PARTY OPPONENT—THE
STATE'S DNA EXPERT WITNESS—DENIED DAVIS HIS RIGHT TO CONFRONT
WITNESSES AGAINST HIM, A FAIR TRIAL, DUE PROCESS AND A RELIABLE
SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS. ..................................................................76

Seventh Ground for Relief: .........................................................................88

THE PRESENTATION OF "EXPERT" TESTIMONY WITHOUT FIRST ESTABLISHING
EITHER THE SCIENTIFIC BASIS OR THE QUALIFICATIONS OF THE "EXPERT"
DEPRIVED DAVIS OF DUE PROCESS AND A FAIR TRIAL. ...........................88

    A. Detective Elliget's Testimony.................................................90

    B. Testimony Was Improper.......................................................98

    C. Davis Was Denied His Right to Due Process Because Scientifically
    Unsupported and Unsupportable, Misleading, and Unreliable Evidence
    Undermined the Fundamental Fairness of the Entire Trial. ........................101

    D. The State Failed to Disclose Material Exculpatory and Impeachment
    Evidence in Violation of Davis' Rights Under *Brady*................................102

    E. Davis Was Denied a Meaningful Opportunity to Present a Complete
    Defense by the Failure to Disclose Material Exculpatory and
    Impeachment Evidence..........................................................................105

    F. The State's Evidence and Argument Rendered Davis' Trial
    Fundamentally Unfair and Violated His Right to a Jury Verdict Based
    Solely Upon the Facts of the Offense Proven Beyond a Reasonable
    Doubt. .................................................................................................107

    G. Davis' Right to Due Process Was Violated Because Detective
    Elliget's Scientifically Unsupported and Unsupportable, Misleading and
    Unreliable Testimony Led to the Conviction of an Innocent Man. ............108

# TABLE OF CONTENTS

**Page**

H.  Davis' Conviction Must Be Overturned Because of the Cumulative Prejudice from All of the Constitutional Errors. ..........................................108

I.  Detective Elliget's Scientifically Unsupported and Unsupportable, Misleading and Unreliable Testimony Violated Davis' Eighth Amendment Right to Heightened Reliability in Capital Sentencing. .........109

J.  Davis' Death Sentence Violates Due Process Because Its Imposition Was Based Upon a Material Misapprehension of Fact. .............................110

K.  Davis Was Denied His Right to An Impartial Penalty-Phase Jury........111

L.  Davis Is Entitled to Relief Based Upon the Cumulative Prejudicial Effect of These Constitutional Errors..........................................................111

M. Conclusion...........................................................................................112

Eighth Ground for Relief:...................................................................................113

DAVIS WAS DENIED A FAIR TRIAL, DUE PROCESS OF LAW AND A FAIR AND RELIABLE SENTENCING DETERMINATION BECAUSE THE STATE OFFERED INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION ON THE AGGRAVATING CIRCUMSTANCE OF KIDNAPPING OR THE CHARGE OF KIDNAPPING....................113

A.  The state presented insufficient evidence of purpose to engage in sexual activity. ...............................................................................................113

B.  The state failed to present sufficient proof beyond a reasonable doubt on the second statutory aggravating circumstance. .....................................116

C.  Conclusion...........................................................................................117

Ninth Ground for Relief: ...................................................................................119

THE TRIAL COURT'S ERRONEOUS JURY INSTRUCTIONS DURING THE TRIAL PHASE DEPRIVED DAVIS OF A FAIR AND RELIABLE DETERMINATION OF HIS GUILT OR INNOCENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ....................................................................................................119

A.  The trial court failed to give an instruction prohibiting the jury from stacking inferences.........................................................................................119

B.  The instructions permitted Davis to be convicted on less than a unanimous verdict........................................................................................121

C.  The trial court's definition of "beyond a reasonable doubt" relieved the state of its burden of proof..................................................................125

iv

# TABLE OF CONTENTS

Page

D.  The trial court erroneously instructed the jury on the fundamental element of causation. ...................................................................127

E.  Conclusion.....................................................................................130

Tenth Ground for Relief: ...........................................................................132

THE CUMULATIVE AND GRUESOME PHOTOGRAPHS ADMITTED AT THE TRIAL AND PENALTY PHASES DEPRIVED ROLAND DAVIS OF DUE PROCESS, A FAIR TRIAL, AND A FAIR AND RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ...................................132

Eleventh Ground for Relief: ......................................................................139

THE ADMISSION OF STATE'S EXHIBITS 12A.1 AND 12A.2, WITHOUT IDENTIFICATION OR AUTHENTICATION, VIOLATED ROLAND DAVIS' CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE FEDERAL CONSTITUTION......................................................................................139

Twelfth Ground for Relief:.........................................................................143

THE ADMISSION OF TAPE RECORDINGS AS EVIDENCE WITHOUT FIRST PRESENTING AND AUTHENTICATING IT IN OPEN COURT IN THE PRESENCE OF THE DEFENDANT DENIED DAVIS HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT A CRITICAL STAGE OF THE TRIAL AND TO A TRIAL IN OPEN COURT, IN VIOLATION TO THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ADDITIONALLY, THE ADMISSION OF A TRANSCRIPT OF THESE UNIDENTIFIED TAPES THAT WERE NEVER PLAYED IN THE COURTROOM VIOLATED DAVIS' RIGHTS TO DUE PROCESS, A FAIR TRIAL, THE EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING DETERMINATION. ...............................143

A.  The court admitted tapes of what the state alleged was an interview with Davis without ever requiring identification of the evidence. ..............143

B.  The court also permitted the jury to have a transcript of the taped interview as "an aid" even though it had not been authenticated or admitted as evidence...................................................................................149

PENALTY PHASE GROUNDS FOR RELIEF ....................................................152

Thirteenth Ground for Relief:.............................................................152

ROLAND DAVIS WAS CONVICTED AND SENTENCED TO DEATH IN A TRIAL CONDUCTED IN AN EMOTIONAL ATMOSPHERE WHERE THE PROSECUTOR EXPLOITED THE EMOTIONAL IMPACT OF EVIDENCE ABOUT THE VICTIM IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.....152

# TABLE OF CONTENTS

**Page**

Fourteenth Ground for Relief: ..............................................................156

THE FAILURE TO MERGE THE KIDNAPPING AND AGGRAVATED ROBBERY
SPECIFICATIONS OF STATUTORY AGGRAVATING CIRCUMSTANCES RESULTED IN
THE JURY WEIGHING DUPLICATIVE AND CUMULATIVE AGGRAVATING
CIRCUMSTANCES THEREBY DENYING DAVIS DUE PROCESS AND A FAIR AND
RELIABLE SENTENCING PHASE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS. ......................................................156

Fifteenth Ground for Relief: ................................................................160

THE JURY INSTRUCTIONS AT THE PENALTY PHASE FAILED TO CONVEY TO THE
JURY ADEQUATE INFORMATION TO PROPERLY GUIDE EXERCISE OF ITS
DISCRETION, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS. .................................................................................160

    A.  The jury was permitted to consider trial phase evidence that was not
    relevant to the penalty phase determination. ...............................160

    B.  The trial court's instructions under Ohio Rev. Code §§ 2929.03,
    2929.04 and 2929.05 failed to properly allocate and define the burden of
    proof for the penalty phase. ......................................................161

    C.  The Ohio "beyond a reasonable doubt" standard of proof fails to meet
    the requirement of higher reliability for the guilt determination phase of a
    capital case. ..........................................................................163

    D.  The trial court failed to instruct the jury on residual doubt. ..................164

    E.  The trial court gave an incorrect parole-eligibility instruction. .............165

    F.  The trial court failed to give a mercy instruction. ..................................167

    G. Conclusion. ...........................................................................170

PROSECUTORIAL MISCONDUCT GROUNDS FOR RELIEF .......................172

Sixteenth Ground for Relief: ................................................................172

THE PROSECUTOR VIOLATED DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS BY FAILING TO MEET HIS OBLIGATION TO
SEEK JUSTICE AND TO REFRAIN FROM UNFAIRLY SEEKING A CONVICTION OR
SENTENCE OF DEATH BASED ON IMPROPER EVIDENCE, IMPROPER ARGUMENT
AND OTHER MISCONDUCT. ...............................................................172

    A.  The prosecutor repeatedly vouched for witnesses and expressed
    personal beliefs. ......................................................................173

    B.  The prosecutor improperly commented on a missing witness. ..............177

# TABLE OF CONTENTS

**Page**

C.  The prosecutor improperly elicited victim impact evidence..................178

D.  The prosecution improperly commented on Davis' silence and attempted to shift the burden of proof. ........................................182

E.  The prosecution improperly denigrated defense counsel......................184

F.  The prosecutor improperly requested a conviction to bring justice.......187

G.  The prosecutor engaged in other improper conduct during the penalty phase. ..................................................................................188

H.  The state improperly withheld *Brady* material. ....................................198

I.  Conclusion..............................................................................200

Seventeenth Ground for Relief:................................................................202

DAVIS WAS DENIED HIS RIGHT TO DUE PROCESS AND TO A FAIR TRIAL WHEN THE STATE FAILED TO DISCLOSE MATERIAL, FAVORABLE EVIDENCE................202

INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS FOR RELIEF .......206

Eighteenth Ground for Relief:................................................................206

ROLAND DAVIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ...........................206

A.  Davis was denied the effective assistance of counsel during the pre-trial stage....................................................................................208

B.  Davis was denied the effective assistance during the trial phase. .........219

C.  Davis was denied the effective assistance of counsel at the penalty phase. ..................................................................................238

D.  Conclusion..............................................................................255

SYSTEMIC GROUNDS FOR RELIEF ...............................................257

Nineteenth Ground for Relief:................................................................257

THE DEATH SENTENCE IMPOSED ON ROLAND DAVIS IS DISPROPORTIONATE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ...257

A.  Davis' substantive Eighth Amendment right to a death sentence that was not imposed in an arbitrary or capricious manner was violated. .........257

B.  The Ohio Supreme Court's refusal to consider life sentences in Davis' proportionality review denied him due process...........................................258

C.  Ohio has created a liberty interest in proportionality review.................259

D.  Conclusion..............................................................................261

## TABLE OF CONTENTS

Page

Twentieth Ground for Relief: ...............................................................262

THE OHIO SENTENCING REVIEW PROCESS AS IMPLEMENTED DENIED ROLAND DAVIS AN ADEQUATE SAFEGUARD AGAINST THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY. THE DEATH PENALTY IN THIS CASE IS INAPPROPRIATE UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. .................................................................................262

Twenty-First Ground for Relief: ........................................................268

DAVIS WAS DENIED DUE PROCESS AND EQUAL PROTECTION BECAUSE OHIO'S POST CONVICTION PROCEDURES DID NOT PROVIDE HIM WITH AN ADEQUATE CORRECTIVE PROCESS TO FULLY AND FAIRLY VINDICATE HIS FEDERAL CONSTITUTIONAL CLAIMS IN THE STATE COURTS UNDER PRINCIPLES OF COMITY AND FEDERALISM. .................................................................................268

Twenty-Second Ground for Relief: .....................................................276

DAVIS WAS DENIED DUE PROCESS BECAUSE THE TRIAL COURT IMPROPERLY DENIED HIS MOTION FOR LEAVE TO FILE A NEW TRIAL MOTION, THUS DENYING HIM ANY OPPORTUNITY TO DEMONSTRATE HIS ACTUAL INNOCENCE BASED ON NEWLY DISCOVERED EVIDENCE. ...........................................................276

Twenty-Third Ground for Relief: ........................................................281

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL. OHIO REV. CODE ANN. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, 2929.05, AND 2929.06 ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO ROLAND DAVIS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION. FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.......................................................281

    A.  Davis' death sentence represents arbitrary and unequal punishment. ...281

    B.  Ohio's system employs unreliable sentencing procedures. ...................284

    C.  The Ohio scheme impermissibly burdened Davis' right to a jury. .........285

    D.  Ohio Rev. Code §§ 2929.03 (D)(1) and 2929.04 are unconstitutionally vague. ......................................................................................................286

    E.  Ohio's scheme impermissibly lacks individualized sentencing. ...........288

    F.  The Ohio system unconstitutionally creates a mandatory death penalty and impermissibly fails to require a thorough appropriateness analysis.....288

    G.  Ohio's statutory death penalty scheme violates international law.........290

## TABLE OF CONTENTS

**Page**

H.  Lethal Injection. ...................................................................................299

I.  Conclusion...........................................................................................302

PRAYER FOR RELIEF .......................................................................303

VERIFICATION.....................................................................................305

CERTIFICATE OF SERVICE

## <u>PREFACE</u>

Petitioner Roland Davis uses the following abbreviations to reference the state-court proceedings:

- Transcript of trial proceedings:  (Tr. at ____.);

- Transcript of sentencing proceedings:  (Sent. Hr'g Tr. at _____ (July 15, 2005).);

- Transcript of other proceedings*:  e.g.*, ([Type] Hr'g Tr. at ____ ([Date of hearing]).);

- Trial motions:  (Motion No. x, [Title of Motion].);

- Trial court entries:  (Entry No. __, filed _____.);

- Trial exhibits:  ([Def.'s or State's] Ex. ___ [, at ____].);

- Exhibits submitted with the state-court post conviction petition: (Post Conviction Pet., Ex. ____.);

and

- Exhibits submitted with the state-court motion for new trial: (Mot. for New Trial, Ex. _____.).

## PETITION FOR WRIT OF HABEAS CORPUS—28 U.S.C. § 2254

1.      Comes now Roland T. Davis, pursuant to Article I, § 9 and Article III, of the
United States Constitution, as well as the Fourth, Fifth, Sixth, Eighth and
Fourteenth Amendments, 28 U.S.C. § 2241 *et seq.* (including 28 U.S.C. § 2254),
and 18 U.S.C. § 3006A and all other applicable law, and respectfully moves this
Court for a Writ of Habeas Corpus declaring unconstitutional and invalid his
convictions for Aggravated Murder and sentence of death, imposed by the Court of
Common Pleas, Licking County, Ohio on July 15, 2005, and order a new trial.
Davis further requests that he be granted leave to engage in Discovery pursuant to
Fed. R. Civ. P. 26, *et seq.* and Rule 6 of the Rules Governing Section 2254 Cases.
Davis further states that this is his first Petition for Writ of Habeas Corpus and it is
being filed in compliance with 28 U.S.C. § 2244(d).  While Davis' conviction and
sentence became final on direct appeal on October 10, 2008, his "properly filed
petition for State post conviction . . . review" did not become final until June 17,
2009, when the Supreme Court of Ohio overruled his Memorandum in Support of
Jurisdiction.  28 U.S.C. § 2244 (d)(1)(A) and (d)(2).

2.      Should Davis discover additional facts or claims not stated in this Petition,
he will necessarily seek leave of court to amend this Petition.

## <u>JURISDICTION</u>

3.     Roland Davis invokes the jurisdiction of this Court under 28 U.S.C. § 2241, *et seq.*, including 28 U.S.C. § 2254.  Roland Davis, Inmate No. 499211, is being restrained of his liberty by Warden David Bobby and the Ohio Department of Rehabilitation and Correction at the Ohio State Penitentiary, 878 Coitsville-Hubbard Road, Youngstown, OH 44505, on death row.  Davis has been under such restraint since his transfer to the Ohio Department of Rehabilitation and Correction in 2005, following his conviction and sentence.

4.     Roland Davis petitions this Honorable Court to be relieved of his convictions and sentences imposed on July 15, 2005 because said convictions and sentences violate the United States Constitution, including the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as the various international treaty obligations of the United States.

## PROCEDURAL BACKGROUND

### A.    Charges, Convictions, and Sentences

5.    Roland Davis was indicted for one count of aggravated murder, Ohio Rev. Code § 2903.01 for the death of Elizabeth Sheeler.  He was also charged with four specifications of statutory aggravating circumstances, pursuant to Ohio Rev. Code § 2929.04(A). In addition, he was indicted on the lesser offense of murder, Ohio Rev. Code § 2903.02, one count of kidnapping, Ohio Rev. Code § 2905.01, one count of aggravated robbery, Ohio Rev. Code § 2901.01, and one count of aggravated burglary, Ohio Rev. Code § 2901.11, all arising out of this single incident.

6.    Davis' jury trial began with voir dire on June 27, 2005, in front of Judge Thomas Marcelain of the Common Pleas Court of Licking County, Ohio.

7.    The jury returned guilty verdicts on the evening of July 7, 2005.

8.    The penalty phase began on Monday July 11, 2005.

9.    The jury returned a death verdict on July 12, 2005.

10.    The court subsequently sentenced Davis on July 15, 2005.  Davis was sentenced to death on Count One Aggravated Murder, ten years each to be served consecutively on each count of Aggravated Robbery, Aggravated Burglary, and Kidnapping.

4

**B.**    **Counsel**

11.    The trial court appointed Kirk McVay of Columbus, Ohio and Andrew Sanderson of Newark, Ohio to represent Davis at trial.

12.    The trial court appointed David C. Stebbins and Carol A. Wright of Columbus, Ohio, to represent Davis on his sole appeal of right to the Supreme Court of Ohio.

13.    The trial court appointed the Office of the Ohio Public Defender to represent Davis on his Petition for Post Conviction Relief pursuant to Ohio Rev. Code § 2953.21 *et seq.*, and the appeals therefrom.  Davis was represented by Joseph Wilhelm and Kenneth Lee of the Office of the Ohio Public Defender on his post conviction petition and the appeals therefrom.

14.    Davis was represented by Joseph Wilhelm and Kenneth Lee on his Application to Reopen his direct appeal pursuant to Ohio R. App. P. 26(B) and Ohio Sup. Ct. R. Prac., Rule XI, § 6.

15.    Davis was represented by Joseph Wilhelm and later by Ruth Tkacz of the Office of the Ohio Public Defender on his Motion for Leave to File a Motion for New Trial and the appeals from the denial of the Motion.

**1.    Direct Appeal—Supreme Court of Ohio**

16.    Following imposition of a sentence of death, Roland Davis filed his Notice of Appeal to the Supreme Court of Ohio on September 6, 2005 along with a

5

Motion for Leave to File a Delayed Appeal. On September 27, 2005, the Supreme

Court of Ohio granted Davis' Motion for Leave to File a Delayed Appeal.

17.   Davis raised the following issues on appeal in the Supreme Court of Ohio:

> **PROPOSITION OF LAW NO. I**
>
> ROLAND DAVIS WAS ENTITLED TO A TRIAL BY
> A FAIR AND IMPARTIAL JURY FREE FROM BIAS
> OR PRECONCEIVED OPINIONS ABOUT GUILT OR
> PUNISHMENT UNDER ART. I, §§ 2, 9, 10 AND 16
> OF THE OHIO CONSTITUTION AND THE FIFTH,
> SIXTH, EIGHTH AND FOURTEENTH
> AMENDMENTS. THE JURY SELECTION PROCESS
> HERE DENIED DAVIS AN OPPORTUNITY TO
> INSURE THAT A FAIR AND IMPARTIAL JURY
> WAS SEATED.
>
> **PROPOSITION OF LAW NO. II**
>
> THE ADMISSION OF STATE'S EXHIBITS 12A.1
> AND 12A.2, WITHOUT IDENTIFICATION OR
> AUTHENTICATION VIOLATED ROLAND DAVIS'
> CONSTITUTIONAL RIGHTS TO DUE PROCESS, A
> FAIR TRIAL, AND THE RIGHT TO THE EFFECTIVE
> ASSISTANCE OF COUNSEL, AS GUARANTEED BY
> THE FEDERAL AND STATE CONSTITUTIONS.
>
> **PROPOSITION OF LAW NO. III**
>
> THE ADMISSION OF TAPE RECORDINGS AS
> EVIDENCE WITHOUT FIRST PRESENTING AND
> AUTHENTICATING THE TAPE RECORDING IN
> OPEN COURT IN THE PRESENCE OF THE
> DEFENDANT DENIED DAVIS HIS
> CONSTITUTIONAL RIGHT TO BE PRESENT AT A
> CRITICAL STAGE OF THE TRIAL AND TO A
> TRIAL IN OPEN COURT IN VIOLATION TO THE
> FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
> AMENDMENTS AND ARTICLE I, § 2, 9, 10 AND 16

6

OF THE OHIO CONSTITUTION. ADDITIONALLY
THE ADMISSION OF A TRANSCRIPT OF THESE
UNIDENTIFIED TAPES THAT WERE NEVER
PLAYED IN THE COURTROOM VIOLATED DAVIS
RIGHTS TO DUE PROCESS, A FAIR TRIAL, THE
EFFECTIVE ASSISTANCE OF COUNSEL AND A
RELIABLE SENTENCING DETERMINATION.

**PROPOSITION OF LAW NO. IV**

THE CUMULATIVE AND GRUESOME
PHOTOGRAPHS ADMITTED AT TRIAL DEPRIVED
ROLAND DAVIS OF DUE PROCESS, A FAIR TRIAL,
AND A FAIR AND RELIABLE SENTENCING
DETERMINATION IN VIOLATION OF THE FIFTH,
SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS AND ARTICLE I, SECTIONS 2, 9, 10
AND 16 OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. V**

UNQUALIFIED OPINION TESTIMONY
CONCERNING THE TRUTHFULNESS OF A
WITNESS OF A DECLARANT USURPS THE
FUNCTION OF THE JURY AND DENIED DAVIS
DUE PROCESS, A FAIR TRIAL THE RIGHT OF
CONFRONTATION, AND THE EFFECTIVE
ASSISTANCE OF COUNSEL.

**PROPOSITION OF LAW NO. VI**

BEFORE PRESENTING "EXPERT" TESTIMONY,
THE STATE MUST ESTABLISH THE SCIENTIFIC
OR OTHER BASIS FOR THE TESTIMONY AND
ESTABLISH THAT THE "EXPERT" HAS THE
QUALIFICATIONS AND TRAINING TO RENDER
AN OPINION. DAUBERT v. MERRILL DOW
PHARMACEUTICALS, INC. 509 U.S. 579 (1993).
THE PRESENTATION OF "EXPERT" TESTIMONY
WITHOUT FIRST ESTABLISHING EITHER THE
SCIENTIFIC BASIS OR THE QUALIFICATIONS OF

7

THE "EXPERT" DEPRIVED DAVIS OF DUE
PROCESS AND A FAIR TRIAL.

**PROPOSITION OF LAW NO. VII**

REPORTS PREPARED BY AN EXPERT WITNESS
AND RELIED ON BY THAT WITNESS DURING
HER TESTIMONY AND SUBJECT TO CROSS
EXAMINATION ARE ADMISSIBLE AS EXHIBITS
WHEN REQUESTED BY THE PARTY OPPONENT.
THE TRIAL COURT'S EXCLUSION OF SUCH
REPORTS OF THE STATE'S DNA EXPERT DENIED
ROLAND DAVIS HIS RIGHT TO A FAIR TRIAL,
DUE PROCESS AND A RELIABLE SENTENCING
DETERMINATION IN VIOLATION OF THE FIFTH,
SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AND ARTICLE I §§ 2, 9, 10 AND 16
OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO. VIII**

ROLAND DAVIS WAS DEPRIVED OF  A FAIR AND
RELIABLE DETERMINATION OF HIS GUILT OF
INNOCENCE IN VIOLATION OF HIS RIGHTS
UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS AND SECTIONS 2,
9, 10 AND 16, ARTICLE I OF THE OHIO
CONSTITUTION, BY THE TRIAL COURT'S
ERRONEOUS JURY INSTRUCTIONS AT THE
PENALTY PHASE.

**PROPOSITION OF LAW NO. IX**

DAVIS WAS DENIED HIS RIGHT TO A FAIR
TRIAL, DUE PROCESS OF LAW AND A FAIR AND
RELIABLE SENTENCING DETERMINATION
BECAUSE THE STATE OFFERED INSUFFICIENT
EVIDENCE TO SUPPORT A CONVICTION ON THE
AGGRAVATING CIRCUMSTANCE OF
KIDNAPPING OR THE CHARGE OF KIDNAPPING.

8

## PROPOSITION OF LAW NO. X

THE FAILURE TO MERGE THE KIDNAPPING AND
AGGRAVATED ROBBERY SPECIFICATIONS OF
STATUTORY AGGRAVATING CIRCUMSTANCES
RESULTED IN THE JURY WEIGHING
DUPLICATIVE AND CUMULATIVE
AGGRAVATING CIRCUMSTANCES THEREBY
DENYING DAVIS DUE PROCESS AND A FAIR AND
RELIABLE SENTENCING PHASE AS
GUARANTEED BY THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I,
§§ 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XI

JURY INSTRUCTIONS AT THE PENALTY PHASE
MUST CONVEY TO THE JURY ADEQUATE
INFORMATION TO PROPERLY GUIDE THE JURY'S
EXERCISE OF ITS DISCRETION. THE
INSTRUCTIONS HERE FAILED TO PROVIDE THE
MANDATED GUIDANCE IN VIOLATION OF THE
FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AS WELL AS ARTICLE I, §§ 2, 9, 10
AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XII

THE PROSECUTOR HAS AN OBLIGATION TO
SEEK JUSTICE AND TO REFRAIN FROM
UNFAIRLY SEEKING A CONVICTION OR
SENTENCE OF DEATH BASED ON IMPROPER
EVIDENCE, IMPROPER ARGUMENT AND OTHER
MISCONDUCT UNDER THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS AND
ARTICLE I, §§ 2, 9, 10, AND 16 OF THE OHIO
CONSTITUTION.

**PROPOSITION OF LAW NO. XIII**

THE REPRESENTATION PROVIDED TO ROLAND
DAVIS FELL FAR BELOW THE PREVAILING
NORMS FOR COUNSEL IN A CAPITAL CASE, WAS
UNREASONABLE, AND AFFECTED THE
OUTCOME IN VIOLATION OF THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS AS
WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO
CONSTITUTION.

**PROPOSITION OF LAW XIV**

ROLAND DAVIS WAS CONVICTED AND
SENTENCED TO DEATH IN A TRIAL CONDUCTED
IN AN EMOTIONAL ATMOSPHERE WHERE THE
PROSECUTOR EXPLOITED THE EMOTIONAL
IMPACT OF EVIDENCE ABOUT THE VICTIM IN
VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS AS WELL AS
ARTICLE 1, SECTIONS 2, 9, 10 AND 16 OF THE
OHIO CONSTITUTION.

**PROPOSITION OF LAW XV**

THE DEATH SENTENCE IMPOSED ON ROLAND
DAVIS IS DISPROPORTIONATE IN VIOLATION OF
THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

**PROPOSITION OF LAW XVI**

THE OHIO SENTENCING REVIEW PROCESS AS
IMPLEMENTED BY THE TRIAL COURT DENIED
ROLAND DAVIS AN ADEQUATE SAFEGUARD
AGAINST THE ARBITRARY AND CAPRICIOUS
IMPOSITION OF THE DEATH PENALTY.  THE
DEATH PENALTY IN THIS CASE IS
INAPPROPRIATE UNDER THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS AS

10

WELL AS ARTICLE I, §§ 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION,

**PROPOSITION OF LAW XVII**

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL.  OHIO REV. CODE ANN. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, 2929.05, AND 2929.06 ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO ROLAND DAVIS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ART. I, §§ 2, 9, 10, 16 OF THE OHIO CONSTITUTION.  FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW

**PROPOSITION OF LAW XVIII**

A TRIAL COURT MAY NOT SENTENCE A DEFENDANT TO MAXIMUM AND CONSECUTIVE SENTENCES BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY DEFENDANT.  THIS VIOLATED DAVIS' CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §10 AND 16 OF THE OHIO CONSTITUTION.

18.    In an Opinion released January 3, 2008, the Supreme Court of Ohio affirmed the convictions and sentence of death.  *State v. Roland Davis*, 880 N.E. 2d 31 (Ohio 2008).  A timely filed Motion for Reconsideration was denied.  *State v. Davis*, 893 N.E. 2d 512 (Ohio 2008).

11

19.     A Petition for Certiorari was filed in the United States Supreme Court on

June 6, 2008.  The Court denied the Petition for Certiorari on October 10, 2008.

*Davis v. Ohio*, 129 S. Ct. 137 (2008).

### 2.     Post Conviction Litigation

20.     Pursuant to Ohio Rev. Code § 2953.21 *et seq.*, Davis, through counsel,

timely filed his Petition for Post Conviction Relief on June 23, 2006.

21.     In his Petition, Davis raised the following issues demonstrating that his

convictions and sentences were void or voidable under the United States and Ohio

Constitutions:

### First Ground for Relief

Petitioner Davis's convictions and sentences are void
and/or voidable due to excessive security measures used
throughout his trial, thus violating his right to a fair and
impartial trial, due process, the presumption of
innocence, and the right to counsel.

### Second Ground for Relief

Petitioner Davis's convictions and sentences are void
and/or voidable due to the trial counsel's failure to object
or request a hearing to determine whether it was
necessary to use excessive security measures throughout
Petitioner's trial, thus violating his right to effective
assistance of counsel, a fair and impartial trial, due
process, the presumption of innocence, and the right to
counsel.

### Third Ground for Relief

Petitioner Davis's judgment and sentence are void or
voidable because the State failed to disclose any and all

12

evidence favorable to the accused. As a result, Petitioner was denied his constitutional rights to due process, equal protection, and a fair trial.

**Fourth Ground for Relief**

Petitioner Davis's convictions and/or sentences are void or voidable because he was denied the effective assistance of counsel in the mitigation phase of his capital trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

**Fifth Ground for Relief**

The judgment and sentence against Petitioner Davis are void and/or voidable because the death penalty as administered by lethal injection violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law.

**Sixth Ground for Relief**

Petitioner Davis's judgment and sentence are void or voidable because Ohio's post conviction procedures do not provide an adequate corrective process, in violation of the constitution.

**Seventh Ground for Relief**

Petitioner Davis's judgment and sentence are void or voidable because, assuming arguendo that none of the Grounds for Relief in his Post Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition in paragraphs one through fourteen have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the United States and Ohio Constitutions.

13

**Eighth Ground for Relief**

Petitioner Davis's convictions are void or voidable because he was denied his right to be present at a critical stage of the trial.

**Ninth Ground for Relief**

Petitioner Davis's convictions are void or voidable because his rights to equal protection and a fair cross-section of the community were violated by the under-representation of African-Americans from his jury.

**Tenth Ground for Relief**

Petitioner Davis's convictions are void or voidable because pervasive pre-trial publicity about this case warranted a charge of venue from Licking County.

**Eleventh Ground for Relief**

Petitioner Davis's convictions are void or voidable because Petitioner was prejudiced by the errors and omissions of his counsel in the culpability phase of his capital trial.

**Twelfth Ground for Relief**

Petitioner Davis's death sentence is void or voidable because Petitioner was prejudiced by trial counsel's failure to present mitigating evidence from a clinical or forensic psychologist.

**Thirteenth Ground for Relief**

Petitioner Davis's convictions and sentences are void or voidable because he is actually innocent of the crimes charged in this case.

**Fourteenth Ground for Relief**

Petitioner Davis's convictions are void or voidable because trial counsel rendered prejudicially deficient

14

performance by not raising a challenge to the jury pool based on the under-representation of African-Americans on juries in Licking County death penalty cases. (*See* Ninth Ground for Relief.)

Petitioner Davis's convictions are void or voidable because trial counsel rendered prejudicially deficient performance by not moving for a change of venue following voir dire. (*See* Tenth Ground for Relief.)

Petitioner Davis's convictions are void or voidable because trial counsel rendered prejudicially deficient performance by not objecting when the jury was permitted to view State's Exhibits 12-A.l and 12-A.2 outside of Petitioner's presence. (*See* Eighth Ground for Relief.)

22.    Davis subsequently filed an Amended Petition for Post Conviction Relief on July 20, 2006, in which he raised two additional Grounds for Relief:

### Fifteenth Ground for Relief

Petitioner Davis's convictions are void or voidable because trial counsel failed to call Damien Turner as a witness. Testimony from Turner on this point would have established a pattern by law enforcement of inducing confessions of jailhouse snitches in exchange for consideration.

### Sixteenth Ground for Relief

Petitioner's convictions and sentences are void or voidable because his trial counsel rendered ineffective assistance by not making a cogent challenge to the State's Y-STR DNA evidence.

23.    Davis attached to his Petition and Amended Petition numerous affidavits and exhibits *dehors* the record that demonstrated his right to an evidentiary hearing and to relief, including:  six separate Affidavits of Roland Davis; an affidavit of  Phillip

15

Elmore; excerpts from the United States Census Bureau for Licking County, Ohio; copies of news coverage concerning the arrest and trial of Roland Davis; an Affidavit of Ruth Cummings; an Affidavit of Rose Marie Weimer; two letters from Richard Hummel; advertising information on the stun device used in Davis' trial; an Affidavit of Robert L. Smith, Ph.D.; an Affidavit of Sharon Scanlon; "Lethal Injection Constitutes Cruel, Inhuman, or Degrading Treatment Which is Prohibited by International Law" by Douglas Freeman; "Post-Furman Botched Executions" by Michael Radelet; an Affidavit of Monique N. Coleman, Psy. D.; an Affidavit of Kathy Davis; and an Affidavit of Gregory Meyers, Esq.

24.     In support of his Petition for Post Conviction Relief, Davis filed a Motion for Appropriation of funds for Dr. Robert L. Smith Clinical Psychologist; and a Motion for DNA testing; a Motion for Discovery and Evidentiary Hearing.

25.     In Orders dated November 14, 2007 and January 14, 2008, the Court of Common Pleas denied Davis Petition for Post Conviction Relief and overruled all of Davis' motions.

26.     Davis timely appealed to the Ohio Fifth District Court of Appeals, raising three comprehensive Assignments of Error:

> **First Assignment of Error:**
>
> Appellant's right to due process and equal protection was violated because the trial court dismissed his post conviction petition on procedural grounds.

16

**Second Assignment of Error:**

Appellant's due process and equal protection rights were violated because the trial court denied motions that were necessary to fully and fairly litigate his grounds for post conviction relief.

**Third Assignment of Error:**

The trial court erred in dismissing Appellant's Post Conviction Petition when he presented sufficient operative facts to merit relief or, at minimum, an evidentiary hearing.

27.    In an Opinion dated December 23, 2008, the Ohio Fifth District Court of Appeals affirmed the judgment of the trial court denying Davis' Petition for Post Conviction Relief.  *State v. Davis*, No. 08CA 16, 2008 Ohio App. LEXIS 5718, at *59–60 (Ohio Ct. App. Dec. 23, 2008).

28.    Davis timely filed a Notice of Appeal and a Memorandum in Support of Jurisdiction in the Supreme Court of Ohio, raising four Propositions of Law:

**Proposition of Law No. 1:**

A capital post conviction petitioner's rights to due process and equal protection are violated when the petitioner is denied discovery expert assistance, and a hearing to fully develop the factual basis for the petitioner's constitutional claims.

**Proposition of Law No. 2:**

It is error to deny a capital post conviction petitioner's claims for relief on the basis of res judicata when the claims are supported with evidence de hors the trial record.

17

**Proposition of Law No. 3:**

It is error to deny relief on the merits to a capital post conviction petitioner who has presented claims of constitutional errors that are supported with evidence de hors the trial record.

**Proposition of Law No. 4:**

A claim of factual innocence is cognizable on post conviction review under O.R.C. § 2953.21 et seq.

29.     The Supreme Court of Ohio denied Davis' Memorandum in Support of Jurisdiction in an Order dated June 17, 2009.

### 3.     Application to Reopen

30.     Davis likewise filed an Application to Reopen his Direct Appeal in the Supreme Court of Ohio on April 2, 2008, raising three propositions of law.

31.     The Supreme Court of Ohio denied Davis' Application to Reopen in an Order dated September 10, 2008.

### 4.     Motion for New Trial

32.     Davis filed a Motion for Finding that Defendant was Unavoidably Prevented from Discovering New Evidence within 120 days of Verdict under Ohio R. Crim. P. 33 (B) and for Leave to File a Motion for New Trial on October 31, 2008, raising the claim that Davis had been denied the effective assistance of counsel by counsel's failure to mount a cogent challenge to the state's DNA evidence that would have proven that Davis was actually innocent of this capital offense.

18

33.    In an Entry dated January 30, 2009, the Court of Common Pleas of Licking County Ohio denied Davis' Motion for Leave to File a Motion for New Trial.

34.    Davis timely appealed to the Ohio Fifth District Court of Appeals.

35.    In an Entry dated September 24, 2009, the Court of Appeals affirmed the trial court's denial of Davis' Motion for Leave to File a Motion for New Trial.

36.    Davis timely filed a Notice of Appeal and Memorandum in Support of Jurisdiction in the Supreme Court of Ohio.

37.    In an Order dated January 27, 2010, the Supreme Court of Ohio granted Davis' Memorandum in Support of Jurisdiction as to Proposition of Law I.

38.    As of the filing of this Petition the case is pending argument and decision in the Supreme Court of Ohio.  *State v. Roland Davis*, Case No. 2009-2028.

## **PRELIMINARY FACTS**

39.     Elizabeth Sheeler was an elderly woman who was found dead in her

apartment in Newark, Ohio on July 12, 2000.  Her body was found wrapped in

bedding in her bedroom.  (Tr. at 972.)

40.     The cause of death was identified as blunt trauma injuries and sharp

instrument wounds.  Tissue and blood samples were collected and preserved for

possible testing.

41.     Detective Tim Elliget, a criminalist with the Newark Police Department was

the primary crime scene investigator.  At trial, defense counsel stipulated that Det.

Elliget was an expert in criminology, crime scene investigation and preservation.

(Tr. at 1034.)  Detective Elliget found no evidence consistent with a forced entry.

(Tr. at 1038.)

42.     Sheeler was in the habit of leaving her door partially open and was very hard

of hearing.  Most of her transportation was obtained from friends or from taking

taxicabs.

43.     Sheeler spoke with a friend on the telephone on Monday evening, July 10,

2000 for approximately 2 hours from 8 p.m. to 10 p.m. when they both hung up to

watch a specific TV show.  There was no indication during that call that anyone

else was in the apartment with Sheeler.  (Tr. at 1139.)

44.     Sharon Wright, a former girlfriend, met Davis in 1994 while both were working for Yellow Cab in Newark.  Wright and Davis both became acquainted with Sheeler from driving her in cabs. They often helped her with her groceries. Wright testified that Davis was not at her house on July 10th or 11th, 2000, but that he showed up with a new car and two envelopes full of cash on the 13th.  (Tr. at 1155–57.)  Davis told her that he has been running drugs from Florida to Ohio.

45.     Terri Geer also had a relationship with Davis.  She testified that Roland had a small pocketknife that he always carried.  (Tr. at 1216.)  She recalled Davis buying her son a new drum set in July 2000.  The parties stipulated that the drum set cost more than $1200.00.  (Tr. at 1220, 1226–27 (Joint Ex. 6).)  Geer also testified that Roland has a distinctive stutter when he speaks.  (Tr. at 1223–25.)

46.     Wayne Rutherford, a dispatcher for Yellow Cab, recalled Sheeler requesting Roland Davis as one of her drivers.

47.     Susan Fowls, a waitress at Annie's Place in 2000, testified that sometime in 2004 she saw a photo of Davis who had been arrested for the murder of Sheeler in the newspaper.  Fowls claimed that once she saw that photo she recalled that a man had come into the restaurant in late spring or summer of 2003 and questioned her about whether there were any leads on the Sheeler case.  (Tr. at 1256–57.)  She claimed that Davis was that same man.  She did not initially report the encounter to

21

the police.  Tari Paxton, the owner of Annie's Place, confirmed much of Fowls testimony.  (Tr. at 1282–85.)

48.    Detective Steven Vanoy, testified that a kitchen towel had been found next to a dish strainer in the kitchen.  Detective Vanoy testified that DNA analysis identified the DNA found on the towel to be that of a male.  (Tr. at 1316–17.)

49.    On March 1, 2004, after receiving information from Florida, Det. Vanoy focused on Davis as a suspect.  He gathered information on Davis' background trying to verify if he was in Newark in July 2000.  He also obtained a DNA sample from Davis and submitted it for testing.  He claimed that the DNA matched that on the towel.  (Tr. at 1328.)

50.    Detective Vanoy went to Florida to interview Davis.  The entire interview was taped without Davis' knowledge.  Detective Vanoy testified at length about this interview, his opinions and his methods of attempting to coerce Davis into confessing.  (Tr. at 1330–60.)

51.    After Det. Vanoy obtained the results of DNA testing, Davis was arrested for Sheeler's murder.  Detective Vanoy interviewed him a second time in Newark. This interview lasted five hours.  No attempt to tape this interview was made. Davis denied being involved in Sheeler's murder.  (Tr. at 1355.)

52.    Detective Vanoy conceded that Davis never confessed in either interview. (Tr. at 1376–77.)  Although Det. Vanoy asked if Dana Davis, one of Roland's

22

brothers, had ever been to the Sheeler residence, he did not ask about Randy, Roland's other brother.  He also did not ask about the relationship between Roland and Randy.  (Tr. at 1379.)

53.     Richard Hummel served time in the Licking County Jail for a DUI on October 24, 2004.  (Tr. at 1389.)  Hummel claimed that he met Davis while in the jail and while they talked Davis admitted stabbing Sheeler five or seven times and stated something about blood on her face and that they had brought him up here on DNA evidence.  (Tr. at 1394.)  Hummel claimed that the state did not give him anything in exchange for his testimony.

54.     Detective Elliget testified about processing the items in the apartment for fingerprints.  No prints matched Davis.  (Tr. at 1429.)  There was also no evidence of blood in the spare bedroom or the northeast bedroom.  Detective Elliget testified that he found what he considered to be a "wipe" pattern on several of doorknobs. (Tr. at 1431.)  In the kitchen, Det. Elliget found blood near the faucet.  This was subsequently confirmed with a DNA test.  In addition, one towel found next to the strainer tested for blood.  That towel was sent to a DNA expert for analysis.  (Tr. at 1447.)  Fingerprints were discovered on one of the plates in the strainer.  They did not match Davis.  (Tr. at 1448–49.)

55.     All DNA recovered from the victim's clothing came from the victim. Fourteen usable finger prints and three palm prints were obtained from the

23

apartment.  No person was ever identified by the prints.  They did not match Davis. (Tr. at 1498–99.)  A cutting from the kitchen towel which had one blood spot on it was submitted to BCI.  BCI found no DNA.  (Tr. at 1540–41.)

56.     Dr. Ramen Tejwani testified that DNA analysis on the blood found on the kitchen towel did not match the victim.  Dr. Tejwani did presumptive testing on the oral, vaginal and rectal swabs taken from Sheeler.  There was a positive presumptive test for semen on the oral swab.  (Tr. at 1579.)  Additional testing only found the victim's DNA on the oral swab.  (Tr. at 1580.)  No semen was found in any of the other blood stains.

57.     The state also presented Meghan Clement, the technical director in the forensic identity testing department at Laboratory Corporation of America Holdings, Incorporated.  (Tr. at 1655.)  Clement testified that there were three areas on the fitted sheet taken from Sheeler's bedroom that contained male DNA and that Davis could not be excluded as a possible contributor of that DNA.  (Tr. at 1683–86.)  In addition, male relatives of Davis could not be excluded.  (Tr. 1686–87.)

58.     The Defense presented one stipulation:  that Randy L. Davis, Roland Davis' brother, died as a result of an auto accident on Nov. 26, 2002, more than two years after Sheeler's death.  During the course of the autopsy a sample of blood was

24

collected and preserved.  The sample was available at Licking County Coroner
Office.

59.    The jury returned guilty verdicts on all counts and specifications.  (Tr. at
1978.)

60.    The penalty phase began on Monday, July 11, 2005.  The Court merged the
escaping detection specification with the remaining specifications but refused to
merge the kidnapping specification with the aggravated robbery specification.  (Tr.
at 2001.)  The state moved to admit all evidence, testimony and exhibits from the
trial phase into evidence and then rested.  (Tr. at 2030.)

61.    In mitigation, the defense presented the testimony of Davis' aunt, Ruth
Cummings who described the home life of her sister (Davis' mother, Marie).  Her
parents were extremely religious and very strict.  (Tr. at 2039.)  The girls were not
allowed to socialize in any manner with friends or classmates.  There was no
dating permitted.  Davis' mother, Marie, was never permitted to date.  She
subsequently ran away with Tom Davis who she then married.  Cummings
described the marriage as disastrous.  Tom Davis, Roland's father, was very
abusive and an alcoholic and not a fit father or husband.  Ruth never saw Tom play
with his children and never saw him help with homework.  (Tr. at 2046.)  He did
not support the family financially or emotionally.  She recalled her sister calling
for food and for money for the bills that were unpaid.  She recalled seeing bruises

25

on her sister and vividly recalled seeing Tom Davis shove her from wall to wall on at least one occasion.  She described her sister having to act like a servant to Tom Davis.  (Tr. at 2048–50.)

62.     The mental and physical abuse of Marie Davis was ongoing and constant. At one point Marie left Tom.  Her mother and father took Randy, the youngest child (Marie had four children with Tom) but the other children, including Roland, were put in an orphanage for several months.  Cummings did not recall ever visiting the children at the orphanage.  (Tr. at 2053–54.)

63.     When Marie learned Tom had placed the other kids in the orphanage, she returned to Newark, got her children and returned to the marriage.  The violence continued and she repeatedly saw her sister with bruises.  (Tr. at 2060–62.)

64.     Marie left a second time when Roland was eighteen years old.  At that time, she moved to Florida with Roland, Dana and Todd.  Randy continued to live with his father, Tom.  Cummings described Roland as a devoted grandson to her parents.  She also described a speech impediment and stutter that Roland had since he first learned to talk.  (Tr. at 2064.)  Roland had hearing problems and at some point had surgery on his ears.  She believed surgery was put off long after it was recommended.  She also did not think that the kids were ever taken to doctors or dentists.  (Tr. at 2066.)

26

65.     Dana Davis, Roland's younger brother, described an abusive alcoholic father who came home drunk every day of the week, accused his mother of messing around, and abused her physically.  Dana also recalled seeing bruises and black eyes on his mother.  He estimated that Tom beat his mother four to five times a week.  Although Tom drove them to church on Sunday, he did not attend.  He would get so drunk while the family was in church that he would be unable to drive them home.  Dana recalled the night his mother stabbed his father and was taken to jail.  She had been ironing when Tom came running into the house, red in the face and very drunk.  His mother grabbed a butcher knife to protect herself and his father ran into it.  He also vividly recalled Tom beating Roland with a belt up and down the steps.  (Tr. at 2087.)  He recalled his brothers trying to intervene to stop his father from beating his mother but they would get hit as well.  He also recalled a time when his mother took the kids to visit Tom and his father locked them in an attic.  Eventually his mother left Tom and took the kids with her to Florida.  Roland was old enough to work and Dana described how he helped watch the younger kids while his mother worked two jobs.  Eventually Roland got a job and his mother was able to quit one of her jobs because Roland helped with the expenses.

66.     Dana described his brother as someone that took care of him when he was younger.  Dana explained that Roland gets real emotional, sometimes jealous and

27

angry.  (Tr. at 2094.)  Given their background, not surprisingly, all the boys had tempers and sometimes got into fights.  Dana has no relationship with his father.  He has suffered from problems with substance abuse and trouble with the law, as had his older brother Randy.  His sister followed his mother's path marrying right out of high school.  (Tr. at 2099.)

67.     Dana also recalled the problem Roland had with his ears when he was young.  He recalled that Roland's ear would drain on the pillow.  He also recalled people making fun of Roland because of his speech problem.  (Tr. at 2104.)

68.     Dolly Sidle was an old friend of the family.  Dolly described Roland's early years and his life with Tom Davis.  She confirmed that Davis was a mean drunk that wanted his beer and wanted to be left alone.  She never saw any positive interaction with the kids.  (Tr. at 2132.)  She recalled always seeing Marie, Roland's mother, with bruises—some of which were severe.  Dolly noted Roland's speech impediment and recalled that he would stutter more when his father was around.  (Tr. at 2137–38.)  She also knew that the elder Davis' had financial problems and often had to rely on Marie's parents for help to pay the bills.

69.     Susan McGuire also had known Roland and his family as he grew up.  She described Tom Davis as always yelling and screaming at his family, and as surly and hateful at times.  She knew even as child that he drank daily.  (Tr. at 2153.)  She also recalled Tom Davis abusing Roland and calling him a "retard."  He often

28

cussed him out.  Tom Davis would rip the phone cord from the wall and the kids would come over to her house to call the police.

70.    Rose Weimer, Roland Davis' mother, explained her background.  (Tr. at 2166.)  She described her marriage to Tom Davis as "pure hell."  She was physically abused, tortured and knocked around.  Her parents believed that you had to stick with marriage regardless of the problems, and she had a very difficult time leaving Tom Davis.  (Tr. at 2167–68.)  She tried to leave at one point but learned her kids had been put in an orphanage so she returned.  (Tr. at 2170.)  She described that her kids attempted to protect her, but were assaulted by her husband. Finally after years of abuse and threats she left for Florida.  Roland helped with the younger kids and helped for a long time to help pay bills.  He would buy food and pay the rent and was always available if she needed him.

71.    Rose testified about Roland's stutter and learning from a hearing test the school conducted he had a perforated ear drum.  She thought that he had problems hearing before the test but Tom Davis would not allow her to spend money on doctors for the kids.  Roland never complained about anything although he was often teased and ridiculed.  (Tr. at 2182–83.)

72.    The jury returned a death verdict.

73.    On July 15, 2005, the court sentenced Davis to death and ten years consecutive sentences on the other felonies.  (July 15 Tr. at 33–34.)

29

**PRETRIAL GROUNDS FOR RELIEF**

**First Ground for Relief:**

**ROLAND DAVIS WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL, TO COUNSEL, TO PRESENT A DEFENSE AND TO PRESENT MITIGATION AND HAVE THAT MITIGATION EVIDENCE CONSIDERED AND GIVEN EFFECT BY THE JURY WHEN THE TRIAL COURT ORDERED HIM TO WEAR A STUN BELT DEVICE ON HIS ARM WITHOUT FIRST HOLDING A HEARING ON THE NECESSITY FOR SHACKLING.**

74.   It is prejudicial per se to have restraints on the accused, and restraints are only to be used as a last resort. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *Earhart v. Konteh*, 589 U.S. 337, 349 (6th Cir. 2009). Shackles can interfere with the accused's ability to communicate with counsel and to pay attention and participate during trial, violating the defendant's constitutionally protected rights. *Deck v. Missouri*, 544 U.S. 622, 631 (2005); *Kennedy v. Cardwell*, 487 F.2d 101, 106 (6th Cir. 1973).

75.   The burden is on the State to make a "clear showing of necessity" before any type of shackling is permitted. *Kennedy*, 487 F.2d at 106; *Woodards v. Cardwell*, 430 F.2d 978 (6th Cir. 1970). Before a defendant is secured with a stun belt, the State must prove that there is a compelling need for the defendant to be restrained, independent of the crime for which the defendant is standing trial. A trial court must hold a hearing before determining whether shackling is necessary and what type of security measures are reasonable. *Holbrook*, 475 U.S. at 569. Thus, any

30

decision to order a defendant to wear a stun belt or similar type of restraint must be based on an individualized determination.

76.     The trial court ordered Davis to wear a "Band-It" sleeve on his arm during trial.  The electrical device can be set off by the officer holding the control, or automatically on movement.  The device caused Davis to have to wear a sweater in the heat of June/July because he could not button his shirt over the bulky device. The fact that the air conditioning in the courtroom was broken at various times during trial, made Davis' bulky attire even more noticeably unusual, thus drawing attention to the presence of the Band-It.  Furthermore, the deputies in control of the device constantly taunted Davis to run so they could shock him.

77.     No hearing was held and there is no evidence in the record of any need for restraints or any type of shackles or stun belt-type device.  There was no evidence Davis had caused or threatened to cause any disruption in the courtroom.  In addition, there were always two deputies in the courtroom for security purposes.

78.     The stun belt device distracted Davis throughout the trial and substantially interfered with his right to a fair trial, his ability to consult with counsel, and his ability to present a defense during the trial.  Similarly, being forced to wear the stun belt substantially interfered with Davis' right to a fair trial, to counsel, to present a defense, and to present mitigating evidence and to have that evidence

31

considered and given effect by the jury during the penalty phase of his trial. (See Post Conviction Pet., Exs. B, N, O, P, Q , R).

79. There was no justification to force Davis to be restrained. Along with the inherent prejudice that was present because Davis' stun belt was visible, the particular psychological and physical impact that it had on Davis prejudiced him during his trial and sentencing. Thus, at both phases of his trial, Davis was deprived of a fair trial, due process, the right to the effective assistance of counsel, to present a defense, and to present mitigation evidence and have that mitigation evidence considered and given effect by the jury, to his prejudice, under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

80. To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

81. This Court should issue the writ.

## JURY SELECTION GROUNDS FOR RELIEF

**Second Ground for Relief:**

**ROLAND DAVIS WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL AND AN IMPARTIAL JURY CONTRARY TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS WHEN HE WAS FORCED TO STAND TRIAL IN LICKING COUNTY, OHIO, AMIDST PERVASIVE PRE-TRIAL PUBLICITY.**

82.    The Fifth, Sixth, Eighth, and Fourteenth Amendments guarantee to the

accused a public trial by an impartial jury:

> In essence, the right to a jury trial guarantees to the
> criminally accused a fair trial by a panel of impartial,
> "indifferent" jurors.  The failure to accord an accused a
> fair hearing violates even the minimal standards of due
> process.  "A fair trial in a fair tribunal is a basic
> requirement of due process."

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Murchison*, 349 U.S. 133,

136 (1955); *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510

(1927)).

83.    Concepts of due process and a fair trial encompass trials that are not

overwhelmed by pretrial publicity.  *See Sheppard v. Maxwell*, 384 U.S. 333

(1966); *Rideau v. State of Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd*, 366 U.S.

717 (1961).

84.    Davis was denied due process and a fair trial by an impartial jury due to

pervasive pre-trial publicity that flooded Licking County, Ohio.  Davis' case

received extensive media coverage.  (Post Conviction Pet., Ex. J.)  Prospective

jurors knew of this case by television, radio, newspapers, and word of mouth. (*See, e.g.*, Tr. at 196; 208; 545.)  As a result of this extensive publicity, many prospective jurors knew about the facts of this case.  (*See, e.g.*, Tr. at 208; 545.) Moreover, several prospective jurors admitted that they had formed opinions about Davis' culpability from publicity they had seen or read.  (*See, e.g.*, Tr. at 195; 196; 211; 212; 221; 284; 285.)

85.     The trial court denied counsel's motion for individual sequestered voir dire, so voir dire on publicity was done in groups of six jurors.  (Tr. at 335–36.)  Thus, other jurors were exposed to the view points of jurors who had already formed opinions based on publicity.

86.     Moreover, the relatively small size of Newark and Licking County made the effects of pervasive publicity more pronounced.  Indeed, Licking County had had only one prior jury trial that resulted in a death sentence before Davis' trial.  The infrequency of capital cases in Licking County, Ohio, doubtless made Davis' trial a matter of high public interest.  All of these factors coalesced to create an atmosphere in which Davis was denied the presumption of innocence by the jurors.

87.     The trial court misapplied the law.  When reviewing whether to grant a change of venue, the court must make two inquiries.  First, the court must determine whether, due to the pretrial publicity, there is a presumption of prejudice such that the trial court should not have attempted to seat a jury.  *Patton v. Yount*,

467 U.S. 1025, 1031 (1984).  In such cases, the trial court cannot rely upon the claims of jurors that they can be fair and impartial.  *Id.*  The second inquiry is whether the seated jury could remain impartial in the face of the negative pretrial publicity, and the measures that were taken to ensure a fair and impartial panel. *See Estes v. Texas*, 381 U.S. 532, 542–44 (1965).

88.     Prejudice should have been presumed.  Media coverage and pretrial publicity blanketed Licking County, Ohio.  (Post Conviction Pet., Ex. J.)  This extensive publicity was adverse to Davis and denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

89.     To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

90.     This Court should issue the writ.

## Third Ground for Relief:

**DAVIS WAS DENIED A TRIAL BY JURY DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY AND EQUAL PROTECTION UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE OF THE UNDER-REPRESENTATION OF AFRICAN-AMERICANS ON HIS JURY.**

91.    The Fifth, Sixth, Eighth, and Fourteenth Amendments guarantee a jury with a "jury drawn from a fair cross section of the community." *See Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).  In order to demonstrate a fair cross-section violation, Davis must establish (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process.  *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

92.    To establish a federal equal protection violation to the selection and composition of the petit jury, Davis must demonstrate by statistical evidence a significant discrepancy in the number of persons of a certain class in the community and the number of those persons on the jury venires, which evidence suggests discrimination.  *See Washington v. Davis*, 426 U.S. 229, 239–41 (1976).  While an equal protection claim resembles a fair cross-section claim, the purposes are different.  The purpose of an equal protection claim is to determine whether the disparity in the jury venire is the result of a discriminatory purpose.  That is, were

36

members of a discrete group intentionally denied the opportunity to serve on a jury? The inquiry in a fair cross-section claim focuses on the representativeness of the jury venire. *Duren*, 439 U.S. at 368 n.26.

93. Davis has demonstrated violations of both the fair cross-section requirement and equal protection. No African-Americans served on Davis' jury. (Post Conviction Pet., Ex. F.) Similarly, No African-Americans served on the jury in the last capital case where the death penalty was imposed in Licking County, Ohio. (Post Conviction Pet., Ex. G.) Statistical data on the population characteristics of Licking County, Ohio demonstrate that the absence of African-Americans in both capital trials was not fair and reasonable in relation to the number of African-Americans in the community. (Post Conviction Pet., Exs. H, I.) African-Americans are under-represented in Licking County capital juries.

94. Davis thus established both a fair-cross-section claim and an equal-protection claim of violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

95. To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

96. This Court should issue the writ.

37

**Fourth Ground for Relief:**

**THE JURY SELECTION PROCESS IN ROLAND DAVIS' TRIAL DENIED HIM AN OPPORTUNITY TO ENSURE THAT A FAIR AND IMPARTIAL JURY, FREE FROM BIAS OR PRECONCEIVED OPINIONS ABOUT GUILT OR PUNISHMENT, WAS SEATED, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

    **A.**     **Davis was denied the thorough and adequate voir dire necessary to develop the factual bases for challenges for cause and to exercise peremptory challenges of jurors who were exposed to extensive pretrial publicity or who were biased on questions of guilt, innocence, or sentence.**

97.     Where, as here, a small community has been saturated with sensational news stories about the facts of a crime, the voir dire must go beyond "general inquiries [in order to detect] those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Morgan v. Illinois*, 504 U.S. 719, 734–35 (1992). The relatively small community of Newark, Ohio had received substantial amounts of news coverage about this crime. The community grief and outrage over the murder of an elderly woman in her home required a thorough voir dire to uncover jurors who would not be able to judge the case on evidence presented in the courtroom. The voir dire permitted by the court was insufficient to uncover these jurors: little or no inquiry was made into the extent of the prospective juror's knowledge of the case or whether the juror would be able to put aside that knowledge and fairly try the case based solely on the evidence presented in the courtroom. Without this inquiry, the limited questioning about

38

whether the juror had formed so fixed an opinion that it could not be overcome by evidence was meaningless. *See Morgan*, 504 U.S. at 734–35.

98.    Davis was thus denied his right to a fair and impartial jury able to judge the case solely on the evidence presented in the courtroom under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1.    The pretrial media coverage was extensive.

99.    This crime involved the murder and robbery of an elderly woman inside of the apartment she had lived in for over twenty years.  The nature of the crime as well as the years-long investigation attracted widespread attention throughout the community and naturally engendered a great deal of community interest.  (*See* Tr. at 1250–75 (testimony of Susan Fowls); Tr. at 1276–302 (testimony of Tari Paxson); Tr. at 1310 (testimony of Det. Vanoy ("Q:  . . .  in this particular case, did [Mrs. Sheeler's] . . . death become publicized around the Newark area?  A: Highly publicized.")); Post Conviction Pet., Ex. J.)

100.   Because of the widespread publicity and saturation of the community with information about the crime and investigation, Davis was entitled to a change of venue.  *See Irving v. Dowd*, 366 U.S. 717, 725–29 (1961); *Nevers v. Killinger*, 169 F.3d 352, 364 (6th Cir. 1999); Second Ground for Relief, *supra*.[1]

---

[1] To the extent that counsel for Davis failed to litigate a Motion for Change of Venue and to more fully examine the prospective jurors on these subjects, and did not more fully develop the record concerning the level of pretrial publicity, or the

### 2.    The limited voir dire questioning did not elicit any pertinent information concerning the effect of the pretrial publicity.

101.   Counsel were aware of the emotionally charged atmosphere that existed and took steps to ensure that the jury was free from the biasing effects of this negative and prejudicial pretrial publicity.  (*See* Tr. at 335–36 (referencing Defense Motion for Individual and Sequestered Voir Dire).)  Despite the publicity, and community interest, a change of venue was apparently not considered, by counsel or the court.

102.   The trial court, and counsel, ignored clearly established federal law announced by the United States Supreme Court requiring a thorough voir dire that detects views that prevent or substantially impair jurors from deciding the case on facts presented in the courtroom and failed to adequately question prospective jurors on their knowledge of the case and whether and how they could put whatever knowledge they had out of their minds.  *Morgan*, 504 U.S. at 734–35.

103.   Where more than forty prospective jurors are aware of facts about the crime, (*see* Tr. at 26–27, 208), a thorough voir dire into the extent of jurors' knowledge was required.  Without such inquiry, there could be no factual determination about how much the juror knew and whether the juror could actually put that knowledge aside and decide the case based on the evidence presented in the courtroom.

---

need for a change of venue, counsel's performance fell far below the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

*Morgan*, 504 U.S. at 729 (one factor in "the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors").

104. Of the forty jurors who had knowledge of the crime, six claimed they could not be fair and impartial. (Tr. at 28–29.) Only two of these six were questioned individually by defense counsel to determine the extent of their knowledge. (*See* Tr. at 283–85.) This is hardly the thorough voir dire necessary to uncover bias. *See* other subclaims in Fourth Ground for Relief, and Eighteenth Ground for Relief, *infra*.

105. While jurors with opinions may serve if those opinions are not fixed, limiting inquiry into that exposure resulted in a voir dire that was largely meaningless in Davis' trial. The voir dire examination here did not elicit adequate information so that counsel could intelligently and knowingly develop challenges for cause or exercise peremptory challenges or for the court to be able to rule on them. The voir did not provide counsel or the court with sufficient information with which to decide those challenges.

106. Without inquiry into the facts, the voir dire here left the assessment of the juror's knowledge of the facts, his ability to put those facts aside, and the assessment of his own biases entirely in the hands of the juror himself.

107. The limited questioning here did not elicit any pertinent information concerning the effect of pretrial publicity, and permitted the seating of a partial

41

jury, a denial of due process in violation of the Fifth, Sixth, Eighth and Fourteenth
Amendments.

### 3.    Roland Davis was denied a fair and impartial jury.

108.   The right to a fair and impartial jury is best effectuated by a thorough voir
dire of the prospective jurors, *see United States v. McVeigh,* 918 F. Supp. 1467,
1469–70 (W.D. Okla. 1996), in part to identify unqualified or biased jurors.
*Morgan*, 504 U.S. at 729–30.  Because the voir dire was inadequate, Davis' ability
to exercise his peremptory challenges in an informed manner as well as his ability
to develop challenges for cause was denied.  *See J.E.B. v. Alabama,* 511 U.S. 127,
143–44 (1994).[2]

109.   Without adequate voir dire "to lay bare the foundation of [Davis'] challenge
for cause against" prospective jurors who may have harbored prejudices against the
defendant or who may not have been able to fully consider issues of guilt or
innocence or give weight to specific mitigating factors or fully consider the
appropriateness of a life sentence, Davis' "right not to be tried by such jurors" was
rendered "nugatory and meaningless." *Morgan*, 504 U.S. at 733–34.  Leaving the
assessment of their own bias in the hands of the individual jurors themselves

---

[2] Davis had a substantive right to exercise peremptory challenges under Ohio Rev.
Code § 2945.25 and Ohio R. Crim. P. 24.

deprived Davis of his right to a fair and impartial jury.  *See Morgan*, 504 U.S. at 735.

110.   The amount of publicity surrounding this incident, and the number of prospective jurors who had knowledge of specific facts about the case demanded a far more comprehensive voir dire examination.  Despite this, the trial court and counsel for both parties conducted only a cursory voir dire.

111.   Inquiring of the prospective jurors whether they thought that they had any opinions that could not be overcome by the evidence simply does not satisfy the need for a thorough voir dire required to ensure a trial by a fair and impartial jury.  In this situation, the failure to conduct an adequate voir dire by only individually examining two of six jurors who stated they could not be fair and impartial on the subject of pretrial publicity deprived Davis of due process and a fair trial.

112.   As the voir dire procedure continued, and the trial court insisted on continuing the questioning of prospective jurors long past regular court hours, (Tr. at 759 ("I'm getting punchy.  It's twenty-five til six"); Tr. at 774 ("The Court: What was I going to say?  The next group, also, they've had more chance to stretch their legs, they got some food so they will not be as punchy as we are.")), counsel's examination of prospective jurors became increasingly incoherent and increasingly brief.  Counsel's voir dire of the final group of six jurors consisted of three and a half pages of statements from defense counsel—without posing one question to

any of the jurors. (Tr. at 797–800.)  Effective voir dire must encompass a search

for biased and unqualified jurors.  A group voir dire in which counsel for the

defendant asks no questions of the prospective juror will not yield any information

that would be helpful to counsel or the court in determining whether or not any of

the prospective jurors were biased or otherwise unqualified.

113.   Because of the trial court's and counsel's own limitations on voir dire, it is

impossible to determine whether the jury was free from outside knowledge or free

from bias.[3] Davis was thus denied due process and a fair trial by an impartial jury

in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  This was

prejudicial to Davis because the publicity and community interest placed too many

pressures on the jury to convict and sentence Davis to death to permit fair and

impartial consideration based on the evidence presented in the courtroom.

114.   To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of these claims, its adjudications were contrary to, or

unreasonable applications of, clearly established federal law, and/or based on

unreasonable determinations of the facts.

---

[3] To the extent that counsel for Davis did not more fully develop the record
concerning the level of pretrial publicity and did not more zealously demand to
question jurors on pretrial publicity, counsel's performance was not in keeping
with the prevailing professional norms and was therefore, unreasonable and denied
Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and
Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

115. This Court should issue the writ.

**B. The trial court applied an improper standard in excusing prospective jurors who expressed objections to capital punishment but who were not unequivocally opposed to capital punishment under all circumstances and could fairly consider death as a sentence.**

116. The trial court failed to apply Ohio Rev. Code § 2945.25(C) when considering challenges for cause for prospective jurors who had reservations about the death penalty. Ohio Rev. Code § 2945.25(C) is the legislatively adopted standard for excusing jurors because of their views on capital punishment and requires the juror to unequivocally state that he could never impose the death sentence. This standard was adopted by the Ohio legislature from the standard enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 521–22 (1968).

117. Later, in *Adams v. Texas*, 448 U.S. 38, 45 (1980), and *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Supreme Court adopted a lesser standard under the federal constitution: if the prospective juror's views would prevent *or substantially impair* the performance of the juror's duties in accordance with the juror's instructions and oath, then the juror is subject to a challenge for cause. A juror's general unwillingness to impose the death penalty may be found to constitute an impairment under the *Witt* standard, although the same hesitance would not be found to be unequivocal under *Witherspoon* and Ohio Rev. Code § 2945.25(C). Such a juror would be subject to removal for cause under *Witt*, but not under *Witherspoon* and Ohio Rev. Code § 2945.25 (C).

45

118. The standard in Ohio Rev. Code § 2945.25(C) provides more protection to the capital defendant than *Witt*. Therefore, Davis has a due process right in having the state of Ohio apply its own legislative enactments even if those standards are more strict than those dictated by the federal constitution. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985). The state is always free to impose higher standards then the federal constitution mandates. *See Michigan v. Long*, 463 U.S. 1032, 1038–42 (1983). The state cannot set lower standards then the federal constitution mandates. The trial court consistently applied the less stringent *Witt* standard rather than the more stringent Ohio Rev. Code § 2945.25(C) standard in excusing jurors for cause based on their views on the death penalty. (*See* Tr. at 567 (Juror Spearman); Tr. at 629–30 (Juror Smith); Tr. at 727–28 (Juror Barsky); Tr. at 728–29 (Juror Harden); Tr. at 729 (Juror Hanson).)

119. Roland Davis' right to a fair and impartial jury chosen from a fair cross section of the community under Ohio Rev. Code. § 2945.25(C) (limited as it was to those willing to impose a sentence of death), as well as the standards of Ohio Rev. Code § 2945.25(C) and *Witherspoon* were infringed because the trial court improperly excused jurors who were otherwise qualified solely because of their views on the death penalty.

120.   Davis was likewise denied due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments.[4]

121.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

122.   This Court should issue the writ.

**C.   Trial counsel failed to fully examine jurors about whether their opinions on the death penalty would prevent them from following the court's instructions and fairly considering the imposition of the death penalty.**

123.   Whenever a juror indicated any hesitancy about imposing the death penalty, counsel failed to make sufficient inquiry into the juror's feeling before the court granted the state's challenge for cause.  Counsel likewise failed to object or fully object to these cause challenges.  (Tr. at 566, 567; 611–28, 629; 721–25, 726.) Failing to fully question and rehabilitate such jurors denied Davis a fair and impartial jury composed of a fair cross-section of the community as well as the

---

[4] To the extent that counsel failed to rehabilitate these jurors or to zealously object to the trial court's use of the improper standard and to the trial court's dismissal of otherwise qualified jurors, their performance likewise fell far below the prevailing professional norms, and was therefore unreasonable, depriving Davis of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.[5]

124.   The primary purpose of death qualification is to identify jurors whose views on the death penalty are so strong (in favor of or opposed to) that they cannot be impartial in sentencing.  *Morgan*, 504 U.S. at 728–29.  Counsel must develop facts indicating whether a juror's views on the death penalty would or would not interfere with their impartiality at both phases of the trial.

125.   Improper limitations on voir dire here deprived Davis of the opportunity to fully develop (or defend) challenges for cause.  Counsel failed to defend against the state's challenges for cause to juror's because of their feelings about the death penalty and Davis was thus denied due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

126.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

---

[5] To the extent that counsel for Davis did not more zealously demand to question jurors on their ability to set aside their views on the death penalty, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

127.   This Court should issue the writ.

**D.  The trial court refused to permit counsel to fully examine prospective jurors about potential mitigating evidence, about whether they could consider a life sentence for someone who had killed an elderly woman in her home or whether they would automatically vote for death upon a showing of guilt.  The failure to fully examine on these subjects resulted in jurors who would automatically vote for the death penalty and who would not consider mitigating evidence.**

128.   Counsel and the court failed to examine prospective jurors as to whether they would automatically impose a sentence of death upon a finding of guilt or whether they could fairly consider mitigating evidence, or whether they could ever consider a life sentence for someone who had killed an elderly woman in her home, and whether they could consider specific mitigating evidence.  Counsel did not question these jurors about their inclinations to impose the death penalty in every murder case and were therefore unable to successfully challenge any of them for cause.

129.   Counsel and the court failed to fully question jurors who expressed a willingness to impose the death penalty for any murder about whether they could consider mitigating evidence and consider imposing a life sentence and counsel failed to successfully challenge these jurors for cause.  (*See* Tr. at 630–31 (Juror Marston); Tr. at 603 (Juror Cronin).)

130.   The court did not permit counsel to question prospective jurors about whether they could ever consider mitigating evidence and the imposition of a life

49

sentence under the particular facts of this case, specifically that the victim was an elderly woman who was murdered in her home.  Here, counsel failed to inquire into and therefore discover any such biases on the part of prospective jurors. General inquiries about whether the juror "could be fair" or "follow the law" are always insufficient to uncover such biases, "their protestations to the contrary notwithstanding." *Morgan*, 504 U.S. at 735.  This failure to uncover these biases was particularly critical here where the prosecutor consistently and improperly attempted to exploit these facts in seeking a conviction and a sentence of death. *See* Thirteenth Ground for Relief, Sixteenth Ground for Relief, *infra*.

131.   Counsel failed to examine prospective jurors about this relevant information, to develop and exercise challenges for cause, and to exercise peremptory challenges against these jurors who could not fairly consider mitigation or a life sentence under the factors of this case.  This denied Davis the effective assistance of counsel, due process, a fair trial, and a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See Morgan*, 504 U.S. at 729.

132.   The court denied challenges for cause for jurors who stated that they would automatically impose a death sentence upon conviction for murder.  Because these jurors could not fairly and impartially consider all possible sentences, they were unqualified.  The failure to remove these jurors rendered the conviction unfair and

the sentence handed down unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

133.   Davis was thus denied due process and a fair trial by an impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  These rights were violated here, and this was prejudicial to Davis because he was entitled to be fair and impartial consideration for his sentence. [6]

134.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

135.   This Court should issue the writ.

**E.    Comments by the prosecutor during voir dire misled the jurors about their role in the determination of sentence and prevented the jury from considering compelling mitigating evidence.**

136.   The prosecutor improperly indoctrinated prospective jurors about what constituted mitigating evidence, about whether the jurors were required to consider

---

[6] To the extent that counsel failed to zealously demand the right to fully inquire into the juror's knowledge of the facts of the case and their reactions to those facts as well as inquire into the true feelings and abilities to consider mitigation and a sentence of life imprisonment, their performance fell far below the prevailing professional norms.  *See* Eighteenth Ground for Relief, *infra*.  To the extent counsel failed to adequately challenge these jurors, their performance likewise fell far below the prevailing professional norms, and was therefore unreasonable, depriving Davis of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *Id.*

mitigating evidence, and about the requirements for unanimity for a life sentence. The prosecutor likewise improperly explained and listed mitigating factors—known to not exist in this case—to the prospective jurors in a manner that suggested that these were the only compelling mitigating factors that could justify the jurors imposing a life sentence.  The prosecutor then argued in closing argument at the penalty phase that these mitigating factors that he had discussed and listed in voir dire did not exist, and therefore the death penalty was the only appropriate sentence.  The actions of the prosecutor had the effect of negating and preventing the jury's consideration of proffered mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

137.   Throughout the voir dire, the prosecutor repeatedly told the jurors that they did not have to consider any proffered evidence as mitigating.  (*See* Tr. at 365–66; Tr. at 374–75; Tr. at 376–77 ("the jury has to be unanimous as to . . . what sentence of those four options is appropriate"); Tr. at 476; Tr. at 479–81 ("Just because someone says it's mitigating, if you don't think it's mitigating, it's not mitigating."); Tr. at 490; Tr. at 523–31; Tr. at 600 (suggesting that same crime deserves same punishment); Tr. at 604–08; Tr. at 660–62; Tr. at 692 ("[V]erdicts would require a unanimous decision."); Tr. at 742–52; Tr. at 780–93.)  Neither defense counsel nor the trial court took any steps to remedy these misstatements by the prosecutor, leaving the prospective jurors with misinformation about their roles

52

in determining the sentence, about the requirements for unanimity, about what they could consider as mitigating evidence and about the power of one juror to independently find and weigh mitigating evidence and to prevent the imposition of a death sentence.

138.   One of the primary mandates of Eighth Amendment jurisprudence is the requirement that the jury be given clear guidance so that it can arrive at a reliable and appropriate sentence. *Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring).  The prosecutor's actions here mislead the jury (and the individual jurors) about their role in determining sentence, in individually finding and weighing evidence as mitigation, and in individually determining the appropriate sentence.  The requirement that the jury's discretion be limited and clearly guided minimizes the risk of the arbitrary and capricious imposition of sentences of death, condemned in *Furman.*  The prosecutor's actions here were designed to and did undermine the careful guidance of the jury required under the Eighth Amendment.

139.   The prosecutor's statements incorrectly informed the jurors that acquitting Davis of the death penalty required unanimity.  These statements were incorrect and misleading under Ohio Rev. Code § 2929.03(D) and *State v. Brooks*, 661 N.E.2d 1030, 1040 (Ohio 1996), and deprived Davis of his right to a fair and

reliable sentencing determination and denied him due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

140.   A second basic principle of Eighth Amendment jurisprudence is the heightened need for reliability in the determination that death is the appropriate sentence in a specific case.  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). To ensure the reliability of the determination that death is the appropriate sentence, there must be individualized consideration of "mitigating factors [that stem] from the diverse frailties of human kind."  *Id.* at 304.

141.   So that it may properly fulfill this constitutional mandate, the jury cannot be mislead as to its role in determining mitigating factors, the unanimity requirements, *Mills v. Maryland*, 486 U.S. 367, 382–84 (1988), or their individual role in determining the sentence.  The prosecutor misled the jury by telling the prospective jurors that any verdict at sentencing would have to be unanimous.  Ohio law is clear that once a jury concludes that it is not unanimous for death, then the jury must continue on to consider the various life sentences.  Ohio Rev. Code § 2929.03(D); *State v. Springer*, 586 N.E.2d 96, 100 (Ohio 1992).  The prosecutor's statements on unanimity misled the jury, thus depriving Davis of due process, a fair and reliable sentencing determination, and an individualized sentencing determination.

142. The prosecutor's repeated statements during voir dire mislead the jurors about its role in determining the existence of mitigating factors. Under Ohio law, each individual juror must determine the existence of any mitigating factors and whether those mitigating factors are sufficient so that the statutory aggravating circumstances did not outweigh those mitigating factors. Ohio Rev. Code § 2929.03(D); *Brooks*, 661 N.E.2d at 1040–41. Should that individual juror determine the existence of mitigating factors and that those factors are sufficient so that the statutory aggravating circumstances do not outweigh them beyond a reasonable doubt, then that juror is obligated to prevent the imposition of a sentence of death by voting for a life sentence. Ohio Rev. Code § 2929.03(D). The prosecutor suggested repeatedly that the jurors would be obligated to impose a sentence of death, but neither the prosecutor, the court, nor defense counsel ever mentioned the individual juror's obligation to prevent the imposition of a sentence of death should that individual juror make the appropriate findings.

143. In addition, there are seven statutorily listed mitigating factors that must be considered as mitigating factors under Ohio Rev. Code § 2929.04(B). Contrary to *Lockett* and basic Eighth Amendment principles, the prosecutor's statements repeatedly informed the jurors that there were no factors that they had to consider as mitigating. These statements prevented the jury as well as individual jurors

from considering and giving effect to valid mitigating evidence, thus denying

Davis due process, a fair trial, and a fair and reliable sentencing determination.

144.  The error in these statements was compounded by the prosecutor's repeated

discussions during voir dire of mitigating factors (that were clearly not present in

this case) as mitigating factors that they could consider in imposing a life sentence.

The prosecutor set these factors up in voir dire as the truly proper factors to be

considered as mitigation—if they existed—and then during closing argument at the

penalty phase relied on the absence of those mitigating factors as justifying a

sentence of death.  This intentional set-up of non-existent mitigating factors

prevented the jury from considering valid and compelling mitigating evidence at

the penalty phase.  The prosecutor set up a list of strong and compelling mitigating

factors in voir dire as the truly proper mitigating factors that could be considered in

mitigation.  The prosecutor was aware that these mitigating factors were not

present in this case.  The prosecutor's action in voir dire created an expectation in

the jurors that the mitigating factors he had discussed would be the mitigating

factors that they would hear about in the penalty phase.

145.  The prosecutor then exploited this in his closing argument in the penalty

phase by stating that the mitigating factors that the jurors had all acknowledged

were important in voir dire were not present here.  The prosecutor continued to

argue that because those mitigating factors were not present, Davis had failed to

56

demonstrate that death was not the appropriate sentence. (Tr. at 2240–42.)  The

prosecutor's creation of this "strawman" of compelling mitigation during voir dire,

that he could then knock down during closing argument at the penalty phase,

prevented the jury from considering other compelling mitigating evidence

presented by Davis that did not comport with the mitigating factors that the

prosecutor had told the jury was important.  The actions of the prosecutor denied

Davis due process, a fair trial, and a fair and reliable sentencing determination

under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[7]

146.   To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of these claims, its adjudications were contrary to, or

unreasonable applications of, clearly established federal law, and/or based on

unreasonable determinations of the facts.

147.   This Court should issue the writ.

### F.     The trial court failed to excuse jurors who knew too much about the crime, the victim or Roland Davis.

148.   Throughout voir dire, many potential jurors explained they had some

knowledge that might render them unfit to sit as jurors.  (*See* Tr. at 28–29.)  The

---

[7] To the extent counsel failed to object to the prosecutor's ongoing misstatements, improper questioning and improper argument as outlined in this subsection, counsel's performance fell far below prevailing professional norms and was, therefore, unreasonable, thus denying Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

failure to more fully explore these subjects in voir dire and to remove such biased jurors denied Davis due process and a fair trial by a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

149.   Where the vast majority of jurors seated in a case are familiar with the facts of the case, a fair trial is difficult.  Where a majority of the jurors are acquainted with or related to the family of the victim, there is not even an appearance of impartiality.  The jury that tried Roland Davis was not a fair and impartial panel drawn from a fair cross-section of the community.

150.   The most important inquiry in voir dire is not the words the juror uses to answer the question "can you be fair," but how the jury answers all questions concerning bias.  *Morgan*, 504 U.S. at 735.  General inquiries about whether the juror "could be fair" or "could they follow the law" were not enough to uncover bias. Clearly, the jurors' personal relationships with the Sheeler family, as well as their knowledge of the case and the history of Roland Davis, prevented them from being fair and impartial, especially in the face of the overwhelming community grief.  The jury was comprised of persons acquainted with the victim or her family, persons who were intimately familiar with the facts of the case, and persons who were familiar with the history of Roland Davis.  Because of this familiarity, the jury that tried Davis could not have been fair and impartial.

151.   To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of these claims, its adjudications were contrary to, or

unreasonable applications of, clearly established federal law, and/or based on

unreasonable determinations of the facts.

152.   This Court should issue the writ.

> **G.     The prosecutor and the trial court impermissibly sought
> commitments from the prospective jurors that they impose the death
> penalty.**

153.   Roland Davis had the right to have his guilt or innocence—as well as his

sentence—determined by a fair and impartial jury.  *See Irvin*, 366 U.S. at 722.

Davis had the right to a fair and impartial jury at the penalty phase of his trial.  *See*

*Morgan*, 504 U.S. at 726–27.

154.   Here, the important principle of basic fairness and impartiality in the

determination of punishment was violated.  During voir dire, the prospective jurors

were asked to commit themselves to the death penalty.  Davis' fate was therefore

improperly entrusted to "a tribunal organized to return a death verdict."  *See id*.

155.   The court, the prosecutor and counsel repeatedly asked the prospective

jurors whether they could sign a death verdict.  (*See* Tr. at 490–92; 561–66; 596–

98; 600–03; 654–56; 667–71; 704–07; 707–12; 721; 746–52; 769–71; 782–93; 788

("you are obligated to sign a verdict").)  The jurors were never asked whether they

could sign a life verdict or if they understood that if they individually concluded

59

that the statutory aggravating circumstances *did not* outweigh the mitigating factors beyond a reasonable doubt, they were obligated to sign a life verdict.

156. The questions on capital punishment improperly skewed the jury selection process in favor of the death penalty. *Witherspoon* and *Witt* (as well as Ohio Rev. Code § 2945.25(C)) prohibit questions that force a prospective juror "to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."

157. These questions operated to identify and exclude jurors with reservations against the death penalty. There was no concomitant inquiry or commitment sought to identify and exclude those jurors with reservations against a life verdict. *Cf. Morgan*, 504 U.S. at 729–30. The focus of the voir dire was to ferret-out those jurors who were biased against a death verdict, in the absence of a concomitant inquiry as to whether the jurors could sign a life verdict, thus conveying the impression that the death penalty was the primary (and preferred) sentencing option.

158. The voir dire by the prosecutor also required the prospective jurors to commit themselves to "the extreme penalty in the case before [them]." *Witherspoon*, 391 U.S. at 522, n.21. The prosecutor repeatedly asked the prospective jurors if they could sign a death verdict. By seeking personal assurances from the prospective jurors that they could sign a death verdict before

60

trial, the prosecutor organized a tribunal for death before the first witness testified; much less before any penalty phase evidence was adduced.  *See id.* at 522.  As the Court made clear in *Witherspoon*, "a prospective juror cannot expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."  *Id.* at 522 n.21.[8]

159.   The improper death qualifying procedures used during voir dire violated Davis' right to a fair and impartial sentencing jury, due process, and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

160.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

161.   This Court should issue the writ.

---

[8] To the extent that counsel failed to object to (and participated in) requiring jurors to commit to signing a death verdict and failure to have juror commit to signing a life verdict fell far below the prevailing professional norms, and was therefore unreasonable, depriving Davis of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

**H.    The court and counsel failed to question a juror about personal problems that would distract from performing duties as a juror and failed to remove that juror.**

162.   During the course of the voir dire proceedings, Juror Wallace twice informed the court and counsel that she was being harassed at work for not getting off of the jury.  On one occasion, Juror Wallace informed the court that her supervisor had suggested that she should use white supremacist language in an attempt to get off the jury.  (Tr. at 826.)  On the second occasion, the same juror informed the court and counsel that he supervisor had not only again harassed her for not getting off of the jury, but that he had fired her because she was going to miss work.  (Tr. at 1078–79.)  The juror reported that she had gone to supervisors higher up in the company and that she had been reinstated.  (*Id*.)

163.   On both occasions, the trial court offered counsel the opportunity to voir dire the juror.  On both occasions, counsel declined to question the juror about these bizarre experiences or whether these bizarre actions by her supervisor would have any effect on her ability to sit as a juror and to fairly and dispassionately try the case based solely on the evidence presented in the courtroom.  (Tr. at 826, 1079.)

164.   Juror Wallace served on the jury and acted as foreperson.  (Tr. at 2314.)

165.   Counsel have an obligation during voir dire to fully examine the jurors to determine if there are any factors about the juror that would disqualify them as a juror and subject them to a challenge for cause.

166.   Likewise counsel have an obligation in voir dire to determine if there are any personal matters concerning the juror that would make it difficult or impossible for the juror to fully concentrate on the job of the jury—to give full attention to the matters being presented in the courtroom and to be able to dispassionately decide the case based solely on the evidence presented in the courtroom.  Clearly, a prospective juror who is being harassed (and fired) from her job for serving on this jury, will have some distractions that could interfere with her ability to perform adequately as a juror.  Counsel and the court had an obligation to voir dire the juror on whether any of these matters would affect her ability to concentrate on the trial and whether these matters might affect the way she viewed the evidence or the outcome.  Neither the judge nor counsel conducted any such inquiry, thereby permitting a potentially contaminated juror to sit (in fact be foreperson) during the capital trial of Roland Davis, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

167.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

168.   This Court should issue the writ.

63

## I.      Conclusion

169.   The actions of the trial court, the state, and counsel failed to ensure that Roland Davis was tried by a fair and impartial jury.  The overwhelming publicity about the crime and the community interest required a "careful and searching voir dire" to determine what biases the prospective jurors had.  This was not done. Likewise the trial court applied the incorrect standard for evaluating whether death hesitant jurors could fairly consider the death penalty and improperly dismissed such jurors.  No inquiries were made as to whether strong death penalty jurors could fairly consider mitigation and a sentence of life imprisonment.  No commitments to signing a life verdict were sought even though commitments to signing a death verdict were improperly sought.  The result was a jury that was not fair and impartial and that denied Roland Davis a fair trial and due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

170.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

171.   This Court should issue the writ.

## TRIAL PHASE GROUNDS FOR RELIEF

### Fifth Ground for Relief:

**UNQUALIFIED OPINION TESTIMONY CONCERNING THE TRUTHFULNESS OF A WITNESS OR A DECLARANT USURPED THE FUNCTION OF THE JURY AND DENIED DAVIS DUE PROCESS, A FAIR TRIAL THE RIGHT OF CONFRONTATION, AND THE EFFECTIVE ASSISTANCE OF COUNSEL.**

172.   Detective Vanoy of the Newark Police Department assisted the prosecutor as the state's representative at counsel table during the trial.  (Tr. at 831.)  Detective Vanoy also testified extensively at the trial, primarily about his investigation of the case, his thought processes in focusing on Roland Davis as the primary suspect, and his interviews of Roland Davis in Florida and later in Newark, Ohio.

173.   Detective Vanoy testified as to his training and experience including his ten years of service with the Newark Police Department which included attending the basic police academy; earning a Bachelor's Degree in Criminal Justice and a Master's Degree in Public Administration; attending a practical homicide school and a two-week homicide seminar at the University of Louisville put on by the Southern Police Institute; and training in the basics of preservation of evidence issues and collection issues.  (Tr. at 1304.)  Detective Vanoy was neither offered nor qualified as an expert on any subject.

174.   Despite his lack of expertise, there was interspersed throughout his testimony, Det. Vanoy's unsupported opinion testimony about the meaning of evidence, about why Davis said and did specific things during the interviews,

about Davis' thought processes, and about when Davis was lying and telling the truth.

175.   Police witnesses may testify about facts that they have discovered or observed.  They may testify about statements the defendant made to them (if properly admitted).  They may even testify about proper police techniques.  They may not, however, give their unsupported opinions about the meaning of specific pieces of evidence, nor may they give their opinions about the defendant's thought processes while being interviewed, nor may they give their opinion about the truthfulness of statements made by the defendant.  Properly qualified experts may give their expert opinion to assist the jury.  Police officers who have not been qualified may not give their opinion on the ultimate question before the jury.

176.   Detective Vanoy was not qualified to present the entire thought process of the Newark Police Department behind the investigation and interrogation, nor was he qualified to give his opinion about the truthfulness of Davis' statements or his opinion of Davis' thought processes during the interrogations.  This testimony was beyond the scope of any purported expertise of Det. Vanoy and usurped the role of the jury to make such determinations about Davis' truthfulness.  Permitting Det. Vanoy to give his dissertation and opinion on the interrogation of Roland Davis denied Davis due process, the right to confront witnesses, a fair trial, the effective

assistance of counsel, and a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.[9]

177.   Detective Vanoy was extensively questioned about the investigation into the death of Elizabeth Sheeler.  He was questioned by the prosecutor about whether the police had received information from an out-of-state law enforcement agency in 2004 concerning Davis as a suspect in this crime.  Without ever revealing what this tantalizing bit of information was, Det.Vanoy responded yes, and then continued "since Mr. Davis at that point was a potential suspect . . . ."  (Tr. at 1320–21.)  This unexplained tip apparently permitted Det.Vanoy to focus all of his energies on demonstrating for the jury that Roland Davis was indeed guilty of this crime.

178.   Detective Vanoy later testified about his interrogation of Roland Davis in Florida.  He testified that he surreptitiously tape-recorded the interview.  (Tr. at 1330.)[10]  Detective Vanoy then continued to testify about the content and details of

---

[9] To the extent that counsel failed to object to any of the testimony of Det. Vanoy, counsel's performance fell far below the prevailing professional norms, and was therefore unreasonable, depriving Roland Davis of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

[10] Neither the tape of this interview nor the transcript of the tape was introduced as an Exhibit or authenticated by Det. Vanoy or anyone else.  *See* Eleventh and Twelfth Grounds for Relief, *infra*.  Counsel's failure to object again fell far below the prevailing professional norms, was therefore unreasonable and denied Davis

the interrogation, and how and why he asked specific questions and his opinion of Davis' truthfulness in his responses.  (Tr. at 1331.)  Despite the fact that the tape was available for playing in open court, the jury was instead provided with Det. Vanoy's interpretation of the session as well as his opinion of what had occurred and why.

179.   Detective Vanoy testified about observing Davis' reaction when he was shown Elizabeth Sheeler's picture during this interview.  He gave an extended answer—including his recollection of Davis' reaction to viewing the photograph and his opinion of what Davis' reaction meant:  "Yeah, she kind of looks familiar. Not really sure.  She may have requested me before.  Just very non-committal, very wishy washy about it."  (Tr. at 1332–33.)  Next Det. Vanoy testified about Davis' reactions when he told Davis Elizabeth Sheeler's name:  "And he kind of—she— Sheeler.  I was thinking maybe Schuler.  You know, he was kind of playing around with the name a little bit as if he didn't even know who—he wasn't putting the face with the name."  (Tr. at 1333.)  Detective Vanoy then repeatedly opined that all of his efforts to get Davis to admit that he knew Elizabeth Sheeler did not jog Davis' memory.  (Tr. at 1334–35.)

---

the effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

180.   The prosecutor and Det. Vanoy continued this dialogue.  "He had a lot of qualifying statements throughout our contact with him. . . .  So, he made a lot of qualifying statements and he didn't commit to a whole lot."  (Tr. at 1337.)  This line of questioning continued for several pages of transcript, culminating in the following lengthy dissertation:

> A:     Again, this came at the very end, towards the very end of the interview.  And again, I— . . . , as best as I can recall it was just kind of like a—just a light bulb went off, because it was shortly after Mr. Davis had mentioned that, . . . we were trying to accuse him of killing Mrs. Sheeler, and I told him, . . . we have to explain why your DNA is in there, Roland, and he says, oh, yeah, Ms. Sheeler.  The first time in the whole interview he called her Ms. Sheeler, which is what the majority of the people that knew Elizabeth called her, Ms. Sheeler, *and that was very telling to me*.  And he then went into the fact that, oh yeah, I used to go over there.  I mean, it was just—it was a 360.  Oh yeah, I used to go over there.  She'd call me.  Sweet old lady.  I'd go down, I'd knock on the door, she'd answer the door.  Sometimes, I may have to wait for her.  There was a table—as you walk into the apartment, there's a table there right on the right.  Sometimes, you know, she'd get her—lift her pocketbook up, take the pocketbook.  He couldn't remember what type of pocketbook.  Sometimes he carried the pocketbook for her.  I think he mentioned that he may have even locked her apartment door for her and then escorted her out to the cab by holding her arm.
>
> Q:     So, this is entirely different than his first response to being shown this woman's picture?
>
> A:     Absolutely.
>
> Q:     His response to being told her name?

69

A:    Correct.

Q:    His response to being shown—described the location of her apartment?

A:    Correct.

Q:    His response to being shown a picture of her living room?

A:    Correct.

Q:    His response to being shown a picture of the hallway.

A:    Correct.

. . .

A:    What we did from there. . . . You know, we had someone who was being *very deceptive* to us.

(Tr. at 1348–50 (emphasis supplied).)

181.   The actions of the prosecutor in propounding this line of questions and Det. Vanoy in giving his running commentary about the content of the interview and the meaning of the responses of Roland Davis to questions and the truthfulness of those responses, permitted Det. Vanoy to express his opinion that Davis was lying, ("You know, we had someone who was being very deceptive to us"), and why and how he got to that belief that Davis was lying.  This usurped the role of the jury to determine the truthfulness of Roland Davis in his statement to the police. Detective Vanoy had not been qualified as an expert in order to give his opinion about the truthfulness of Roland Davis.  Even if he had been so qualified, giving an

70

opinion that a witness is truthful or not truthful is exclusively within the province of the jury.  It is never properly the subject of opinion testimony.

182.   Permitting Det. Vanoy to provide his opinions about the content of Davis' statements and his reactions to Det. Vanoy's questions and interrogation techniques, and his truthfulness deprived Davis of his rights of confrontation, as well as due process, a fair trial, and the effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

183.   The right to confrontation as well as the right to a jury trial includes the right to have the jury make the critical determinations as to a witness' or declarant's truthfulness.  While statements of a criminal defendant may generally be admissible as statements against interest, this general rule does not give the police officer who conducted the interrogation, interview, or any other purported experts, a free pass to comment on the truthfulness of those statements where they do not agree with the state's theory.  The jury would have no opportunity to determine for themselves if the declarant is reliable or trustworthy and, accordingly, how much weight should be accorded the statements.

184.   Here, the state was permitted to present its interpretation of the statements and reactions of Roland Davis and then to present its interpretation of Davis' truthfulness through Det. Vanoy.  Davis was unable to challenge these assertions by Det. Vanoy in any meaningful manner.  *See Crawford v. Washington,* 541 U.S.

71

36, 51 (2004) ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.  Raleigh was, after all, perfectly free to confront those who read Cobham's confession in court.").  The statements taken by Det. Vanoy from Roland Davis are testimonial in nature.  *See id*. at 52 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.").

185.   While the statements themselves may (or may not) have been admissible as statements against interest under the Ohio Rules of Evidence, Det. Vanoy's ongoing commentary and opinion testimony is not admissible.  Davis had no ability to meaningfully cross examine Det. Vanoy about his opinions about Davis' truthfulness or his reactions.  The error in permitting Det. Vanoy to present his unsupported opinions is compounded by the fact that the tape and transcript were available and provided far better evidence of the content of the interrogation than Det. Vanoy's refreshed recollection and commentary.  *See* Eleventh and Twelfth Grounds for Relief, *infra*.

186.   There was no reason for Det. Vanoy to testify as to the contents of Davis' interrogation.  The tape was available as was a transcript of the tape.  Both the tape and the transcript were provided to the jury (along with a tape player) during their deliberations at both phases of the trial.  Clearly, the best evidence of the content of

the tape was the tape itself. The second best evidence of the content of the interrogation was the transcript of the tape. The least reliable evidence of the content of the interrogation was Det. Vanoy's refreshed recollection. (Tr. at 1337 ("I obviously did some review before I came in here today.").)

187.   Nevertheless, Det. Vanoy was permitted to testify about his recollection of the interrogation, and give his damning opinion about the meaning of the evidence, the motivation and meaning of all of Roland Davis' responses to his questions, and his opinion that Davis was lying during the interrogation. All this was unnecessary and improper and highly prejudicial given the existence of the tape. This was a police officer testifying under oath that Davis as a liar. Detective Vanoy essentially told the jury that Davis was the killer.

188.   Detective Vanoy's testimony usurped the role of the jury to determine truthfulness, and denied Davis the right to confront witnesses, due process, a fair trial, and the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. *See* Eleventh and Twelfth Grounds for Relief, *infra*.

189.   Detective Vanoy later testified that after Roland Davis had been arrested for the murder of Elizabeth Sheeler, Det. Vanoy again interrogated him. The second interview was not recorded. (Tr. at 1355.)[11] The prosecutor again requested Det.

---

[11] The decision not to record that interview was apparently solely Det. Vanoy's decision. (Tr. at 1375.) This second interrogation lasted five hours. Even though it was not taped, Det. Vanoy only testified to one particular set of questions that in

Vanoy to give his opinion as to whether Davis had changed his story between one interview and the other.  (Tr. at 1355 ("Okay.  During the course of this interview, is there anything significantly different that Mr. Davis tells you than his first interview, or the final part of his first interview. . .").)  Detective Vanoy was again permitted to give his opinion that Davis had lied in the first interview.  (Tr. at 1355 ("However, one thing that stood out that was substantially different from what he had told us in Florida was he admitted that he had lied to Detective Mummy about knowing Mrs. Sheeler.  And I asked him why had he lied to us about that, and he said, because you guys were trying to pin the murder on me.  You're trying to say that I killed Mrs. Sheeler.").)  This again permitted Det. Vanoy the opportunity to express his opinion that Davis was lying—an opinion that he was not qualified to give and that usurped the legitimate function of the jury.

190.   On redirect examination, the prosecutor again attempted to have Det. Vanoy explain that Davis had lied in the first recorded statement even though the tape was available to play for the jury:

> Q:      . . . [I]f Mr. Davis . . . had made a significantly different version of events about anything related to his involvement with Mrs. Sheeler, would you have done a recorded statement?

---

his mind indicated that Davis was lying.  Compare this to Det. Vanoy's lengthy testimony about the contents of the first two hour interview which was taped and was available on tape and as a transcript.

> A:     Yes, and we tried to do a recorded statement after
> the fact that Mr. Davis would not give us one.

(Tr. at 1383.)  Not only did this permit Det. Vanoy to again re-emphasize his

opinion that Davis was lying, it permitted him to state that Davis had refused to be

interviewed a third time—clearly a comment on Davis' exercise of his right to

remain silent under the Fifth, Sixth, Eighth and Fourteenth Amendments.

191.   Additionally, during re-direct examination, the prosecutor asked Det. Vanoy

if Davis had ever provided information about Randy Davis and Mrs. Sheeler.  (Tr.

at 1383–84.)  The prosecutor's questions clearly commented on Davis right to

remain silent and shifted the burden of proof from the state to Davis in violation of

the Fifth, Sixth, Eighth and Fourteenth Amendments.

192.   To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of these claims, its adjudications were contrary to, or

unreasonable applications of, clearly established federal law, and/or based on

unreasonable determinations of the facts.

193.   This Court should issue the writ.

**Sixth Ground for Relief:**

**THE TRIAL COURT'S REFUSAL TO GRANT DAVIS' REQUEST TO ADMIT REPORTS PREPARED AND RELIED UPON BY THE WITNESS OF A PARTY OPPONENT—THE STATE'S DNA EXPERT WITNESS—DENIED DAVIS HIS RIGHT TO CONFRONT WITNESSES AGAINST HIM, A FAIR TRIAL, DUE PROCESS AND A RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

194.   The state presented the testimony of Meghan Clement, the technical director of the forensic identity testing department at Laboratory Corporation of America Holdings, Incorporated.  (Tr. at 1655.)

195.   Clement testified that she was responsible for supervising the technologists and the quality assurance and quality control measures in the lab.  She was also responsible for interpreting all the raw data of all the cases analyzed.  (Tr. at 1656.) She had been working in the area of DNA forensics for seventeen to eighteen years.  (Tr. at 1658.)

196.   During cross examination, Clement identified the Lab Corp, Inc. Amended Certificate of Analysis.  (*See* Tr. at 1730 (identifying Def.'s Ex. L).)  She testified that she personally prepared that report document based on the testing she personally performed.  (Tr. at 1730–31.)

197.   Clement testified that there were three areas on the fitted sheet taken from the victim's bedroom that contained male DNA, based on Y-STR testing.  Those samples were identified as Items 4.4, 4.6 and 4.7.  (Tr. at 1684.)  The sample areas had a mixed sample of DNA.  (Tr. at 1692.)

76

198.   At times, Clement testified that Davis "could not be excluded" as a possible contributor of that DNA.  (Tr. at 1686; 1692; 1696.)  This language is more scientifically accurate and in accordance with the terminology used in the Amended Certificate of Analysis.  (*See* Def.'s Ex. at 2–3.)

199.   At other times, however, Clement misleadingly individualized the test results by testifying that the tests "matched" Roland Davis, using this improper individualizing language repeatedly throughout her testimony.  (Tr. at 1686; Tr. at 1688–90; Tr. at 1692–93; Tr. at 1695–96; Tr. at 1765.)

200.   Clement dramatically exacerbated this improper characterization of her test analysis by explicitly equating an inability to exclude Roland Davis with definitive individualized identification of Roland Davis: "Q:  You said you can't exclude him, so it matches him.  A:  That's correct."  (Tr. at 1686.)

201.   Further muddying the waters, Clement also testified that there was "not exactly" a "match" to Roland Davis from the autosomal testing, and that she couldn't exclude him, but immediately followed that statement by asserting that "the characteristics do match him."  (Tr. at 1695–96.)  She also later testified on cross exam that "the major profile of the evidence . . . match[es] Mr. Davis" and that "Mr. Davis happens to match the evidentiary material."  (Tr. at 1765.)

202.   Notably, however, Clement testified that male relatives of Roland Davis could not be excluded.  (Tr. at 1686–87.)   Moreover, Clement specifically testified

77

that Roland Davis' brother Randy Davis "could not be excluded as a source of the DNA evidence. (Tr. at 175657.)

203.    This result is reflected on the second page of the Amended Certificate of Analysis which was Defendant's Exhibit L, which provides that "Roland Davis *and his paternal relatives* cannot be excluded as a source of the male genetic material in these samples." (Def.'s Ex. L at 2 (emphasis supplied).)

204.    Clement also testified regarding the specifics of autosomal testing and the data obtained from that testing. This resulted in thirteen separate loci or areas of DNA that were identified in the sample. (Tr. at 1733.) This is reflected on the third page of the Amended Certificate of Analysis which was Defendant's Exhibit L. She further testified that the DNA that was recovered from the fitted sheet was not from semen. (*Id.*)

205.    The thirteen separate loci, as well as the gender DNA that were tested and identified on page three of the Amended Certificate of Analysis include D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, THO1, TPOX, CSF, and Amelogenin.

206.    Listed next to each of these loci was a list of the corresponding allele of Roland Davis, the corresponding allele of Elizabeth Sheeler, the corresponding allele found in sample 4.6 of the fitted sheet and the corresponding allele found in sample 4.7 of the fitted sheet. (Def.'s Ex. L at 3.)

207.   The alleles identified in sample 4.6 and 4.7 did not "match" at every loci with Davis.  There were additional alleles that appeared in these samples.

208.   Clement testified while reviewing the Amended Certificate of Analysis that these additional alleles were all consistent with Sheeler's DNA profile and the fact that 4.6 and 4.7 were mixed samples did not preclude Davis being a major contributor.  But she also acknowledged, again while reviewing this report, that there was additional activity in several of the loci that could be a different allele—not attributable to Davis.  (Tr. at 1744–45.)

209.   Moreover, Sheeler's blood had degraded to a point where no alleles could be determined for at least four of the loci.  (Tr. at 1746.)  Clement also acknowledged that in certain loci, there was not a clear indication of major profile versus minor profile so those loci were not included in the statistical estimate.  (Tr. at 1749.)

210.   Defense counsel also cross examined Clement concerning the issues of the similarity of DNA profiles of male relatives.  Clement testified that there was no study she was aware of that compared related individuals across the thirteen (13) loci.  (Tr. at 1720.)  Yet, incredibly, Clement testified on re-direct exam that she would not have needed to test Randy Davis' DNA to somehow exclude him.  (Tr. at 1757.)

211.   The third page of the report also provided that the statistics about which Clement testified were the "probability of randomly selecting an *unrelated*

79

*individual* with a DNA profile consistent with the major profile obtained from 4.6 which matches Roland Davis" at twelve of the tested loci.  (Def.'s Ex. L at 3 (emphasis supplied); *see also* Tr. at 1767 ("I use the word unrelated individuals because we're talking about a specific profile in a general population of unrelated individuals.  That's the calculation that's being performed.  What is the approximate frequency or probability of this profile being found in a particular ethnic population, and it differs from ethnicity to ethnicity.").)

212.   There was no testimony from Clement about the probability of randomly selecting a related individual such as Randy Davis who might have a DNA profile that was consistent with the test results, despite the fact that the state was in possession of DNA material from Randy Davis that could have been tested.

213.   No objection was raised by the state to the cross examination on these subjects or to the use of Defense Exhibit L in cross examination.

214.   Defense counsel subsequently moved for admission into evidence of Defense Exhibit L, the Amended Certificate of Analysis that Clement prepared and from which she testified, offering several reasons for its admissibility.  (Tr. at 1795–97.)  The state objected, claiming the report was hearsay.  (Tr. at 1796.)

215.   The court sustained the objection, and excluded the report finding that "the jury certainly heard everything that she testified to and I'll argue it that way, which

80

isn't hearsay as the report could be.  I'll sustain the objection on that basis."  (Tr. at 1798.)  Defense counsel then proffered the report.  (Tr. at 1798.)

216.  Defense counsel subsequently discussed much of what was raised in Clement's cross examination during closing argument.  (Tr. at 1867, 1892–95.)  Counsel likewise relied on page three of Defense Exhibit L as a demonstrative exhibit to illustrate their argument.  (Tr. at 1893, 1970.)

217.  The jury requested this exhibit during deliberations.  (Tr. at 1970 ("Can we have the DNA statistics of 4.6, 4.7 of Ms. Clement?").)  Defense counsel requested that the court reconsider its ruling to exclude the report as an exhibit.  The court refused and instructed the jury that they had all the exhibits admitted during the trial.  (Tr. at 1972–73.)

218.  Reports prepared by an expert witness and relied on by that witness during her testimony and subject to cross examination are admissible as exhibits when requested by the party opponent.

219.  The trial court's exclusion of this report was prejudicial constitutional error and a denial of due process and a fair trial.  It is not entirely clear on what basis the court actually excluded the exhibit.  At one point the judge suggested that the information had already been testified to, (Tr. at 1798), and at another point the judge suggested that the report was hearsay and not admissible as a business record, (Tr. at 1971–72).

81

220. Regardless of the trial court's stated reasons, the exclusion of this exhibit denied Davis his right to confront witnesses, to due process, to a fair trial, and to a fair and reliable sentencing determination

221. The report was highly probative and relevant evidence, particularly given the complexity of the thirteen loci; the identifiers for those thirteen loci; the alleles of Roland Davis; the alleles of Sheeler; the alleles in Item 4.6 and the alleles in Item 4.7; Clement's repeated and improper individualization testimony that purportedly "matched" Roland Davis based on the DNA analysis; the report's explicit language that related individuals—especially male relatives of Roland Davis—could not be excluded; and the third-party-culpability defense mounted by Roland Davis that implicated his brother Randy Davis from whom the state possessed biological materials which the state refused to subject to DNA analysis.

222. The fact that Clement testified regarding those facts—and was cross examined on this document—does not substitute for the probative value of the actual exhibit which contained the table demonstrating each of those alleles in each of the persons and samples tested, and other information critical to properly understanding and weighing Clement's testimony.  The actual exhibit demonstrated the differences and discrepancies raised on cross examination.

82

223.   This exhibit clearly demonstrated the problems with Clement's testimony that counsel raised on cross examination.  More importantly, there was nothing prejudicial about the report.  The state did not argue the report was prejudicial.

224.   The fact that an expert prepares a report and then testifies about the report does not preclude the admission of the report as an exhibit or its use as a demonstrative exhibit that reflects the evidence.[12]

225.   Similarly, the fact that an expert testifies to the contents of a report does not preclude its admission into evidence.  To the contrary: unless the person who prepared and signed the report is available to testify to the report and be cross examined on the contents and accuracy of the report, the report would not be admissible under the Sixth Amendment's Confrontation Clause.  *See Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2542 (2009) (applying *Crawford v. Washington*, 541 U.S. 36, 50–51 (2004)).

---

[12] If this was the state of the law, the transcript of Davis' taped interview would also not have been admissible because Det. Vanoy had testified about its contents. *See* Fifth Ground for Relief, *supra*, and Eleventh and Twelfth Grounds for Relief, *infra*.  Detective Vanoy testified to everything on the tape so if the trial court's rationale about someone already testifying to the contents is correct, the tape should never have been admitted, let alone the transcript of the same tape. Although the tape should not have been admitted, the rationale for that argument is because the admission without playing the tape in the courtroom denied Davis the right to be present at a critical stage of the trial, not that the information was already testified to.

226.    Because the report and its preparer were subject to cross examination, the report was not hearsay.  Defense Exhibit L was the report that was prepared by Clement.  Clement testified about the report and was cross examined about the report.  Therefore, the report was admissible.

227.    Nothing in the Ohio Rules of Evidence prevented the admission of this exhibit—especially where its admission was moved by the opposing party.  The exclusion prevented the jury from having access to information about complicated DNA loci, and alleles from Davis, Sheeler, the 4.6 sample and the 4.7 sample, all contained across 13 different locations.  This was particularly prejudicial in light of Clement's repeated and improper individualization testimony that there was purportedly a "match" Roland Davis based on the DNA analysis.  The report's explicit language that male relatives of Roland Davis could not be excluded was critical to Davis' defense implicating his brother Randy Davis.

228.    The fact that Clement testified to the information, or that the jury saw from a distance the charts in the report during counsel's closing argument does not mean that the detailed and complex information contained in the report could be easily recalled by the jury during deliberations.

229.    Defense Exhibit L, the chart used by counsel in closing argument, contained the same table requested by the jury during deliberations.  The report was a demonstrative exhibit that helped clarify what Clement testified to regarding these

specific alleles.  It was admissible as an exhibit and was improperly excluded. This was a visual aid that showed the results of Clement's DNA testing for the jury's aid in understanding highly complex evidence upon which the state primarily rested its case.

230.   Defense Exhibit L was a report prepared by the state's expert and provided to the defense in discovery.  The state offered Clement as its expert witness in support of its theory that DNA from the bedding implicated Roland Davis. Clement repeatedly testified that the DNA test "matched" Roland Davis, even though the evidence only *failed to exclude* Roland Davis and his paternal relatives. This is a critical difference, especially with a third-party-culpability theory asserted by the defense.

231.   All of the evidence from the trial phase was wrongly re-admitted during the sentencing phase, *see* Fifteenth Ground for Relief, *infra*, but Defense Exhibit L was not subject to this blanket re-admittance, having been excluded during the trial phase.

232.   The data on which Clement based her testimony and conclusions elicited by the state were contained in Defense Exhibit L.  The actual data contained in the report raised significant and legitimate questions about Clement's conclusions which were the subject of cross examination by defense counsel.

233.    The jury was entitled to hear, see, and examine the data upon which Clement

based her conclusions during their deliberations—especially since it was the

subject of vigorous cross examination.  The state had no basis upon which to object

to the data—on which its expert based her opinion—being provided the jury.

234.    Exclusion of this exhibit denied Davis the opportunity to fully confront the

state's expert.  While Davis was able to cross examine Clement, the jury was

prevented from examining the critical document that formed the basis of Clement's

opinion and the basis for cross examination during their deliberations.[13]

235.    The court's exclusion of Defense Exhibit L denied Davis his right to

confront witnesses, to due process, to a fair trial, and to a fair and reliable

sentencing determination as well as the effective assistance of counsel in violation

of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  This was prejudicial to

Davis, because his conviction and sentence were based primarily on forensic

evidence.

236.    To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of these claims, its adjudications were contrary to, or

---

[13] To the extent that counsel did not fully object to the exclusion of Clement's
report as an exhibit, or in response to the jury's request, counsel's performance fell
far below the prevailing professional norms and was therefore unreasonable,
denying Davis the effective assistance of counsel under the Fifth, Sixth, Eighth,
and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

unreasonable applications of, clearly established federal law, and/or based on

unreasonable determinations of the facts.

237.   This Court should issue the writ.

**Seventh Ground for Relief:**

**THE PRESENTATION OF "EXPERT" TESTIMONY WITHOUT FIRST ESTABLISHING EITHER THE SCIENTIFIC BASIS OR THE QUALIFICATIONS OF THE "EXPERT" DEPRIVED DAVIS OF DUE PROCESS AND A FAIR TRIAL.**

238.    Before presenting "expert" testimony, the state must establish the scientific

or other basis for the testimony and establish that the "expert" has the

qualifications and training to render an opinion.  *Daubert v. Merrill Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95 (1993).[14]

239.    Detective Elliget of the Newark Police Department testified at trial that he

was a "criminalist," and thus "involved in the processing of crime scenes; the

collection and preservation of evidence; identification; fingerprints; processing of

fingerprints; photography.  We'll do lab analysis to include drug analysis.  I'm

---

[14] The recent report by the National Academy of Sciences on the state of forensic science in the United States concluded that rigorous and mandatory certification programs for forensic scientists are and have been lacking, as have been strong standards and protocols for analyzing and reporting of evidence.  Furthermore, there is a dearth of peer-reviewed, published studies establishing the scientific bases and reliability of many forensic methods.  *See* Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States:  A Path Forward* (The Nat'l Acad. Press 2009) (hereinafter *NAS Report*).

The committee identified and discussed several issues in forensic science that call into question—if not entirely undermine—the proclaimed reliability (and infallibility) of several non-DNA forensic identification techniques.  The issues pertained to: (1) inadequate or no research regarding base rates, error rates, measurement error rates, and minimizing the risk of bias in forensic examinations; (2) inadequate or no standards in determining a match, in forensic terminology, in report writing, and in forensic science education; (3) the lack of mandatory certification for forensic examiners; and (4) inadequate funding.

trained in blood stain pattern analysis."  (Tr. at 1032–33.)  Counsel for Davis volunteered a blanket stipulation to his qualifications.  (Tr. at 1034–35.)[15]  The state accepted the stipulation.  (Tr. at 1035.)

240.  Detective Elliget was then permitted to testify about a wide range of matters including his collection and storage of evidence, his investigation, and his purported and numerous areas of "expertise."   Neither defense counsel nor the court required the state to establish a proper foundation pursuant to *Daubert* for the admission of any of Det. Elliget's testimony concerning the results of his observations based on his "expertise" or the results of any of the testing that he conducted.

241.  Counsel's apparent defense was that Roland Davis' brother Randy Davis committed the crime.  Detective Elliget conceded that the forensic evidence about which he testified was the only basis for the prosecution's position that only a single male (*i.e.*, Roland Davis) committed the offense.  (Tr. at 1505–06.)  Indeed, Roland Davis only became a suspect in this case based on forensic evidence, while the state has steadfastly refused to subject biological evidence from Randy Davis to DNA testing.  *See* Twenty-Second Ground for Relief, *infra*.

---

[15] "I'm more than happy to stipulate to Detective Elliget's qualifications.  He and I have spoken on numerous different occasions and we would agree and stipulate that he is an expert in criminology and crime scene investigation, collection of evidence . . . [a]nd preservation."  (Tr. at 1034–35.)

242.   A court can properly apply the *Daubert* factors to any type of experts. *Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999).  The failure of defense counsel and the court to require the state to establish an appropriate foundation for Det. Elliget's "expert" testimony denied Davis' rights to confront witnesses against him, due process, a fair trial and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

## A.   Detective Elliget's Testimony

### 1.   Fingerprints

243.   Detective Elliget testified that he had been trained in the collection, processing, classification and identification of fingerprints through the FBI.  (Tr. at 1412.)  He failed to identify the extent, scope, nature, or duration of this training through the FBI, or any assessment requirements associated with this training.

244.   Likewise, Det. Elliget failed to establish that he was a member of, or had undergone any training and/or assessments administered by, either of the two agencies identified in the NAS Report's detailed discussion of friction ridge analysis, the International Association for Identification and the Scientific Working Group on Friction Ridge Analysis, Study and Technology.  *See NAS Report* at 136–37.

245.   Detective Elliget testified at some length about fingerprint evidence and the wiping of fingerprints.  (Tr. at 1413–19; Tr. at 1426–32; Tr. at 1453–57.)

90

Detective Elliget then gave ongoing observations about the collection and examination of fingerprint evidence, the absence of fingerprint evidence, and the wiping of fingerprint evidence throughout his testimony about the crime scene investigation of the victim's apartment. (*See* Tr. at 1426–47.)

246.  At no time did Det. Elliget offer, nor did defense counsel demand that he establish, the scientific basis or the scientific validity for this "expert" testimony, despite the development in recent years of a wide body of evidence and study demonstrating that *no* scientific basis exists for much of the field of fingerprint identification.[16]

### 2.    Blood Splatter

247.  Detective Elliget testified that he had attended some classes on blood spatter pattern analysis.  (Tr. at 1420.)  Detective Elliget failed to identify the extent, scope, nature, or duration of any such training, or any assessment requirements associated with any such training.

248.  Likewise, Det. Elliget failed to establish that he was a member of, or had undergone any training and/or assessments administered by, either of the two agencies identified in the NAS Report's detailed discussion of bloodstain pattern analysis that have or recommend qualifications, the International Association for

---

[16] *See, e.g.*, *NAS Report* at 136–45 and publications cited therein; David Stoney, *Fingerprint Identifications in Modern Scientific Evidence:  The Law and Science of Expert Testimony* § 21–2.3.1, at 72 (David L. Faigman et al. eds., West 1997).

Identification and the Scientific Working Group on Bloodstain Pattern Analysis.

*See NAS Report* at 178.

249.   Detective Elliget testified that he formerly "subscribed" to the International

Association of Blood Stain Pattern Analysis Analysts, but that his "subscription

has expired."  (Tr. at 1420.)

250.   Detective Elliget also failed to establish that he possessed the "minimum"

requirements for interpreting and integrating bloodstain patterns into a

reconstruction that are specifically enumerated in the NAS Report.  *See NAS

Report* at 177.[17]  The NAS Report states that an emphasis on experience in blood

stain pattern analysis over scientific educational foundations is "misguided, given

---

[17] These include:
- an appropriate scientific education;
- knowledge of the terminology employed (e.g., angle of impact, arterial spurting, back spatter, castoff pattern);
- an understanding of the limitations of the measurement tools used to make bloodstain pattern measurements (e.g., calculators, software, lasers, protractors);
- an understanding of applied mathematics and the use of significant figures;
- an understanding of the physics of fluid transfer;
- an understanding of the pathology of wounds; and
- an understanding of the general patterns blood makes after leaving the human body.

*NAS Report* at 177.

the importance of rigorous and objective hypothesis testing and the complex nature of fluid dynamics." *See NAS Report* at 178.

251.   Detective Elliget then testified about the meaning of various types of blood patterns and his analysis of these patterns.  (Tr. at 1421–23.)  Detective Elliget also testified about his observations—interpreted because of his blood spatter "expertise"—of the meaning of the blood patterns found in the apartment.  (Tr. at 1423–1547.)

252.   Detective Elliget testified about being able to tell the difference between blood from a wound and expired blood.  (Tr. at 1470–71.)

253.   Detective Elliget and the prosecutor openly speculated about the meaning of the presence (or absence) of blood droplets.  (Tr. at 1472–73.)

254.   Detective Elliget gave his unsupported "expert" opinion that "the patterns here that are present appeared to be consistent with a pattern of a hand being blood covered and the hand grabbing the item and pulling off."  (Tr. at 1476.)  No basis for such an opinion was ever offered.

255.   The state relied on Det. Elliget's blood spatter testimony to prove vital elements of the charges against Davis.

256.   At no time did Det. Elliget offer, nor did counsel demand that he establish, the scientific basis or the scientific validity for this "expert" testimony, despite the development in recent years of a wide body of evidence and study demonstrating

93

that *no* scientific basis exists for much of the field of blood spatter analysis, and that "[t]he uncertainties associated with bloodstain pattern analysis are enormous." *See NAS Report* at 178–79 and publications cited therein.

### 3. Bodily Fluids/Presumptive Tests

257.   Detective Elliget testified about testing the apartment for materials that appeared to be and were consistent with the presence of blood or other bodily fluids.  (Tr. at 1430; Tr. at 1432–33; Tr. at 1437–47.)  Detective Elliget also testified about the use of a special light to demonstrate the presence of blood that was invisible to the naked eye.  (Tr. at 1448–53.)

258.   Despite establishing no scientific basis for this analysis, or that Det. Elliget had any specific training in this technique, Det. Elliget was permitted to give his "expert" opinion on the meaning of this evidence.  (Tr. at 1450 ("Q. What is significant as an expert in this particular photograph?"); (Tr. at 1452 ("Can you—is that—in your opinion as an expert, is that pattern there descriptive enough to make an assessment about it at all?").)

### 4. Other "Expert" Testimony

259.   Elliget was permitted to testify as an "expert"—in general—despite the absence of qualification or scientific basis for his opinion testimony.

260.   Detective Elliget testified about characteristics of hair, hair color, and DNA evidence available from hair found at the scene.  (Tr. at 1463–64.)  The NAS

94

Report exposes the flaws and unreliability of much of the "science" related to analysis of hair evidence.  *See NAS Report* at 155–61.

261.   Detective Elliget testified as some type of "expert" over defense counsel's objection, about finding a number of purses and whether those purses "appeared to have the contents you might expect a purse to have in terms of identification, photographs, anything of that nature[.]"  (Tr. at 1480.)

262.   Detective Elliget testified to matters related to DNA testing and procedures, despite the fact that counsel for Davis explicitly and repeatedly objected on the basis that Det. Elliget was not an expert on DNA.  (*See, e.g.*, Tr. at 1540–46.) Nevertheless, the prosecutor explicitly referred to Det. Elliget as an expert in relation to the DNA evidence during closing argument.  (Tr. at 1918 ("I'm not the expert, these folks are.  And as long as DNA has been around and as many cases these folks have done—that is, these folks being this officer, *Detective Elliget*, Dr. Tejwani, Meghan Clement, and their degrees and stuff, they know these things more than we can hope to know, if we hope to know it at all." (emphasis supplied)).)

263.   Detective Elliget even went so far as to testify that he decided to have certain evidence tested using Y-STR DNA testing rather than mitochondrial DNA testing because "YSTR [sic] is cheaper than mitochondrial, but it also is a lot quicker and more expedient *and more definitive*."  (Tr. at 1545 (emphasis

supplied).)  Detective Elliget gave no scientific basis for this assertion that Y-STR DNA testing is more definitive.

264.   Throughout the direct examination, Det. Elliget repeatedly was asked and answered questions that required either a scientific basis or considerable training and education in order to form the basis for his "expert" opinion.  None was offered.  None was requested by defense counsel, despite the development in recent years of a wide body of evidence and study demonstrating substantial and serious flaws with the forensic "science" and its application that was the entire basis of Det. Elliget's testimony.

265.   During redirect examination, the prosecutor improperly inquired of Det. Elliget whether the same evidence he had examined had been made available to the defense for observation and testing.[18]  Detective Elliget replied in detail that all of the evidence had been made available to the defense, implying that because they did not have any evidence or "expert" opinion to the contrary, his conclusions were obviously accurate.  (Tr. at 1535.)

---

[18] This type of question from the prosecutor was not accidental or an isolated instance.  The prosecutor repeated this misconduct while questioning witness Clement, asking her if the forensic evidence had been provided to a defense expert. (Tr. at 1763–64.)  The prosecutor elicited the same kind of testimony from witness Tejwani.  (Tr. at 1602.)  This misconduct was the basis for a motion for a mistrial, which the court denied.  *See* Sixteenth Ground for Relief, *infra.*

266.   Detective Elliget also speculated throughout his testimony about the meaning of particular forms of evidence and how the police created a theory of guilt out of their speculation about various pieces of evidence.  (Tr. at 1544 ("this whole thing is just to explain the reasoning process and not to try to qualify you as some expert").)

267.   Despite this assurance by the prosecuting attorney, Det. Elliget was repeatedly asked his expert opinion, and the prosecutor referred to him as an expert in DNA evidence during closing argument.  But Det. Elliget was never qualified as an expert, in DNA or any other forensic evidence about which he testified, nor were the fields for which he claimed expertise ever subjected to the gatekeeping requirements of *Daubert* and *Kumho Tire*.

268.   Detective Elliget was likewise asked and did vouch for the credibility of the Columbus Police Crime Lab and the validity of the work performed in that lab, as well as the quality and accuracy of the work.  (Tr. at 1537–40.)  While continuing to bolster the validity of his own opinions (as well as those of the Columbus Police Department), Det. Elliget also speculated about the state of the presence or absence of evidence and what that presence or absence meant to the prosecution of Roland Davis.  (Tr. at 1546.)

269.   Finally, the prosecutor thanked Det. Elliget in front of the jury for devoting so much time and effort to solving this crime for the community.  (Tr. at 1547.)

97

**B.     Testimony Was Improper**

270.   Detective Elliget had no specific qualifications to give the various expert opinions he provided.  The state never tendered Det. Elliget as an as expert witness on any subject.  The prosecutor also did not acknowledge that the "science" upon which Det. Elliget testified was seriously flawed.  The prosecutor did not provide any materials to defense counsel that revealed that Det. Elliget's testimony was flawed, unreliable and/or based on unreliable "science."  The prosecutor presented Det. Elliget as an educated, experienced, highly qualified "expert," and his "expert" testimony as reliable, scientifically based and unimpeachable.

271.   Counsel never stipulated that Det. Elliget was qualified to give "expert" opinion on every subject, although they did not object at any point.[19]

272.   Because Det. Elliget was not actually proffered as an expert in any subject, neither the trial court nor counsel were able to properly assess his qualifications and determine whether in fact Det. Elliget was an expert in the field related to his "expert opinion" testimony.

---

[19] Counsel's blanket stipulation to Davis' qualifications, as well as counsel's failure to object to his "expert" testimony and the absence of any scientific basis for the testimony, fell far below the prevailing professional norms for counsel in a capital case in 2005, and was therefore unreasonable and deprived Davis of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

273.    Before a witness is permitted to give expert testimony that witness must first be determined to be an expert in the field in which he offers his opinion.  Similarly, the subject matter about which the expert will testify must be accepted as scientifically reliable.

274.    The forensic evidence Det. Elliget provided was scientifically unsupported and unsupportable, misleading, and/or unreliable, because neither Det. Elliget nor—more critically—the forensic science community has ever: (1) adequately tested these procedures to ensure that they were reliable and valid; (2) collected base rate data regarding different characteristics or features, such as hair characteristics or blood spatter analysis; (3) conducted rigorous research to identify unseen and unconscious contextual biases; (4) developed and implemented procedures aimed at minimizing the impact of contextual biases; and (5) conducted rigorous proficiency testing to ensure that its examiners were accurate and competent at their respective tasks.

275.    The failure to demand that the state present qualified experts and to present a scientific basis for the "expert" opinion under *Daubert*, denied Davis his rights to confront witnesses against him, to a fair trial, and due process, as well as the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

276.   Detective Elliget's testimony fails the test of scientific reliability set forth in *Daubert*, and more closely resembles, in Justice Scalia's words, "science that is junky." *Kuhmo Tire*, 526 U.S. at 159 (Scalia, J., concurring).

277.   The "theories or techniques" underlying Det. Elliget's testimony were not ones that "can be (and ha[ve] been tested)." *Daubert*, 509 U.S. at 593.  Nor have Det. Elliget's theories or techniques "been subjected to peer review and publication," either at the time of trial or since.  *Id.*

278.   Detective Elliget's testimony regarding hair, blood spatter, bodily fluids, trace and DNA evidence was critical to the state's theory that Roland Davis—and Roland Davis alone—alone killed Sheeler.  Yet Det. Elliget's testing and analysis had no "standards controlling the technique's operation."  *Id.* at 594.

279.   A lack of quality of forensic science practice is material and exculpatory because it creates legitimate doubt as to the accuracy and reliability of any supposedly scientific identification of an individual on the basis of forensic testing.

280.   A lack of credibility is material and exculpatory because it impeaches both the "scientific" nature of the tests and of the "expert" who is supposedly providing "scientific" testimony based upon those tests.

**C. Davis Was Denied His Right to Due Process Because Scientifically Unsupported and Unsupportable, Misleading, and Unreliable Evidence Undermined the Fundamental Fairness of the Entire Trial.**

281.    The hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget during Davis' trial—evidence which was then wrongly re-admitted during the sentencing phase, *see* Fifteenth Ground for Relief, *infra*—was scientifically unsupported and unsupportable, misleading, unreliable and "so extremely unfair that its admission violates fundamental concepts of justice." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted). *See, e.g.*, *NAS Report* at 42–48, 122–24, 132, 136–45, 155–161, 177–79, 182–91.

282.    These errors were prejudicial to Davis because the hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget was a "critical" and "highly significant" factor in Davis' conviction and death sentence. *See Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (citation omitted).

283.    The admission of the hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget—considered cumulatively with the unchallenged DNA evidence presented by two other witnesses—undermined the fundamental fairness of the entire trial.

284.   Individually and collectively, while the scientifically unsupported and unsupportable, misleading, and unreliable hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget may have been relevant, its probative value was greatly outweighed by the prejudice to the accused from its admission.  Where the evidence supporting a defendant's conviction turns out to be scientifically unsupported and unsupportable, unreliable, misleading and invalid, it is clear that his trial was fundamentally unfair, his conviction unjust, and his death sentence unconscionable.

### D.   The State Failed to Disclose Material Exculpatory and Impeachment Evidence in Violation of Davis' Rights Under *Brady*.

285.   Detective Elliget and the state failed to disclose material exculpatory and impeachment evidence regarding the unreliability of hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget, as they were constitutionally required to do.  *See Brady* v. *Maryland,* 373 U.S. 83, 87 (1963).

286.   The evidence relating to the unreliability of the "science" underlying the hair identification, blood spatter, bodily fluids, trace, fingerprint, DNA and other forensic evidence presented by Det. Elliget in this case is material and exculpatory because it creates legitimate doubt as to the accuracy and reliability of any supposedly scientific identification of Roland Davis as the perpetrator of the crimes for which he was convicted.

102

287.  Similarly, the scientific defects in the analyses performed in this case are material and exculpatory.

288.  Similarly, the lack of scientific credibility of the "science" underlying hair identification, blood spatter, bodily fluids, trace, fingerprint, DNA and other forensic evidence presented by Det. Elliget is material and exculpatory because it impeaches Det. Elliget's credibility.  First, because the tests he performed were not, in fact, meaningfully scientific.  And second, because Det. Elliget's truthfulness and credibility would be undermined by exposure of the fact that he failed to follow scientific protocols and procedures, failed to perform any actual scientific testing, failed to account for and eliminate any contextual bias,[20] and yet provided what turns out to be misleading and unreliable testimony, both as to the supposed objectivity, reliability, and scientific nature of the tests and to the allegedly "scientific" conclusions he drew from them.

---

[20] "Contextual bias" refers to any of a number of ways in which a forensic examiner's analysis and resulting conclusions can be affected by the context in which the analysis is conducted.  For instance, "[f]orensic scientists who sit administratively in law enforcement agencies or prosecutors' offices, or who are hired by those units, are subject to a general risk of bias.  Bias also is introduced through decisions made about evidence collection, which controls who is listed as a suspect." *NAS Report* at 185; *see also id.* at 185 nn.2 & 4 (citing publications); *id.* at 122–25 (citing publications).  Notably, "the traps created by such biases can be very subtle, and typically one is not aware that his or her judgment is being affected." *Id.* at 185.

289.   Det. Elliget testified that he based his "expert" opinions "upon [his] experience and training and a reasonable *scientific certainty*."  (Tr. at 1484 (emphasis supplied).)  Disclosure of the material exculpatory and impeachment evidence regarding the unreliability of hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget would have impeached Det. Elliget's credibility and his testimony that was so key to Davis' conviction and sentence.

290.   Defense counsel stipulated to Det. Elliget's qualifications, but that stipulation was falsely induced because Det. Elliget and/or prosecutors failed to disclose the material exculpatory and impeachment evidence regarding the unreliability of hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by Det. Elliget.

291.   The state has continued to fail to disclose this material exculpatory and impeachment evidence in subsequent proceedings in state court, including on direct appeal and post conviction proceedings.  Indeed, the state has actively represented that the forensic evidence is unimpeachable.

292.   In addition, defense counsel's stipulation to Det. Elliget's qualifications as an expert in criminology and crime scene investigation and collection and preservation of evidence was based on counsel's conversations about the case with Det. Elliget "on numerous different occasions."  (Tr. at 1034.)  This, too,

represents a false inducement to counsel's stipulation, since prosecutors had a constitutional obligation to provide this material exculpatory and impeaching evidence to Davis' counsel, and/or to correct a material misrepresentation such as that which led Davis' counsel to agree to the stipulation.

293.   Without the forensic evidence presented by Det. Elliget, there was little basis to discount Davis' defense that his brother actually committed the crime, especially absent any evidence or testimony related to DNA testing regarding Davis' brother.

294.   Consequently, there is a reasonable probability that the result of the proceeding would have been different, and the withheld evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

295.   The failure to disclose this information undermines confidence in Davis' convictions and requires relief.

   **E.    Davis Was Denied a Meaningful Opportunity to Present a Complete Defense by the Failure to Disclose Material Exculpatory and Impeachment Evidence.**

296.    "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683,

690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also*

*Holmes v. South Carolina*, 547 U.S. 319, 324–31 (2006).

297.   Davis' meaningful defense claim is related to his *Brady* claim.  Detective

Elliget's and the state's failure to disclose the fact that the alleged forensic

"science" evidence was premised on nothing more than contextually biased,

subjective and unreliable identifications and associations in turn premised on

biased, unsubstantiated and error prone methods and techniques (*i.e.*, unsupported

and unsupportable, misleading, and unreliable expert testimony) deprived Davis'

trial counsel from presenting a "complete defense."

298.   Defense counsel stipulated to Det. Elliget's qualifications, but that

stipulation was falsely induced because Det. Elliget and/or prosecutors failed to

disclose the material exculpatory and impeachment evidence regarding the

unreliability of hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other

forensic evidence presented by Det. Elliget.

299.   Had this information been timely disclosed, trial counsel would have used it

to bar Det. Elliget's testimony, to undermine Det. Elliget's credibility, and to

undermine confidence and reliability in any forensic evidence that supposedly

implicated Davis and/or excluded his brother.

300.   The failure to timely disclose the aforementioned information deprived

Davis of the basic right to have the prosecutor's case encounter and "survive the

106

crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648,

656 (1984).

> **F.**   **The State's Evidence and Argument Rendered Davis' Trial
> Fundamentally Unfair and Violated His Right to a Jury Verdict
> Based Solely Upon the Facts of the Offense Proven Beyond a
> Reasonable Doubt.**

301.    The state knew or should have known that the hair identification, blood

spatter, bodily fluids, trace, fingerprint, DNA and other forensic evidence

presented by Det. Elliget lacked any indicia of reliability.  Despite this knowledge

or awareness, the state argued that Det. Elliget's testimony was reliable and thus

highly incriminating:

> And I could spend a lot of time going through trying to
> explain to you folks the explanations you've got from the
> DNA experts, but I'm not the expert; these folks are.
> And as long as DNA has been around and as many cases
> these folks have done—that is, these folks being this
> officer, Detective Elliget, Dr. Tejwani, Meghan Clement,
> and their degrees and stuff, they know these things more
> than we can hope to know, if we hope to know it at all.
>
> In good conscience on this evidence, the only verdicts
> reasonable are guilty of all charges.
>
> The likelihood of Randy Davis being a suspect is—or
> being involved in this on this evidence is zero, unless you
> believe the combined total experience of two DNA
> experts of about if I added correctly, about 37 years,
> don't know what they're talking about.

(Tr. at 1917–18.)

302.   The state's willingness to endorse and present evidence that it knew or should have known was scientifically unsupported and unsupportable, misleading and inherently unreliable "so infected [Davis'] trial with unfairness as to make the resulting conviction a denial of due process."  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

303.    This prosecutorial misconduct diverted the jury's attention from the facts and denied Davis the opportunity to be judged based solely upon appropriate evidence (and argument) of every element of the offenses with which he was charged, proven beyond a reasonable doubt.  *See Apprendi v. New Jersey*, 530 U.S. 466, 476–77 (2000).

## G.   Davis' Right to Due Process Was Violated Because Detective Elliget's Scientifically Unsupported and Unsupportable, Misleading and Unreliable Testimony Led to the Conviction of an Innocent Man.

304.   Detective Elliget's scientifically unsupported and unsupportable, misleading and unreliable testimony ultimately led to the conviction of an innocent person, thus denying Davis due process.  *See Schulp v. Delo*, 513 U.S. 298, 325 (1995); *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

## H.   Davis' Conviction Must Be Overturned Because of the Cumulative Prejudice from All of the Constitutional Errors.

305.   Constitutional claims of error are to be considered cumulatively as well as individually.  Cumulative error or the cumulative effect of prejudice from a range of claims may collectively provide a basis for relief whether or not the effect of

108

individual deficiencies warrants relief. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief).

306. The cumulative prejudice from Det. Elliget's "expert" testimony provides a basis for relief whether or not the effect of the individual errors related to each forensic subject matter warrants relief.

307. All the evidence presented during the trial phase—including Det. Elliget's "expert" testimony"—was erroneously admitted during the penalty phase of Davis' trial as well, to Davis' prejudice. *See* Fifteenth Ground for Relief, *infra*.

## I. Detective Elliget's Scientifically Unsupported and Unsupportable, Misleading and Unreliable Testimony Violated Davis' Eighth Amendment Right to Heightened Reliability in Capital Sentencing.

308. Because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

309. This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976).

310.   This requirement of reliability and accuracy in capital sentencing was not met here, because Det. Elliget's testimony—which was scientifically unsupported and unsupportable, misleading and unreliable—infused the sentencing hearing's fact-finding process with material and prejudicial falsehoods and/or unreliability.

311.   Given the inherently unreliable and hugely prejudicial nature of this evidence, and given the heightened reliability and need for accuracy in capital proceedings, the readmission of this evidence at the penalty phase, the prosecution's argument again endorsing this evidence at the penalty phase, and the jury's reliance upon this evidence in sentencing Davis to death denied him due process, a fair and reliable sentencing determination, and the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

### J.   Davis' Death Sentence Violates Due Process Because Its Imposition Was Based Upon a Material Misapprehension of Fact.

312.   A death sentence that is imposed on the basis of inaccurate information that was material to the sentencing decision violates due process.  *Roberts v. United States*, 445 U.S. 552, 556 (1980); *United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

313.   Davis' death sentence is predicated upon scientifically unsupported and unsupportable, misleading and unreliable testimony that was material to reaching a death sentence, and the jury therefore imposed its sentence upon an erroneous state of assumptions or material facts which guided or controlled its decision.

110

**K.** **Davis Was Denied His Right to An Impartial Penalty-Phase Jury.**

314. The material inaccuracies and misleading nature of Det. Elliget's testimony exposed by the NAS Report also impaired the jury's ability to consider and weigh aggravating and mitigating evidence in a manner that made the jury "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).

315. The jury's reliance on Det. Elliget's scientifically unsupported and unsupportable, misleading and unreliable expert testimony rendered the jury unable to consider and give full effect to all relevant mitigating evidence, and to fairly consider imposition of a life sentence. *See Tennard v. Dretke*, 542 U.S. 274, 285 (2004).

316. This denied Davis his right to an impartial sentencing-phase jury and his right to present and have his jury consider and give effect to mitigation evidence under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**L.** **Davis Is Entitled to Relief Based Upon the Cumulative Prejudicial Effect of These Constitutional Errors.**

317. As in the trial phase, constitutional errors at the penalty phase are to be assessed cumulatively. Individually and cumulatively, each constitutional error was prejudicial and denied Davis his clearly established federal constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**M.    Conclusion**

318.   Davis' rights as guaranteed under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when Det. Elliget testified as a purported "expert" witness and presented various forensic evidence that was scientifically unsupported and unsupportable, misleading, and/or inherently unreliable.  This was prejudicial to Davis, because his conviction and sentence were based primarily on forensic evidence.

319.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

320.   This Court should issue the writ.

**Eighth Ground for Relief:**

**DAVIS WAS DENIED A FAIR TRIAL, DUE PROCESS OF LAW AND A FAIR AND RELIABLE SENTENCING DETERMINATION BECAUSE THE STATE OFFERED INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION ON THE AGGRAVATING CIRCUMSTANCE OF KIDNAPPING OR THE CHARGE OF KIDNAPPING.**

321.  The Fourteenth Amendment to the United States Constitution demands that in a criminal case, the state present sufficient evidence to prove—beyond a reasonable doubt—every element of the offense charged.  A conviction based upon insufficient evidence constitutes a denial of due process of law.  *In re Winship*, 397 U.S. 358, 361–63 (1970).  The test to determine the sufficiency of the evidence is whether, viewing the evidence in a light most favorable to the state, a rational fact finder could find guilt beyond a reasonable doubt on every element of the crimes charged.  *See Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982); *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979).  Review of the evidence in this case will demonstrate that it was not sufficient to sustain Davis' conviction on the separate count of kidnapping pursuant to Ohio Rev. Code § 2905.01 or the statutory aggravating circumstance that the murder occurred during the course of a kidnapping, under Ohio Rev. Code § 2929.04(A)(7).

> **A.**   **The state presented insufficient evidence of purpose to engage in sexual activity.**

322.  Count Three of the indictment charged Davis with Kidnapping in violation of Ohio Rev. Code § 2905.01(A)(4).  Kidnapping was also the underlying felony in

the second statutory aggravating circumstance pursuant to § 2929.04(A)(7), and

Count One, aggravated murder, alleging that Davis purposefully caused the death

while committing, attempting to commit, or while fleeing immediately after

committing or attempting to commit kidnapping, as well as aggravated robbery,

and aggravated burglary.

323.   Ohio Rev. Code § 2905.01(A)(4) provides in part:

> (A) No person, by force, threat, or deception, or, in the
> case of a victim under the age of thirteen or mentally
> incompetent, by any means, shall remove another from
> the place where the other person is found or restrain the
> liberty of the other person, for any of the following
> purposes:
>
> . . .
>
> (4) To engage in sexual activity, as defined in section
> 2907.01 of the Revised Code, with the victim against the
> victim's will

Accordingly, the state was required to prove beyond a reasonable doubt that Davis

removed Sheeler or restrained her for the purpose of engaging in sexual activity,

and that he had an animus for the sexual activity and kidnapping separate from the

animus necessary to commit the murder.

324.   A review of the evidence and arguments establishes the state failed to

present sufficient evidence of purpose (animus) to engage in sexual activity to

sustain the conviction for kidnapping.  The only evidence properly relied on by the

state for this element was the placement of the victim's underwear which was

114

rolled up around her stomach.  This is not sufficient evidence from which a

reasonable juror could find this separate animus to sustain the conviction for

kidnapping.

325.   The state's other evidence on this subject was likewise insufficient.  An oral

swab from the victim indicated a presumptive test for semen.  (Tr. at 1579.)

Detective Elliget, however, testified to what this 'presumptive' result actually

indicated, explaining that all that meant was that a chemical reacted in some

manner usually by changing color.  The only thing established as a result of that

reaction was that there may be semen or blood present.  (Tr. at 1511–12.)

Detective Elliget explained that there are other substances that may cross-react

with the chemicals.  Detective Elliget confirmed that this presumptive test did not

conclusively establish the presence of semen or blood. (*Id.*)  Additional testing on

the oral swab did not confirm the presumptive test.  No DNA was found other than

the victim's.  (Tr. at 1580–81.)  The state also argued that the victim was found

lying on the floor with her legs spread.  However, State's Exhibit 4X, (relied on by

the state for this proposition), does not show the victim's legs spread open.

Moreover, State's Exhibit 4N, demonstrates that the victim was originally found

wrapped in a bedspread.  State's Exhibit 4X, a photograph of the victim's body

after the bedclothes were removed, does not demonstrate spread legs or any

evidence demonstrating a sexual purpose.  At best, it demonstrates how the body

115

looked after authorities entered the room, unwrapped the body and prepared to move the body.

326.   The state presented insufficient evidence of a separate animus and/or the element of purpose to engage in sexual activity.  Therefore, there was insufficient evidence to sustain his conviction for kidnapping in Count Three, as well as his conviction for aggravated murder in Count One and the aggravating circumstance premised on the same theory of kidnapping.

**B.      The state failed to present sufficient proof beyond a reasonable doubt on the second statutory aggravating circumstance.**

327.   The state's failure to present sufficient evidence on the element of purpose to engage in sexual activity also voids the second aggravating circumstance.  The second aggravating circumstance charged Davis with "committing, or fleeing immediately after committing or attempting to commit the offense of Kidnapping, as further defined in Count Three of this Indictment, and the said, Roland T. Davis, was the principal offender in the commission of the offense of Aggravated Murder."  (Indictment p. 2, Sept. 17, 2004.)  For the same reasons set forth in the previous subclaim 8.A, *supra*, the state offered insufficient evidence of the separate animus or purpose element.  The second aggravating circumstance should have been dismissed.

328.   In addressing a sufficiency claim, a reviewing Court must view the evidence in a light most favorable to the state.  *Jackson*, 443 U.S. at 319.  The state failed to

present sufficient evidence for a kidnapping conviction, the related statutory aggravating circumstance, and Count One, aggravated murder.  There is no evidence in the record establishing by proof beyond a reasonable doubt that the restraint or movement occurred for the purpose of engaging in sexual activity.  At a minimum, the second statutory aggravating circumstance is not supported by sufficient evidence.

329.   Likewise, the Indictment charged Davis in Count One with "purposefully causing the death while committing, attempting to commit, or while fleeing immediately after committing or attempting to commit, one or more of the offenses of (a) kidnapping, as further defined in Count three of the Indictment; b) Aggravated Robbery . . . c) aggravated burglary . . . ."  A finding that the specification was not supported by sufficient evidence would likewise negate this first felony element of Count One.  Since it is unclear which of the three felonies caused the jury to vote in favor of guilt in Count One (kidnapping, burglary, aggravated robbery), Davis' convictions and sentence of death must be vacated.

### C.    Conclusion

330.   For the foregoing reasons, there was insufficient evidence to sustain a conviction for Kidnapping in Count Three, the Aggravated Murder in Count One, and the second statutory aggravating circumstance to Count One.  Because there was insufficient evidence to sustain these findings of guilt beyond a reasonable

doubt, Davis' convictions and sentences of death were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

331.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

332.   This Court should issue the writ.

## Ninth Ground for Relief:

**THE TRIAL COURT'S ERRONEOUS JURY INSTRUCTIONS DURING THE TRIAL PHASE DEPRIVED DAVIS OF A FAIR AND RELIABLE DETERMINATION OF HIS GUILT OR INNOCENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

### A. The trial court failed to give an instruction prohibiting the jury from stacking inferences.

333.   Counsel requested an instruction forbidding the jury to make an inference based solely on another inference.  (Tr. at 1808.)  The trial court refused to give this instruction, stating that according to OJI (Ohio Jury Instructions) the use of this instruction was limited to civil cases.  (*Id.*)  The instruction was not given to the jury.[21]

334.   The failure to instruct the jury that it could not make an inference based solely on another inference denied Davis his right to due process, a fair trial and a reliable sentencing proceeding.  Permitting a jury to infer from other inferences lessens the burden of proof required for a finding of guilt.  The principle underlying the rule is that, where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second

---

[21] To the extent counsel for Davis failed to object, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative raising merely conjecture or possibility.

335.   There is no rule or caselaw in Ohio prohibiting this instruction from being given in a criminal case.  There is no reason for such a prohibition to only apply to civil cases.  Given the burden of proof in a criminal case this instruction is even more appropriate than in a civil case.  Moreover it was particularly appropriate in this case.

336.   Findings of guilty on the kidnapping count, the aggravated murder based on kidnapping, and the related specification required the jury to impermissibly stack inferences.  The evidence relied on by the state to establish that the victim was restrained or removed for the purpose of engaging in unwanted sexual activity was primarily the disarray of her clothing.  *See* Eighth Ground for Relief, *supra*.  This evidence was insufficient in and of itself and not conclusive evidence of the kidnapping elements, absent this impermissible stacking of inferences.

337.   Instead, the state also relied on a presumptive oral swab test.  To consider the presumptive test as evidence of purpose to commit sexual activity, the jury would have had to rely on an inference from another inference.  First, the jury would have had to infer that the presumptive test was correct and actually indicated semen, then it must have inferred that it was Davis' semen, for which no evidence was presented.  Finally, the jury must have inferred that the presumed presence of

120

semen from the oral swab was from unwanted sexual activity that occurred during the restraint.

338.   The trial court's refusal to instruct on the prohibition against inferences on inferences relieved the state of its burden of proof on elements of the kidnapping charge, the kidnapping specification and portion of the aggravated murder count, thereby denying Roland Davis his due process right to a fair trial.

   **B.     The instructions permitted Davis to be convicted on less than a unanimous verdict.**

339.   Davis was indicted in Count One as follows:  "did purposely cause the death of another, to wit:  Elizabeth L. Sheeler, while committing, or attempting to commit, or while fleeing immediately after committing or attempting to commit, one or more of the offenses of:  a) kidnapping . . . ; b) Aggravated Robbery . . . ; c) Aggravated Burglary . . . ."  (Indictment pp. 1–2, Sept. 17, 2004.)

340.   The trial court instructed the jury during the trial phase as follows:

> While committing or attempting to commit, or while fleeing immediately after committing or attempting to commit means that the death must occur as part of acts leading up to, or occurring during or immediately after the commission of kidnapping, or aggravated robbery, or aggravated burglary, and that the death was directly associated with the commission or flight immediately after the commission of kidnapping, or aggravated robbery, or aggravated burglary. . . .
>
> Before you can find the Defendant guilty of aggravated murder as alleged in Count 1 of the indictment, the State must also prove beyond a reasonable doubt that the

121

> Defendant committed or attempted to commit
> kidnapping, aggravated robbery or aggravated burglary.

(Tr. at 1935–36.)

341. The trial court failed to instruct the jurors to find unanimously that Davis either committed kidnapping, aggravated robbery <u>or</u> aggravated burglary. The court's failure to instruct the jury to make one finding or the other on the underlying felony permitted a finding of guilty on a less than unanimous verdict. Davis was thus deprived of his right to a unanimous verdict. The jury had to *specifically* and unanimously agree on one or more of the three felonies underlying the felony murder count that Davis was guilty of committing, not all three in the alternative.

342. States determine whether "statutory alternatives" are (1) "mere means of committing a single offense" or (2) constitute "independent elements of the crime." *Schad v. Arizona*, 501 U.S. 624, 636 (1991). If the statutory alternatives do constitute independent elements, then their existence (or nonexistence) must be separately determined by the jury. *Cabana v. Bullock*, 474 U.S. 376, 384 (1986).

343. Due process requires the state to prove every element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361–63 (1970). The Sixth Amendment guarantees the criminal defendant the right to trial by jury. The jury in a criminal case must be instructed to find every element of the offense beyond a reasonable doubt. Without a jury instruction on each element the criminal

122

defendant is deprived of a jury determination of his guilt or innocence, a right protected by the due process clause, and the Sixth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 157–58 (1968).

344.   Davis' jury was never required to make a separate finding as to which felony—underlying Count One—Davis was guilty of committing. The jury was not instructed to determine unanimously, which one or more of the felonies the state had proven, thus denying Davis due process and a fair trial.

345.   Requiring proof of every element of charged criminal conduct beyond a reasonable doubt is one of many aspects of English common law which have become fundamental tenets of American common law and, indeed, American constitutional law. The Due Process Clause of the Fourteenth Amendment imposes this standard on state criminal proceedings. *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979).

346.   The beyond-a-reasonable-doubt standard is given force by the unanimity requirement. It cannot be said that the state has proven every element of the offense beyond a reasonable doubt if some of the jurors do not in fact agree to an element.

347.   Recent U.S. Supreme Court cases suggest that the Ohio Supreme Court's rulings fail to comport with Due Process and the right to a trial by jury and are unreasonable applications of clearly established federal law. Beginning with

*Apprendi v. New Jersey*, 530 U.S. 466, 482–83 (2000), the Court gave renewed force to the right to trial by jury. In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Court held that the Sixth Amendment requires any finding of fact that makes a defendant eligible for the death penalty must be unanimously made by a jury beyond a reasonable doubt. *See also Blakely v. Washington*, 542 U.S. 296, 301–02 (2004).

348.  Given the improper instruction in Davis' case, it cannot be said that the jury unanimously found one or more of the underlying felonies necessary for a conviction on Count One. Absent clear instructions, it is unlikely jurors ever felt the need to deliberate separately on whether Davis committed kidnapping, aggravated robbery, *or* aggravated burglary. Because the instruction failed to require a unanimous verdict on the underlying felony elements, the instructions failed to pass constitutional muster and the guilty verdict lacks reliability.

349.  In capital cases, due process requires that the jury be instructed to reach its determination unanimously as to every element constituting the capital offense which makes the defendant death-eligible.

350.  Here, no such requirement was imposed. The jury was not told that it must determine each element of Count One unanimously. Accordingly, Davis convictions must be reversed and this case remanded for a new trial.

351.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

352.   This Court should issue the writ.

### C.   The trial court's definition of "beyond a reasonable doubt" relieved the state of its burden of proof.

353.   The trial court gave the statutory definition of reasonable doubt under Ohio Rev. Code § 2901.05(D).  (Tr. at 1927.)  The statutory definition of reasonable doubt is constitutionally infirm because it embodies a standard of proof below that required by the Fifth, Sixth, Eighth and Fourteenth Amendments.[22]

354.   "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."  *In re Winship*, 397 U.S. at 364.  For the public to maintain confidence in our system of justice, proof beyond a reasonable doubt must be held to be proof of guilt "with utmost certainty."  *Id.*

---

[22] To the extent that counsel for counsel did not more zealously object to the jury instructions that permitted Davis to be convicted on something less than "beyond a reasonable doubt," on a less-than-unanimous verdict, *see* subclaim 9.B, *supra*, and/or something other than the requisite "purpose" and "causation," *see* subclaim 9.D, *infra*, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

355.   The instructions here did not adequately convey the stringent nature of the beyond a reasonable doubt standard.  The "firmly convinced" language in the first sentence of the statute represents only a clear and convincing evidence standard. The statutory definition of proof beyond a reasonable doubt and the definition of clear and convincing proof are similar.  The similarity between this definition and Ohio Rev. Code § 2901.05(D) is most pronounced if jurors "cannot say they are firmly convinced of the truth of the charge."

356.   Likewise, the "willing to act" language in the last sentence of the statute is too lenient to satisfy the stringent due process standard.  The "willing to act" language is inadequate when defining proof beyond a reasonable doubt.  *See Holland v. United States*, 348 U.S. 121, 140 (1954) ("[T]he charge should have been in terms of the kind of doubt that would make a person hesitate to act . . . rather than the kind on which he would be willing to act.") (citation omitted).  An instruction that equated reasonable doubt with substantial doubt, tempered by a comparison to a "hesitate to act" standard, as a whole passed constitutional muster. *Victor v. Nebraska*, 511 U.S.1, 20–21 (1994).

357.   Jurors are frequently required to make important decisions based upon proof of a lesser nature by choosing the most preferable course of action.  The "willingness to act" language set out in Ohio Rev. Code § 2901.05(D) does not meet the beyond a reasonable doubt standard, because people do not make

important decisions based upon a reasonable doubt standard but, rather, are "willing to act" upon a lesser standard.

### D. The trial court erroneously instructed the jury on the fundamental element of causation.

358.   Roland Davis was charged with one count of aggravated felony murder with specifications of aggravating circumstances under Ohio Rev. Code § 2903.01.  To find Davis guilty of this count, the state had to prove beyond a reasonable doubt that Davis purposely caused the victim's death during the course of the kidnapping, aggravated robbery, or aggravated burglary.  The trial court defined purpose:

> Purpose is an essential element of the offense of Aggravated Murder.
>
> A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of Elizabeth Sheeler while committing or attempting to commit or while fleeing immediately after committing or attempting to commit one or more of the offenses of kidnapping, or aggravated robbery or aggravated burglary.
>
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct.
>
> The purpose with which a person does an act is determined from the manner in which it is done, the

127

means or weapon used, and all the other facts and circumstances in evidence.

If a wound is inflicted by a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be, but is not required to be, inferred from the use of the weapon.  The inference, if made, is not conclusive.

Proof of motive is not required.  The presence or absence of motive is one of the circumstances bearing upon purpose.  Cause is an essential element of the offense of aggravated murder.  Cause as it relates to the charge of aggravated murder, is an act which directly produces the death of another, and without which it would not have occurred.

(Tr. at 1934–35.)  In Ohio, no one can be convicted of aggravated murder unless the jury finds specific intent to cause the death of the victim.  Ohio Rev. Code § 2903.01(D).  Here, the trial court erroneously instructed the jury on the fundamental element of causation.  (Tr. at 1934–35.)

359.   These instructions were incompatible with the requirement that the state prove a specific intent to cause the death of the victims.

360.   Those instructions on the essential element of purpose to kill relieved the state of its burden of proof on that element thereby denying Roland Davis his due process right to a fair trial.[23]

---

[23] To the extent that counsel for Davis did not more zealously object to the jury instructions on purpose and causation, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

361.   The Due Process Clause of the Fourteenth Amendment guarantees to the criminally accused that the state must prove each essential element of the crime charged beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.  Purpose to kill is an essential element of aggravated felony murder.  Ohio Rev. Code § 2903.01(B).

362.   The instruction on purpose created a mandatory rebuttable presumption of the *mens rea* element from the mere use of a deadly weapon.  That instruction relieved the state of its burden to prove the element of purpose to kill because "a reasonable juror could . . . have understood that the instructions placed the burden of proof on the defendant [to rebut the inference of purpose to kill]."  *Boyde v. California*, 494 U.S. 370, 390 (1990) (Marshall, J., dissenting) (*quoting Francis v. Franklin*, 471 U.S. 307, 315–16 (1985)) (internal quotation marks omitted).

363.   The jury should not have been allowed to presume purpose to kill simply from the use of a weapon.  The jury had to make an independent finding that Davis had a specific intent to kill, unaided by any presumptions.  *See Sandstrom*, 442 U.S. at 524.  The instruction created an impermissible evidentiary presumption where purpose or intent to kill was presumed upon proof that a weapon was used.  *See Francis v. Franklin*, 471 U.S. 307, 313–14 (1985).  Once the jury found that the victim suffered knife wounds, the instruction allowed the jury to presume that

129

the knife was used with a specific purpose to kill. Purpose to kill cannot be presumed from the mere use of a weapon. *Id.*

364. The instructional errors also violated Davis' right against cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments. Davis could not have become death eligible without a guilty verdict on the aggravated murder charges. *See* Ohio Rev. Code §§ 2929.02; 2929.03(D). Even at the trial phase, a heightened degree of reliability is required in the process of instructing the jury on the question of death eligibility. *See Beck v. Alabama*, 447 U.S. 625, 633– 43 (1980). The instructional flaws here severely undermined the reliability of the jury's guilty verdict on the aggravated murder counts. Concomitantly, the crucial function of narrowing Davis' offense into that class of death eligible offenses was also undermined in violation of Fifth, Sixth, Eighth, and Fourteenth Amendments. Davis' convictions for aggravated murder and the other felonies must be reversed and his case remanded for a new trial.

## E. Conclusion

365. The jury instructions at the trial phase and throughout the trial deprived Roland Davis of a fair trial and due process in violation of Fifth, Sixth, Eighth, and Fourteenth Amendments.

366. To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or

130

unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

367.   This Court should issue the writ.

**Tenth Ground for Relief:**

**THE CUMULATIVE AND GRUESOME PHOTOGRAPHS ADMITTED AT THE TRIAL AND PENALTY PHASES DEPRIVED ROLAND DAVIS OF DUE PROCESS, A FAIR TRIAL, AND A FAIR AND RELIABLE SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

368.   Gruesome and repetitive pictures unrelated to causation were shown to and relied upon by the state at trial and during the penalty phase, thus denying Davis a fair trial, a fair and reliable sentencing determination, and due process.  The constitutional standard for determining whether gruesome photographic evidence is admissible in a capital case is stricter than the standard used in noncapital cases.

369.   Eighth Amendment jurisprudence strives to make the trial phase of a capital case as sound and reliable as possible.  *See Beck v. Alabama*, 447 U.S. 625, 630 (1980) (requiring instruction on lesser offense at trial phase of capital case when supported by evidence).

370.   Here, counsel filed a pretrial motion in limine to limit the number of repetitive and gruesome photographs, (*see* Motion No. 6, Mot. in Limine to Limit the Number of Photographs of the Victim[]), and objected to their admission at trial, (*see* Tr. at 816, 822).  Counsel renewed the objection prior to the witnesses identifying the specific photographs.  (*See* Tr. at 989–90.)  In addition, defense counsel objected to the admission of the photos as exhibits to be sent back to the jury.  (Tr. at 1782–84.)  Finally, certain photos were re-admitted in the sentencing phase and the defense objected to those photos.  (Tr. at 2198–99.)  The court did

not admit photos 7C, 7D and 7J in the sentencing hearing.  These photos were

admitted in the trial phase.  (Tr. at 1786.)  Despite these objections, the court

permitted the state to show multiple gruesome photographs of Elizabeth Sheeler

where she was found in the bedroom, and during the autopsy.  These photos

included the following:

> State's Exhibit 4Y — photograph of Sheeler uncovered
> in the bedroom where she was found,[24] focusing on her
> neck and the bottom of her face.  It shows that she is
> covered in dried blood that appears black in parts of the
> photo.  There are dried blood paths running down her
> chest.  There is blood all over her face and neck and her
> skin is swollen and mottled.
>
> State's Exhibit 4V — shows the lower half of the body
> with the bedspread from the waist up, naked from the
> waist down—and the photo shows her crotch area.
>
> Exhibit 4X — another view of Sheeler's crotch area
> looking toward her face.  The body appears bloated,
> mottled and bloody.  Her underwear is around her chest.
>
> State's Exhibit 4N — shows the body as it was actually
> found wrapped in a bedspread with a foot sticking out.
>
> State's Exhibit 4O — a close up of 4N which
> demonstrates nothing additional.
>
> State's Exhibit 7B — a photo of a naked Sheeler lying on
> a table for the autopsy.  It shows a badly bloated body
> and again reveals all the dried blood on her face and body
> that can be seen in 4Y and 4V.

---

[24] Sheeler was found wrapped in a bed spread with a foot sticking out of the
bedspread, not lying out in the open as pictured in this photograph.

133

State's Exhibit 7C — a photo of the head and shoulders with the tongue coming out of the mouth showing blood spots and stains, black eyes and cuts in chin and neck, mottled bloated decomposing skin.

State's Exhibit 7D — cumulative to and repetitive of 7C. It is the same face, with black eyes, and the neck shot with gloved hands pulling the lips apart and down with a ruler showing black marks around the lips and the inside of the lip.  The face and neck are bloody, bloated and mottled.

State's 7E — a close up of the chest looking to the head with the bloody head visible.

State's 7F — a photo of the right side of the neck and face showing neck wound which is visible in the other photos.  It shows mottled skin and bloody to black marks.

State's 7G — the neck wound again with bloody mottled skin and a ruler measuring the wound.

State's 7H — the same wound.

State's 7I — the same wound again with the mottled bloody bloated head and neck.

State's 7J — a photo of the upper neck with head pulled back and a ruler against one of the neck wounds with mottled bloody skin.

State's Exhibit 7K — her trachea, pulled out and her esophagus covered in blood with her lungs visible in one area.

State's 7L — the scalp pulled back during the autopsy to show a bloody mass on the side of the head.

State's 7M — the same as 7L without the coroner's hands.

371.   The photographs were gruesome and surely inflamed the passions of lay jurors wholly unaccustomed to seeing any pictures of dead bodies.  It so alarmed one of the jurors that she approached the judge to explain that there was a little boy in the courtroom and it bothered her that he was looking at the photos.  She asked that the boy be removed.  (Tr. at 994.)

372.   As can be seen by the description, many of these photos were cumulative. State's Exhibits 4X and 4V were cumulative and repetitive and because they showed the naked lower half of Sheeler's body included merely to inflame the jury.  State's Exhibits 4O and 4N were the same shot just taken from different distances.  Both shots were cumulative and meant to inflame the jury.  State's Exhibt 7B was the whole naked body shot of a bloated bloody body at the autopsy. It was irrelevant to any of the facts or manner of death.  State's Exhibits 7C and 7D are cumulative and gruesome showing the bloody face, black eyes and hemorrhage into the lips.  State's Exhibit 7E has no relevance to any disputed fact but allows the state to once again highlight that she was unclothed.  Four photos (7F, 7G, 7H and 7I) of the neck wounds were unnecessary, cumulative and gruesome.  State's Exhibit 7J is like 7C and does not add anything relevant and State's Exhibits 7L and 7M are cumulative and particularly gruesome since they depict the scalp retracted and show just a bloody and black mass.

373.   Photos of the body during an autopsy are especially inflammatory.  Counsel repeatedly objected to the cumulative and gruesome photos of the autopsy.

374.   Counsel also objected to the photos of the body and the scene.  These photos unnecessarily depicted injuries that were repeatedly and clearly testified to.  The state's response to the objection was to point out that it had even more photos of the body that it was not using.  (Tr. at 818.)  Additionally the state claimed that these photos would show purpose to kill—an issue that was not in dispute.  (Tr. at 819.)  As to the photos of the semi-naked victim in the bedroom with dried blood all over her body, the state merely argued that these photos all showed that the room was ransacked and that the offender would have known he was killing the victim.  The ransacking was apparent in other photos that did not have portions of Sheeler's body or portions of Sheeler's body in them.

375.   The court overruled the objection on the basis that the photos were not all that graphic.  (Tr. at 824.)  The court also mentioned the specifications of aggravating circumstances including a "ransacking" specification that does not exist under Ohio Rev. Code § 2929.04(A) and could not have been charged in this or any other case.  (*Id.* (mentioning "the specifications there between the burglary, or robbery, or purpose to kill, or ransacking").)

376.   Whatever marginal probative value these photographs may have had was offset by the prejudicial impact they undoubtedly had on the jurors and Davis' right to a fair trial.

377.   Even if the admission of these gruesome photos was harmless at the trial phase, their introduction at the penalty phase contributed to the imposition of the death sentence.  By first introducing cumulative and repetitive and grotesque photos during the trial phase and then readmitting them in the penalty phase, *see* Fifteenth Ground for Relief, *infra*, the state created a climate in which the jury was unable to dispassionately balance the statutory aggravating circumstances against the mitigating factors.  Egregious errors, even if harmless during the trial phase, carry over and become part of the penalty phase.  When they are coupled with other penalty phase errors, the reliability of the death sentencing procedure is called into question.  The photos readmitted during the penalty phase included State's Exhibits 4P, 4R, 4W, 4Y, 4V, 4X, 7M, 7K, 7L, 7H, 7I, 7F, 7G, 7B, and 7E. (*See* Tr. at 2211–12.)

378.   The photos of the dead body and the photos depicting various stages of the autopsy were unnecessary, irrelevant, cumulative, and repetitive and they created a danger of and actual prejudice to Roland Davis.[25]  Their admission denied Davis

---

[25] To the extent that counsel for Davis did not more zealously object to the introduction of irrelevant and inflammatory evidence, counsel's performance fell far below the prevailing professional norms and was therefore, unreasonable and

due process, a fair trial, and a fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

379.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

380.   This Court should issue the writ.

---

denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

## Eleventh Ground for Relief:

**THE ADMISSION OF STATE'S EXHIBITS 12A.1 AND 12A.2, WITHOUT IDENTIFICATION OR AUTHENTICATION, VIOLATED ROLAND DAVIS' CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE FEDERAL CONSTITUTION.**

381.   Detective Vanoy testified about his tape recorded interview of Roland Davis in Florida.  Although never identified by any witness the state offered State's Exhibit 12A into evidence.  (Tr. at 1782.)  State's Exhibit 12A was presumably the tape of that interview.  The tape was not played for the jury in the courtroom.[26] This tape was admitted as evidence and sent back to the jury along with State's Exhibit 12.B, a transcript of the tape recording at both phases of the trial.[27]  (Tr. at 1782; Tr. at 2292–93.)  The only mention in the record of what State's Exhibit 12A is, was the prosecutor claiming "12-A as a normal exhibit . . . ."  (Tr. at 1782.) Both the state and the defense argued that the taped interview should be considered by the jury as substantive evidence.  (Tr. at 1866; Tr. at 1875; Tr. at 1911–12; Tr. at 1914.)[28]

---

[26]  *See* Twelfth Ground for Relief, *infra*.

[27] To the extent counsel for Davis failed to object to this lack of identification or authentication or accuracy, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

[28] *See* Twelfth Ground for Relief, *infra*.

382.   No witness identified or authenticated State's Exhibit 12A as the tape of the interview of Roland Davis.  No witness identified the voices on State's Exhibit 12A as belonging to Davis and/or Det. Vanoy.  There was no stipulation offered in regards to the tape.  There is no evidence that the operator of the device that allegedly recorded the device was competent to operate the device.  There is no evidence that the recording on the tape was authentic or correct.  There is no evidence that changes, additions, or deletions had not been made to the recording.  There is no evidence of who the speakers on the recording are.  There is no evidence that all portions of the tape are audible.  There is no evidence that the tape was properly redacted.

383.   Despite all of these significant foundation problems the court instructed the jury:

> You are further instructed that you will receive as an exhibit two tape recordings identified as being a portion of the statement the Defendant gave to Newark police officers.  The portion on these tapes are those sections of the Defendant's statement that the parties have jointly agreed to admit into evidence.  You may not speculate as to what portions have been deleted, nor the reasons for the deletions.  In addition to these tapes, you will receive a transcript of these tapes.  However, the transcript is not evidence, only the tapes are.  The transcript is intended only as an aid.  In the event you feel there is any discrepancy between what is actually said on the tape and what the transcript says, you must rely upon the tapes themselves.

(Tr. at 1931.)

140

384. Thus, the Court improperly instructed the jury that the tape had been identified as Davis' interview when in fact no person ever identified these tapes and no stipulation was entered into as to the identity of the tapes, despite numerous other stipulations that were entered into throughout both phases of the trial.

385. Authentication or identification is a *prerequisite* to admissibility. Ohio R. Evid. 901(A). No evidence was offered that State's 12A was the tape of the interview, that is was authentic, or unaltered, or that it represented what it purported to represent, *i.e.*, Davis' interview. As such this tape never should have been admitted. The function of authentication or identification is to establish, preliminarily, a connection between the evidence offered and the relevant facts of the case.

386. The trial court is charged with the duty of making an initial determination that the foundational testimony is sufficient to support a jury finding as to authenticity. Ohio R. Evid. 104. When the issue is one of authentication or identification, the condition of fact relates to the genuineness of the item in question.

387. "[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). The admission of Exhibits 12A and 12B without

anyone every identifying or authenticating them permitted the state to convict Roland Davis and obtain a sentence of death based on evidence that is unreliable. As such, Davis was denied due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

388. The admission of this unauthenticated tape, outside of the presence of Roland Davis and his counsel, without any assurance of accuracy or other indicia of reliability relieved the state of its burden of proof, and denied Davis due process, a fair trial, a fair and reliable sentencing determination and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

389. To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

390. This Court should issue the writ.

**Twelfth Ground for Relief:**

**THE ADMISSION OF TAPE RECORDINGS AS EVIDENCE WITHOUT FIRST PRESENTING AND AUTHENTICATING IT IN OPEN COURT IN THE PRESENCE OF THE DEFENDANT DENIED DAVIS HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT A CRITICAL STAGE OF THE TRIAL AND TO A TRIAL IN OPEN COURT, IN VIOLATION TO THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ADDITIONALLY, THE ADMISSION OF A TRANSCRIPT OF THESE UNIDENTIFIED TAPES THAT WERE NEVER PLAYED IN THE COURTROOM VIOLATED DAVIS' RIGHTS TO DUE PROCESS, A FAIR TRIAL, THE EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING DETERMINATION.**

A. **The court admitted tapes of what the state alleged was an interview with Davis without ever requiring identification of the evidence.**

391.   Det. Vanoy testified about his tape recorded interview of Roland Davis in Florida.  (Tr. at 1320–61.)  Although never identified by Det. Vanoy, State's Exhibit 12A.1 and 12A.2 were alleged to be the tapes of that interview.[29]  The tapes were not played for the jury in open court.  Despite this, the tapes were admitted as evidence and given to the jury during deliberations at the trial phase, (Tr. at 1782), and the penalty phase, (Tr. at 2292–93), along with State's Exhibit 12B, the transcript of the tape recordings.  Both the state and the defense discussed this tape.  The state discussed the tape in opening statement:

> You will, I believe, hear ultimately the tape during your deliberations.  *I'm not going to play it in Court*, it's very

---

[29]  *See* Second Ground for Relief, *supra*, regarding the failure to identify or authenticate the tape.  To the extent that counsel failed to object to the failure to identify or authenticate the tape and the failure to insist the tape be played in the courtroom constituted deficient performance, *see* Eighteenth Ground for Relief, *infra*, regarding Davis' denial of the effective assistance of counsel.

> long and may be hard to hear in here, but I hope to have
> it admitted.  But, I'll have an officer testify as to what he
> says.

(Tr. at 915 (emphasis supplied).)

392.   The defense discussed the tape during cross examination of Det. Vanoy, (Tr.

at 1376):

> In this case him getting on the stand and testifying wasn't
> necessary.  It's not necessary because not only do you
> have a three and a half, roughly, hour recorded statement
> from him, but you've got a 112 page transcript that writes
> down on paper the interview between Detective Vanoy
> and Mr. Davis.

(Tr. at 1860.)

393.        The defense encouraged the jury to listen to the tape during closing

arguments:

> And one of the things I would direct your attention to that
> Mr. Oswalt talked about was that they didn't tell him that
> he was under suspicion.  You're going to have an
> opportunity to listen to the tape.  At one point in the tape
> you're going to hear Detective Vanoy tell Mr. Davis that
> they are pinning a murder on him is the exact words that
> he used.

(Tr. at 1861.)

> For the State to say, well, we didn't have any reason to
> think about talking to anybody other than Roland Davis,
> we didn't have any reason to look at his brothers as a
> potential suspect, *listen to the tape* and the interview
> between Detective Vanoy and Roland Davis.

(Tr. at 1866 (emphasis supplied).)

144

I think Detective Vanoy asked him to repeat things about 32 times in the course of the interview and they're sitting from me to you. *You'll be able to hear on the tape that he is just difficult to understand.* And on top of that, he stutters. He stutters and he's almost impossible to understand. . . .

If you're going to identify this man, and after you hear this tape, it will be the thing that will stick out to you, even having sat in this courtroom and stared across at him for weeks, you listen to this tape for even 15, 20 minutes of it, the first thing that will come to mind for you as a description of this man is the way he talks.

(Tr. at 1875 (emphasis supplied).)

394. The state also encouraged the jury to listen to the tape in closing argument:

You'll hear [the taped interview], it's not working.

(Tr. at 1912.)

395. Thus both the state and the Defense argued that the jury should rely on these tapes as relevant substantive evidence to be considered. The state argued that the tapes revealed Davis lying and that only guilty people lie. (Tr. at 1911–12, 1914.) The Defense relied on the tapes to establish that Davis stuttered and that the two women who identified him as the person inquiring about Sheeler never mentioned his stutter. (Tr. at 1875.) In addition, the defense argued that the tape was evidence that the police focused on Roland Davis and did not investigate other suspects. (Tr. at 1866.)

396. The procedure used here, the admission of the tapes as substantive evidence without playing the tapes in open court, created a wealth of problems. Such

145

procedure denied Davis the right to be present at a critical stage of the trial—

during the actual presentation of evidence.  It denied Davis the right to the

effective assistance of counsel as counsel was not able to assist in any manner

since they were not present when the evidence was heard by the jury.  It prevented

reviewing courts from having any record of what evidence was presented at trial.

Sending these tapes, (and transcript) back to the jury and encouraging them to play

the tape is not the same as playing the tapes for the jury in open court with the

Defendant and counsel present.  There is no way for reviewing courts to know

whether the jury listened to the tapes, listened to parts of the tapes or failed to play

any part of the tapes.

397.   The Fifth, Sixth, Eighth and Fourteenth Amendments guarantee to an

accused the right to be personally present at all critical stages of the trial, where the

accused's absence would frustrate the fairness of the proceedings.  *Kentucky v.

Stincer*, 482 U.S. 730, 745 (1987).  It is difficult to perceive a more critical stage of

a trial than the taking of evidence.

398.   Thus, absent an effective waiver, it is a fundamental error for evidence to be

presented to a jury in the absence of the defendant.  There is no record of a waiver

by Davis of his right to be present while this taped evidence was presented to the jury. No court can presume a valid waiver.[30]

399. The Fifth, Sixth, Eighth and Fourteenth Amendments likewise guaranteed to Davis "a speedy *and public trial . . . .*" U.S. Const. amend. VI.

400. Here, evidence was presented to the jury—for the first time—behind the closed doors of the jury deliberation room—without the presence of the public, as well as without the presence of the accused Roland Davis or his counsel. The right of the accused to a public trial includes the right of the public to be made aware of the evidence the state presents against the accused, and for the accused to have the public observe the trial. These fundamental constitutional rights of the accused and the public in general to open and public trials were denied by the presentation of the state's evidence—in the first instance—behind the closed doors of the jury deliberation room. This is especially egregious where neither the accused nor counsel is present to ensure the authenticity or reliability of the evidence. This procedure denied Roland Davis the fundamental constitutional right to a fair, open, and public trial as well as his right to due process of law, the right to confront witnesses against him, and the right to the effective assistance of counsel, as well

---

[30] To the extent counsel failed to object to this procedure and failed to object to the presentation of evidence in the absence of Roland Davis and outside of an open courtroom, counsel's performance fell far below the prevailing professional norms, and was therefore unreasonable, this denying Davis the effective assistance of counsel. *See* Eighteenth Ground for Relief, *infra.*

147

as a fair and reliable sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments.[31]

401.   Here, there is nothing in the record which demonstrates that Davis was advised of his right to be present "at every stage of the trial" or that "every stage" included the right to be present during the presentation of this tape evidence, or there is likewise nothing in the record that his right to a open and public trial was explained to him or that he made a knowing and intelligent waiver of these rights. In fact, the record establishes that neither the court, the prosecutor nor the defense attorney considered Davis' or the public's right to be present during the playing of this tape and Davis did not personally waive his right to be present or to have the public present during the presentation of this evidence.  The right to be present at all critical stages of a trial as well as the right to an open and public trial is a personal right of the accused which cannot be waived by defense counsel.

402.   The right to be present at trial and confront one's accuser's is a right which may only be personally waived by the defendant and which may not be vicariously forfeited.  *Carter v. Sowders*, 5 F.3d 975, 980–82 (6th Cir. 1993).  The same is true for the right to an open and public trial.  Any waiver must be made personally by

---

[31] Counsel' failure to object to the submission of the tapes to the jury during its deliberations at either the trial or penalty phases, fell far below the prevailing professional norms, and was therefore unreasonable denying Davis the effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments. *See* Eighteenth Ground for Relief, *infra*.

the accused on the record and the trial court must satisfy itself that the waiver is knowingly and intelligently made. Here, the trial court made no inquiry of Roland Davis about this procedure. Absent a determination by the trial court, there can be no finding that Davis knowingly and intelligently waived his right—or the public right—to be present during a critical stage of the trial.

403. To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

404. This Court should issue the writ.

**B.   The court also permitted the jury to have a transcript of the taped interview as "an aid" even though it had not been authenticated or admitted as evidence.**

405. The trial court also permitted the jury to have a transcript of the taped interview during its deliberations at both phases. The trial court instructed the jury, "the transcript is not evidence, only the tapes are. The transcript is intended only as an aid. In the event you feel there is any discrepancy between what is actually said on the tape and what the transcript says, you must rely upon the tapes themselves." (Tr. at 1931.) The tapes and the transcript were sent to the jury deliberation—even though they had not been authenticated or admitted as evidence, or played in open court.

149

406.   The admission of the transcript as an exhibit was a violation of the 'best evidence' rule that recognizes that to prove the contents of a recording, the original recording is required.  Ohio R. Evid. 1002.  Clearly the best evidence of the content of the tape was the tape itself.  Although transcripts may be proper as listening aids during the playing of a tape in the courtroom, they are not properly sent back to the jury as an exhibit.  They violate the best evidence rule and they are hearsay.

407.   Moreover, the transcript fails to capture voice tones, emphasis and other nuances of the spoken word which can drastically affect the meaning of what is spoken.  Here, because of the improper procedure employed of providing the tapes to the jury without first playing them in open court in the presence of Davis, his counsel or the court, there is no evidence that the jury even listened to the actual tapes.  Because the transcripts were sent back to the jury, the jury may have relied solely on the transcript and never even played the tape of the two to three hour interview.

408.   "[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and in particular, in accord with the Due Process Clause."  *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).  The admission of Exhibits 12A and 12B without anyone every identifying or authenticating them permitted the state to convict

Roland Davis and obtain a sentence of death based on evidence that is unreliable. As such, Davis was denied due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

409. The admission of the unidentified tapes without playing the tapes in front of the jury in open court and in the presence of Davis during the trial as well as the admission of a transcript of the tapes and the accompanying transcripts at the trial and penalty phases denied Davis the right to a fair, open and public trial; a fair and reliable sentencing determination; due process; and the effective assistance of counsel. This procedure of permitting the introduction of evidence in the absence of the defendant and counsel undermines the fundamental right to a fair, open, and public trial. The conviction and imposition of a sentence of death must be reversed as a violation of these fundamental rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

410. To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

411. This Court should issue the writ.

## PENALTY PHASE GROUNDS FOR RELIEF

### Thirteenth Ground for Relief:

### ROLAND DAVIS WAS CONVICTED AND SENTENCED TO DEATH IN A TRIAL CONDUCTED IN AN EMOTIONAL ATMOSPHERE WHERE THE PROSECUTOR EXPLOITED THE EMOTIONAL IMPACT OF EVIDENCE ABOUT THE VICTIM IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

412.   "In the event that [victim impact] evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  While the Eighth Amendment does not necessarily prohibit consideration of relevant victim impact evidence or argument in the penalty phase of a capital trial, *id.* at 827, victim impact evidence is never relevant for consideration in determining the guilt or innocence of the accused.  Here the prosecutor exploited the age and other characteristics of the victim in obtaining a conviction.

413.   Roland Davis was tried in a small town where during voir dire it became obvious that most jurors knew facts about the crime and would have to make some effort to set aside their opinions and personal feelings about the victim.

414.   Pre-trial media coverage had been extensive.  (*See* Post Conviction Pet., Ex. J.)  In that environment, both the state and court should have taken every step possible to prevent the jurors' feeling from clouding their deliberations.  Instead,

the prosecutor intentionally exploited the emotional atmosphere by introducing unnecessary victim impact evidence throughout the trial.

415.   The prosecutor began his opening statement displaying a picture of the elderly victim, Ex. 1.  (Tr. at 882.)  The prosecutor then showed the picture to each and every witness who followed, displaying it to the jury on each occasion.  The prosecutor also displayed the picture during closing arguments at both phases of the trial and introduced the same picture as evidence at the penalty phase.  The prosecutor likewise stressed the victim's age, 86, at every opportunity at both phases of the trial.[32]

416.   Victim impact evidence is not automatically excluded even from a capital trial.  It is, however, never relevant or admissible at the trial phase and is generally not admissible at the penalty phase.  To be admitted, however, it must be relevant and its relevance must outweigh any prejudicial impact.  Here, most jurors were familiar with the crime and the impact the victim's death had on the community and were struggling to not have that influence their decision.  The repeated and consistent exploitation of the victim's age and other characteristics advanced no legal theories underlying the prosecution.  This exploitation rendered the trial

---

[32] To the extent counsel failed to object to the prosecutor's exploitation of victim impact evidence, counsel's performance fell far below the prevailing professional norms for counsel in a capital case in 2005 to the prejudice of Roland Davis.  *See* Eighteenth Ground for Relief, *infra*.

fundamentally unfair.  Roland Davis was convicted in a trial tainted by an atmosphere of emotion and sympathy for the victim that was exacerbated by the state's presentation and exploitation of unnecessary and irrelevant victim impact evidence, depriving him of due process and a fair trial.

417.   Having been subjected to this highly emotional testimony throughout the first phase of the trial, the jury was once again subjected to the emotional pull of inflammatory evidence in the penalty phase.

418.   This emphasis on the victim's age plus the wholly unnecessary display and introduction of the victim's picture at the penalty phase, coupled with all of the victim impact evidence admitted at the trial phase, resulted in a death sentence obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

419.   The emotional atmosphere in which Davis was tried, exacerbated by the introduction of emotional witnesses and testimony and before a jury composed of persons who were struggling to put aside their feelings and prior impressions of the crime, denied Davis due process, a fair trial, and a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

420.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

154

421.   This Court should issue the writ.

**Fourteenth Ground for Relief:**

THE FAILURE TO MERGE THE KIDNAPPING AND AGGRAVATED ROBBERY
SPECIFICATIONS OF STATUTORY AGGRAVATING CIRCUMSTANCES RESULTED IN
THE JURY WEIGHING DUPLICATIVE AND CUMULATIVE AGGRAVATING
CIRCUMSTANCES THEREBY DENYING DAVIS DUE PROCESS AND A FAIR AND
RELIABLE SENTENCING PHASE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS.

422.  Roland Davis was charged with four statutory aggravating circumstances

pursuant to Ohio Rev. Code § 2929.04(A):

> 1)  escaping detection, apprehension, trial, or punishment
>     for one or more of the offenses of a) kidnapping; b)
>     aggravated robbery; c) aggravated burglary d)
>     felonious assault; e) theft; in violation of R.C.
>     2929.04(A)(3);
>
> 2)  committing or attempting to commit, or fleeing
>     immediately after committing or attempting to
>     commit kidnapping and being the principal offender
>     in the commission of the aggravated murder in
>     violation of R.C. 2929.04(A)(7);
>
> 3)  committing or attempting to commit, or fleeing
>     immediately after committing or attempting to
>     commit aggravated robbery and being the principal
>     offender in the commission of the aggravated murder
>     in violation of R.C. 2929.04(A)(7);
>
> 4)  committing or attempting to commit, or fleeing
>     immediately after committing or attempting to
>     commit aggravated burglary and being the principal
>     offender in the commission of the aggravated murder
>     in violation of R.C. 2929.04(A)(7).

423.  The jury returned guilty verdicts on all four specifications at the trial phase.

Prior to the beginning of the penalty phase, counsel requested merger of the four

156

statutory aggravating circumstances. Counsel argued that the first specification and second specification should merge with the third and fourth specifications. The state agreed that the first specification should merge. (Tr. at 1999.) However, the state argued that the second specification should not merge and the trial court refused to merge the kidnapping specification with the aggravated robbery specification. (Tr. at 2001.) The state claimed they had demonstrated a separate animus for the kidnapping and therefore the kidnapping specification should not merge.

424. These specifications were duplicative and cumulative. Under Ohio law, the sentencer must weigh the statutory aggravating circumstances found to have been proven beyond a reasonable doubt at the trial phase in determining the appropriate penalty. Ohio Rev. Code § 2929.03(D). This weighing process is critical in the sentencing determination. The reliability of the procedure is destroyed when the state artificially inflates the weight and number of the aggravating circumstances which the sentencer must weigh. Such inflation occurs when the state is permitted to present duplicative aggravating circumstances which should have been merged prior to the penalty phase.

425. Here the state established no separate animus for the kidnapping or the aggravated robbery. This was all one indivisible course of conduct that resulted in the death of the victim. The kidnapping did not involve a substantial transportation

157

of the victim to a location different from where the aggravated murder, aggravated robbery or aggravated burglary occurred and did not involve a substantial restraint of the victim's freedom separate and distinct from these other offenses. The victim was not moved from place to place and the state maintained throughout the trial that the offenses which lead to her death all occurred in her bedroom. It was not alleged that the offenses occurred over a prolonged period of time or that they involved separate conduct by Davis, but rather that in a single course of conduct these acts resulted in the victim's death. The movement of the victim as it relates to the kidnapping offense was at best incidental to the aggravated robbery. There was not sufficient evidence of purpose to engage in sexual activity to support that element as a separate animus for the kidnapping charge. *See* Eighth Ground for Relief, *supra*. As such, the kidnapping specification should have merged into the Aggravated Robbery specification so that the jury was only weighing two aggravating circumstances against the mitigating factors in the sentencing phase.

426. The failure to merge those duplicative specifications prior to the penalty phase permitted the state to cumulate them in a manner that made it impossible for the jury to fairly balance the aggravating circumstances and mitigating factors. As such Davis' death sentences lack the reliability required in a capital case, under the Fifth, Sixth, Eighth and Fourteenth Amendments.

427.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

428.   This Court should issue the writ.

**Fifteenth Ground for Relief:**

**THE JURY INSTRUCTIONS AT THE PENALTY PHASE FAILED TO CONVEY TO THE JURY ADEQUATE INFORMATION TO PROPERLY GUIDE EXERCISE OF ITS DISCRETION, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

429.  The jury's discretion must be properly guided to ensure that the jury's

sentencing determination is reliable in order to avoid the arbitrary and capricious

imposition of the death penalty.  *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  The

jury instructions at the penalty phase, both individually and cumulatively, failed to

adequately guide this discretion and permitted a death verdict that was not the

result of a reliable sentencing procedure.

A. **The jury was permitted to consider trial phase evidence that was not relevant to the penalty phase determination.**

430.  At the beginning of the penalty phase, the state moved for the admission of

all the trial phase evidence.  (Tr. at 2030.)  The court admitted, over objection,[33] all

but three photos (State's Exhibits 7C, 7D and 7J at Tr. at 2211), and all of the

testimonial evidence from the trial phase.  The trial court instructed the jury that

"only that evidence admitted in the trial phase that is relevant to the aggravating

_____

[33] Defense counsel objected to some of the exhibits. (Tr. at 2198–99.)  To the extent that counsel for Davis did not more zealously or completely object to the introduction of all evidence including testimony from the trial phase, counsel's performance fell far below the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

circumstances and to any of the mitigating factors is to be considered by you." (Tr. at 2292.)

431. The trial court's ruling and instruction failed to appropriately limit the introduction or consideration of the prejudicial evidence admitted at the trial phase. The statutory aggravating circumstances had been proven beyond a reasonable doubt at the trial phase. Clearly, not all of the testimonial evidence was relevant to whether the statutory aggravating circumstances outweighed the factors in mitigation—the sole question for the jury under Ohio Rev. Code § 2929.03(D). This evidence was not relevant to the nature and circumstances of the offense or the history and character and background of the defendant, the *only* relevant considerations for the jury pursuant to Ohio Rev. Code § 2929.03(D). *State v. Wogenstahl*, 662 N.E.2d 311, 319–20 (Ohio 1996). The trial court had the responsibility to determine which of the evidence was relevant and admissible, not merely to caution the jury that it could only consider relevant evidence. This failure to provide guidance to the jury created a sentencing procedure that was unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**B.** **The trial court's instructions under Ohio Rev. Code §§ 2929.03, 2929.04 and 2929.05 failed to properly allocate and define the burden of proof for the penalty phase.**

432. Ohio Rev. Code. § 2929.03(D)(1) provides that the accused has the burden of going forward with evidence in mitigation. The statute fails to allocate the

161

burden of proof as to the existence of mitigating factors.  This left the jury with no guidance.  Arbitrary decisions result from the vague scheme that fails to guide the jury's discretion.  The state has the burden of proving A) the existence of the statutory aggravating circumstances, and B) that the statutory aggravating circumstances outweigh the mitigating factors, beyond a reasonable doubt.  The instructions that relieved the state of its mandated burden of proof denied Davis due process and a fair and reliable determination of sentence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

433.   Ohio Rev. Code § 2929.03(D)(1) puts the burden of going forward with evidence of mitigating factors on the accused.  A particular defendant may have many items of mitigation in his favor.  But if he declines to raise them, the death penalty becomes mandatory.  The sentencing authority has no choice:  it must weigh the aggravating circumstance(s) (already proven) against the absence of mitigation.  Thus, two men with the same background can commit the same murder and be sentenced to vastly different penalties, merely because counsel for one investigates and presented mitigating evidence and the other does not.  A sentencing scheme which permits this result operates arbitrarily and capriciously in violation of the equal protection and due process clauses as well as the Eighth Amendment.

434. Both *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), condemn any procedure in which evidence of mitigation has no weight at all. *Barclay v. Florida*, 463 U.S. 939, 961 n.2 (1983) (Stevens, J., concurring). The burden of demonstrating it has no weight falls on the state. The jury was not instructed that the state had this burden.

C. **The Ohio "beyond a reasonable doubt" standard of proof fails to meet the requirement of higher reliability for the guilt determination phase of a capital case.**

1. **The statutes fail to require proof beyond all doubt that the statutory aggravating circumstances outweigh mitigating factors, and the appropriateness of death as a punishment before the death sentence may be imposed.**

435. The standard for the burden of proof required for capital cases must be proof beyond all doubt. The jury must be instructed during the penalty phase that the law requires proof beyond all doubt that the aggravating circumstances outweigh the mitigating circumstances.

436. Insistence on reliability of the guilt/innocence and sentencing determinations is a vital component of the Supreme Court's capital jurisprudence. This emphasis on the need for reliability and certainty is a product of the unique decision that must be made in every capital case—the choice between life or death. There is a "qualitative difference" between death as a punishment and a term of years; "death profoundly differs from all other penalties" and is "unique in its severity and irrevocability." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Lockett*,

163

438 U.S. at 605; *Gardner v. Florida*, 430 U.S. 349, 363 (1977) (White, J.,

concurring); *Gregg*, 428 U.S. at 187.

437.   Proof beyond all doubt, a higher standard, must be required at both phases in

a capital case because of the absolute need for reliability.  The irrevocability of the

death penalty demands absolute reliability under the Fifth, Sixth, Eighth, and

Fourteenth Amendment.

> **2.     Ohio's definition of proof "beyond a reasonable doubt" results in a burden of proof insufficiently stringent to meet the higher reliability requirement in capital cases at the penalty phase.**

438.   Davis discussed in detail the constitutional shortcomings in Ohio's

definition of reasonable doubt in his Ninth Ground for Relief, *supra*, and

Eighteenth Ground for Relief, *infra*.  Davis incorporates those arguments here.

Davis was deprived of a fair and reliable sentencing determination by the court's

reasonable doubt instruction in violation of the Fifth, Sixth, Eighth and Fourteenth

Amendments.

> **D.     The trial court failed to instruct the jury on residual doubt.**

439.   If a jury possesses residual or lingering doubts about the guilt of the

defendant, these residual doubts must appropriately be considered during its

deliberation as to the appropriate sentence under the United States Constitution.  A

jury's residual doubts permit the states to employ the procedure whereby a single

jury hears both the trial and mitigation phases.  *See Lockhart v. McCree*, 476 U.S.

162, 180–82 (1986); *see also Ring v. Arizona*, 536 U.S. 584, 609 (2002). An

instruction on residual doubt is essential here because of the unconstitutional

reasonable doubt instruction given in the trial phase of this case. Ohio forbids an

instruction permitting the jury to consider residual or lingering doubt as a

mitigating factor. *See State v. McGuire*, 686 N.E.2d 1112, 1122 (Ohio 1997).

440.   Due process, equal protection and the right to be free from cruel and unusual

punishment obligate the courts to specifically instruct on relevant mitigating

circumstances. Jury instructions must clearly direct the jury to fully consider the

defendant's mitigating evidence as it bears on his moral culpability and the jury

must be given a vehicle through these instructions to express its reasoned moral

response to the evidence. *Penry v. Lynaugh*, 492 U.S. 302, 327–28 (1989),

*abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). A

jury instruction specifically identifying residual doubt as a relevant mitigating

factor that must be considered by the jury was required to comply with the Fifth,

Sixth, Eighth and Fourteenth Amendments.

**E.    The trial court gave an incorrect parole-eligibility instruction.**

441.   The trial court's failure to give the correct instruction concerning parole-

eligibility denied Davis a fair and reliable sentencing determination. Ohio Rev.

Code §§ 2929.03 and 2929.04 provide that Davis was eligible to receive one of

four possible sentences:  death, life imprisonment without the possibility of parole,

life imprisonment without the possibility of parole for thirty full years, or life imprisonment without the possibility of parole for twenty-five full years.  The Court failed to explain that this meant twenty-five or thirty full years of imprisonment with no possibility of being paroled or no possibility of being paroled ever.

442.   Jurors speculating as to the actual number of years a defendant would serve if he were given a "life" sentence has potentially fatal consequences in a capital case.

443.   Jurors know what "death" means.  They do not necessarily know what a sentence of life imprisonment—with no opportunity for parole for twenty-five, or thirty years, or ever—means.

444.   Due process does not permit the execution of a person on the basis of information which he had no opportunity to deny or explain.  *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994) (citing *Gardner*, 430 U.S. at 362).

445.   Failing to instruct the jury about the true meaning of parole eligibility permitted speculation and unreliable sentencing, predisposing the jury to act without regard to whether the death penalty was called for on the facts of this case. There is no state interest in preventing a death-qualified jury from receiving accurate information regarding sentencing alternatives.  Even assuming such an interest existed, it is outweighed by the defendant's and the state's own interest in

reliable sentencing. The burden of affording the defendant the process which is due him is negligible, and can be accomplished with a simply jury instruction such as the one counsel requested here.

446. The jury should have been instructed as to the actual number of years of a "life sentence" Davis would be required to serve before he would become eligible for parole. The failure to properly instruct the jury on parole eligibility, should it impose a life sentence, denied Davis a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

### F. The trial court failed to give a mercy instruction.

447. During the penalty phase instructions, the trial court admonished the jury not to consider sympathy, prejudice or bias, (Tr. at 2295–96), but did not instruct the jury that it could consider mercy. The trial court's failure to instruct on mercy denied Roland Davis a fair and reliable and fully individualized sentencing hearing in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

#### 1. The U.S. Supreme Court has recognized the importance of a mercy instruction in capital sentencing.

448. The role of mercy in capital sentencing is critical to avoid arbitrary sentencing. *Kansas v. Marsh*, 548 U.S.163, 176 (2006). The Court cited the mercy instruction as foreclosing the possibility of *Furman*-type error noted in the dissent. *See id*. at 176 n.3 ("The 'mercy' jury instruction alone forecloses the possibility of *Furman*-type error as it eliminate[s] the risk that a death sentence

167

will be imposed in spite of facts calling for a lesser penalty.") (internal quotation marks omitted).

449.   Absent an instruction to consider mercy, there can be no assurance that a death sentence will not be imposed in spite of facts calling for a lesser penalty.

### 2.   Mercy and sympathy are conceptually distinct factors.

450.   Mercy and sympathy are conceptually distinct factors.

451.   The jury's consideration of mercy based on the evidence is critical to capital sentencing because mercy facilitates a reasoned moral inquiry into "the defendant's background, character and crime . . . ." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).  When a jury determines that a defendant is "less culpable" because of the defendant's "disadvantaged background or . . . emotional and mental problems," the jury is simply granting mercy based on the mitigating evidence at trial.  *See id.* (O'Connor, J., concurring); *see also Penry*, 492 U.S. at 327–28.  Mercy underlies the very concept of individualized sentencing.

452.   Accordingly, equating mercy and sympathy is improper.  Considerations of mercy are inextricably tied to the mitigating evidence presented at trial and mercy is fundamental to the concept of individualized sentencing.

### 3. The failure to give a mercy instruction under the facts of this case denied Davis a fair and reliable sentencing determination.

453. The conceptual distinction between sympathy and mercy is easily confused. There is a "reasonable likelihood" that the jury thought that sympathy and mercy were synonymous.

454. Because there is a "reasonable likelihood" that the jurors equated mercy with sympathy, the trial court's admonition against sympathy misled the jurors in the absence of any instruction permitting the consideration of mercy. As the jurors were likely to have thought that mercy and sympathy were synonymous, the trial court effectively told the jurors to also reject mercy, the traditional basis for distinguishing between sentences of life and death. The exercise of mercy is, however, within the juror's traditional prerogative. Accordingly, the jurors needed to have been instructed on the fine but crucial distinction between mercy and sympathy in order to have properly exercised their traditional prerogative to grant mercy.

455. The trial court's instruction to reject sympathy was tantamount to an instruction to not consider mercy because the fine conceptual distinction between sympathy and mercy was not clarified. The court's failure to instruct on mercy rendered the sentencing determination unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. The jury must be properly informed about

terms that were essential to the jury's sentencing deliberations.  *See Simmons v. South Carolina*, 512 U.S. 154, 172–73 (1994) (Souter, J., concurring).

456.  Davis was prejudiced by the instruction that prevented the jury from considering mercy at the penalty phase.  He presented a wealth of mitigating evidence that would have justified the jury in exercising a traditional grant of mercy.  It is the ability to consider and give weight to such factors that is required for the sentencer to properly exercise its discretion.  By not permitting consideration of "mercy," the trial court prevented Davis' jury from fully exercising its discretion and acting as a voice of the community, under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### G.    Conclusion

457.  The jury instructions given at the penalty phase of Roland Davis' trial were inadequate in that they failed to properly define the role of the jury, properly define the mitigating factors and aggravating circumstances, properly define the jury's role and how it should process the evidence it received, properly allocate and define the burden of proof, and properly limit and guide the jury's discretion to determine the appropriate sentence.[34]  As such they denied Davis due process of

---

[34] To the extent that counsel for Davis did not more fully and completely object to the failure to instruct on residual doubt, to not limit consideration of trial phase evidence to the proper questions for the penalty phase, to properly allocate the burden of proof, to properly define the burden of proof, to instruct on mercy, and the failure to give correct parole instructions, counsel's performance fell far below

law, a fair trial and a fair and reliable determination of sentence in violation of the

Fifth, Sixth, Eighth, and Fourteenth Amendments.

458.   To the extent that the Supreme Court of Ohio adjudicated the federal

constitutional merits of all of these jury instruction claims, its adjudications were

contrary to, or unreasonable applications of, clearly established federal law, and/or

based on unreasonable determinations of the facts.

459.   This Court should issue the writ.

---

the prevailing professional norms and was therefore, unreasonable and denied
Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and
Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

## PROSECUTORIAL MISCONDUCT GROUNDS FOR RELIEF

### Sixteenth Ground for Relief:

**THE PROSECUTOR VIOLATED DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY FAILING TO MEET HIS OBLIGATION TO SEEK JUSTICE AND TO REFRAIN FROM UNFAIRLY SEEKING A CONVICTION OR SENTENCE OF DEATH BASED ON IMPROPER EVIDENCE, IMPROPER ARGUMENT AND OTHER MISCONDUCT.**

460.   A capital defendant is entitled to a trial which is free from prosecutorial misconduct that renders the proceeding fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The prosecutor has a special duty and functions as the government's representative, "whose obligation to govern impartially is as compelling as its obligation to govern at all . . . ." *Berger v. United States*, 295 U.S. 78, 88 (1935).

461.   Time and time again, the prosecuting attorney overstepped the bounds of propriety by vouching for the truth of his witnesses, commenting on Davis' silence, shifting the burden of proof, setting up improper straw-man arguments, engaging in improper cross examination and argument designed to inflame the passions of the jury, presenting victim impact evidence, denigrating the defense, and introducing inadmissible and inflammatory evidence.

462.   The prosecuting attorney crossed far over the line of permissible conduct with arguments and tactics long condemned for their capacity to mislead and unfairly prejudice the jury. The misconduct was so pronounced and persistent that

172

it could only be understood as deliberate and calculated to unfairly influence the jury.

### A.    The prosecutor repeatedly vouched for witnesses and expressed personal beliefs.

463.   The prosecutor repeatedly violated a fundamental tenet of prosecutorial conduct: not to express personal opinions concerning credibility of witnesses or guilt of the accused or his belief in the appropriateness of a sentence of death.  It is improper for a prosecutor to express his personal opinion regarding the guilt of the accused.  *See Berger*, 295 U.S. at 88; *United States v. Young*, 470 U.S. 1, 18–19 (1985).  Here, the prosecutor stated in rebuttal closing argument at the trial phase:

> These folks [the state's witnesses] are not the kind of people that would come in here and identify somebody in this kind of case unless they were absolutely, positively certain.

(Tr. at 1915–16.)  This comment was objected to and the objection sustained.  At that point, immediately after the court sustained defense counsel's objection, the prosecutor reiterated the point by stating:

> Do these people appear to you to be people that would come in here and identify the person as a murderer unless they were certain?  You answer that.

(Tr. at 1916.)

173

464.   One of the last arguments the prosecutor made to the jury in rebuttal closing

argument was similarly improper in personally vouching for the expert witnesses'

credibility:

> I'm not the expert, these folks are.  And as long as DNA
> has been around and as many cases these folks have
> done—that is, these folks being officer, Detective Elliget,
> Dr. Tejwani, Meghan Clement, and their degrees and
> stuff, they know these things more than we can hope to
> know, if we hope to know it at all.
>
> ***
>
> The likelihood of Randy Davis being a suspect is—or
> being involved in this on this evidence is zero, unless you
> believe the combined total experience of two DNA
> experts of about—if I added correctly, about 37 years,
> don't know what they are talking about.

(Tr. at 1918.)

465.   Essentially the prosecutor told the jury to trust whatever the experts said

because *he* trusted the experts, regardless of what the jurors might think or

regardless of any doubts raised in cross examination.  The prosecutor argued that

the jury should substitute the opinion of the experts for their own because: 1) they

did a lot of cases;[35] 2) they had a lot of years of experience;[36] 3) they had "degrees

---

[35] (Tr. at 1918 ("as many cases as these folks have done").)

[36] (Tr. at 1017 ("based upon experience and training over, what, two and a half or three decades"); Tr. at 1856 ("And what evidence we do have is a what, 20-year veteran in the DNA area telling you that the profile I found on this bloody hand print statistically—").)

and stuff"; and/or 4) because he had two experts and the defense had none.[37]  This

constituted improper bolstering of the witness's credibility and infringed on the

role of the jury in determining what weight to give the testimony of certain

witnesses.

466.   The prosecutor bolstered several witnesses throughout their testimony,

implying that the jury should believe certain witnesses because of the respective

witness' experience, or because the respective witnesses had done everything in a

"proper" or "scientific" manner.  Yet there was no testimony as to what that proper

manner was.[38]  The prosecutor essentially implied that each of his expert witnesses

should be believed because they knew more than the jury.

---

[37] (Tr. at 1856–57 ("In this particular case, you have two experts that tell you…");
Tr. at 1903 ("but you can't ignore the fact that both these experts testified
unequivocally that people do not have the same DNA pattern . . .").)

[38] (Tr. at 1679 ("Are those items, in your opinion as a DNA expert, appropriately
packaged?  And were they appropriately packaged when they were received?"); Tr.
at 1066 ("And at least while you had—your agency had custody of it, have they
been stored and collected properly during the entire time since the year 2000 up
until now?"); Tr. at 1066 ("But at any point in time they're in your control, you've
maintained them in the proper acceptable scientific manner."); Tr. at 1067 ("At
least while you've had it, has it been maintained in a proper manner in terms of
storage?"); Tr. at 1068 ("Have they been kept, at least while they were in your
custody and care, in proper manner in terms of storage?"  "Yes, they have."
"Limited access to people.  In other words, in areas that are only your employees
that are authorized to be there."); Tr. at 1069 ("Have they been maintained in the
proper manner since their collection in 2004?").)

467.   The prosecutor also bolstered non-expert witnesses.  Richard Hummell testified—as a jailhouse snitch—to alleged conversations he had with Davis at the jail.  Hummell had been in jail for a DUI offense.  The prosecutor vouched for Hummell in closing argument.  He argued that Hummell should be believed because "there is something in a lot of people, no matter their background" that makes them tell about the "killing of an old woman in her own home."  (Tr. at 1848–49.)  The prosecutor argued there was a "sense of decency" about Hummell and that "regardless of his blemishes", he testified "truthfully".  (Tr. at 1849.)  Clearly, this constituted improper bolstering of Hummell's truthfulness.

468.   The prosecutor, likewise, bolstered the truthfulness of Sharon Wright after the facts elicited on cross examination made her markedly less than credible.

469.   For example, Wright admitted she told the police different stories at different times.  (Tr. at 1167–68.)  She admitted she told the police all of Davis' brothers were in Florida when, in fact, two of his brothers had been in Newark.  (Tr. at 1180.)  She testified that Randy Davis died in 1998 or 1999, (Tr. at 1165), and that he died *before* Elizabeth Sheeler, (Tr. at 1193–94).  But Randy Davis in fact died in 2002 and, critically, *after* Sheeler's death.  Wright testified that she was taking Oxycontin two times daily.  (Tr. at 1191–92.)  Finally, she refused to talk with defense investigators.  (Tr. at 1194.)

176

470.   These facts elicited on cross examination made Sharon Wright less than

credible.  Nevertheless, the prosecutor urged the jury to overlook those problems

with her credibility because Elizabeth Sheeler was like a grandparent to Wright

and her death would have been a memorable event to Wright.  (Tr. at 1842–43.)

Again, these comments constituted improper bolstering of Wright's truthfulness as

well as the introduction of improper victim-impact argument.  *See* Sixteenth

Ground for Relief, subclaim 16.C, *infra*.  The information elicited on cross

examination of Wright was proper for the jury to weigh the credibility of her

testimony.

### B.    The prosecutor improperly commented on a missing witness.

471.   The prosecutor improperly elicited and argued that the defense had no expert

witnesses by repeatedly eliciting testimony from his experts that all test results and

notes had been turned over to the defense.  (Tr. at 1535 (testimony from Det.

Elliget that, if the defense had wanted to do any testing on the physical evidence,

he would have "absolutely" turned the evidence over to the defense); 1602

(testimony from Ramen Tejwani that she "provided" all test notes and results to

defense); 1764 (testimony from Meghan Clement that all of the tested material had

been made available in the discovery process).)  The prosecutor also specifically

asked Meghan Clement whether she had given her test data to a defense expert:

177

> "[I]n this particular case did you provide documentation regarding your laboratory, about your processes and your specific testing in this case for access *to a defense expert*?"

(Tr. at 1763 (emphasis supplied).)

472.  The court sustained Davis' objection, but refused to grant a mistrial at the request of the defendant.  (*Id.*)  The prosecutor immediately underscored the same point by eliciting testimony from Clement that all the material related to the case had been made available in the discovery process.  This raised the issue in the jury's mind that, if the defense had complete access to the evidence and no expert to refute the state's experts, then the state's experts must be correct.  (Tr. at 1764.)[39]  This was as improper as the earlier question.  Only the prosecutor, and not the witness, would know what had been turned over in discovery.  A prosecutor may not comment on the fact that a witness was not called at trial.

### C. The prosecutor improperly elicited victim impact evidence.

473.  The prosecutor repeatedly elicited and argued victim-impact evidence.  "In the event that [victim-impact] evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the

---

[39] To the extent counsel for Davis failed to object, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

474.   While the Eighth Amendment may not always prohibit the introduction of relevant victim-impact evidence or argument in the penalty phase of a capital trial, *id*. at 827, victim-impact evidence is never relevant to the determination of whether the state has proven beyond a reasonable doubt all of the elements of the offenses at issue in the trial phase.

475.   The impact a crime may have had on the survivors does not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ohio R. Evid. 401.  The loss caused by a crime simply has no bearing on the determination of who committed the crime.

476.   Nonetheless, the state repeatedly made a point of eliciting victim-impact evidence from virtually every witness at the trial phase.  The state also repeatedly referenced the fact that Elizabeth Sheeler was an 86-year-old woman.  The prosecutor did this in both the trial and sentencing phases. (Tr. at 872, 882 (twice) 1830, 1834, 1835, 1836, 2227, 2228, 2232 (three times) 2281.)  The prosecution asked every lay witness to identify State's Exhibit 1, a photo of elderly white haired Elizabeth Sheeler and then, each time, displayed the large photograph to the jury.  (Tr. at 935, 964, 1091, 1123, 1146, and 1236.)

179

477. The blown-up photograph was sent back with the jury during for deliberations in both the trial phase (Tr. at 1786), and the penalty phase (Tr. at 2197). The photograph was irrelevant to any fact at issue in either phase. It was introduced used solely to inflame the jury.

478. The state's repeated references to an 86-year-old woman who was killed in her own home were solely to inflame the jury. Under Ohio Rev. Code § 2929.04(A), there is no statutory aggravating circumstance concerning the death of an elderly victim. The age of the victim was not an element of any of the crimes charged. Nevertheless, the state repeatedly reminded the jury that the victim here was an 86-year-old, frail woman who was killed in her home.

479. By repeatedly emphasizing her age, by repeatedly using State's Exhibit 1 in both the trial phase and penalty phases, and by submitting the photograph to the jury in both the trial and penalty phases the state effectively created an additional non-statutory aggravating circumstance of the advanced age of the victim for the jury to weigh in its sentencing deliberation. Such tactics denied Davis due process and a fair trial.

480. Additionally, the state elicited testimony from many of the witnesses about the effect the victim's death had on them. In doing so, the prosecutor continually elicited the fact that she had lived alone for 20 years in this apartment and that she had been killed in her own bedroom. He painted a picture of an elderly woman,

180

living alone, lonely and wanting to talk, hard of hearing, and dependent on her

neighbors and others for assistance.  The state repeatedly emphasized that she was

like a grandmother to Sharon Wright both during her testimony and in closing,

including the wholly irrelevant fact that the victim had sent birthday- and

Christmas cards to Sharon Wright.  (Tr. at 1151, 1195–96, 1197, 1842–43.)  This

testimony had no other purpose than to elicit a variety of victim-impact-related

emotions—from horror and disgust to anger and pity.

481.   Victim impact evidence is generally excluded from a capital trial, because it

is never relevant in the trial phase.  To be admitted, however, *it must be relevant*

and that relevance must outweigh any prejudicial impact.  Ohio R. Evid. 403(A).

482.   The introduction of this evidence in Davis' case advanced no legal theory

underlying the prosecution and did not make the existence of any fact of

consequence any more or less likely.  Its admission rendered the trial

fundamentally unfair.  Davis was convicted in a trial tainted by an atmosphere of

emotion and sympathy for the victim that was exacerbated by the state's

presentation of unnecessary and irrelevant victim-impact evidence in violation of

the Fifth, Sixth Eighth and Fourteenth Amendments.[40]

---

[40] To the extent that counsel for Davis did not more zealously object to the
introduction of irrelevant and inflammatory evidence, counsel's performance was
not in keeping with the prevailing professional norms and was therefore,
unreasonable and denied Davis the effective assistance of counsel in violation of

**D.     The prosecution improperly commented on Davis' silence and attempted to shift the burden of proof.**

483.   The prosecutor repeatedly commented on Davis' silence and made arguments attempting to shift the burden of proof from the state to Davis.  In his opening statement, the prosecutor turned the indictment into a challenge to Davis to defend against those charges.  The prosecutor defined the indictment as "a document that gives the Defendant notice of what he's expected to defend against . . . ."  (Tr. at 870.)

484.   The prosecutor then improperly argued for a guilty verdict by asking the jury to return guilty verdicts "because nobody can vouch for his whereabouts the night of the 10th or the morning of the 11th," again challenging Davis to prove where he was one evening five years earlier.  (Tr. at 921.)  The prosecutor repeated this argument in closing.  "Nobody—nobody places—gives this guy an alibi." (Tr. at 1833.)  The absence of an alibi is not a valid relevant fact requiring a guilty verdict.  Moreover, a defendant has no obligation to provide alibi or any evidence.  The prosecutor's suggestion to the contrary clearly was an attempt to shift the burden of proof.

---

the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

485.   The state also repeatedly elicited from Det. Vanoy the fact of Davis' refusal to be tape-recorded during an interview.[41]  (Tr. at 1375.)  When asked why the second interview was not tape-recorded, the detective answered that Davis was unwilling to give a taped statement.  On redirect, the prosecutor elicited the explanation that Det. Vanoy had tried to get a second interview, but that Davis refused.

486.   In closing, the prosecutor once again commented on Davis' refusal to be tape-recorded a second time.  (*See* Tr. at 1914 (suggesting it was "[n]o big deal" because there was no difference between the statement that was tape-recorded in Florida and the five hour statement in Newark that was not recorded, except that Davis admitted he lied).)

487.   The prosecutor then compounded the misconduct, commenting on Davis' silence by arguing that only guilty people lie.  (*Id.*)  The state argued that Davis' refusal to be tape-recorded a second time was evidence that he was guilty.  Such argument is clearly a comment on his silence and clearly improper.

---

[41] This was first elicited on cross examination.  To the extent that defense counsel elicited this testimony, and failed to object when the prosecution emphasized this refusal (Tr. at 1383), counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

488.   The right to remain silent includes Davis' refusal to be recorded.  His invocation of the right to silence cannot be used to prove guilt no matter what the form.  That is what occurred here.  The prosecutor's comments that Davis was guilty because he exercised his right not to be tape-recorded were impermissible comments on Davis' rights against self-incrimination and denied him due process and a fair trial.

**E.      The prosecution improperly denigrated defense counsel.**

489.   The prosecution is afforded wide latitude to highlight the relative strengths of its case and the relative weakness of the defense, but this latitude does not extend so far as to permit the prosecutor to denigrate the role of defense counsel or defense counsel personally.  Here the state ridiculed the defense's legitimate argument about the DNA statistics and the possibility of a paternal relative with the same profile.  The prosecutor argued:

> And Mr. Sanderson wants to talk about wait a minute, there's only six and a half billion people in the world, why isn't there only six and a half billon DNA strands. Because assumingly whatever power created all of us wanted to leave the ability for humans to populate and not stop at six and a half billion, because according to his argument, nobody else could be born tomorrow, because we wouldn't have enough DNA to go around.  Maybe some day in the distant future, long after I'm gone we'll populate other worlds and there will be 97 quadrillion humans, and maybe then when I'm dead and gone, we might have a second person in this world that will have the same DNA pattern.  Maybe.  But right now that second person in the world doesn't exist.  There's two

> people that could have done this, Roland Davis and that
> loose primate we just quite haven't found yet that's
> running around Newark.

(Tr. at 1907–08.)

490.   This argument improperly denigrated defense counsel and the legitimate

defense theory.  It was based on the fact that the overwhelming statistics that were

brought out at trial by the state's DNA experts were based on samples of unrelated

individuals, not based, as it should have been, on the odds of two male relatives

having profiles that were consistent with the evidence.

491.   Additionally, the Y-STR test used to segregate male DNA from female

DNA in a mixed sample is not as precise as some DNA testing.  Meghan Clement

testified that the male DNA obtained from the bedding materials could have come

from Davis or from any of Davis' paternal relatives including his brothers.  (Tr. at

1686.)  Clement conceded that there was not an exact match to Davis.  (Tr. at

1695.)  Finally, Clement conceded that she knew of no studies that compared

related individuals across all thirteen (13) loci that are compared.  (Tr. at 1720.)

492.   This was not harmless error.  The DNA evidence was critical evidence that

was improperly presented as scientifically infallible.  *See* Sixth Ground for Relief,

Sixteenth Ground for Relief, Subclaim.B, *supra*; Seventeenth Ground for Relief;

Eighteenth Ground for Relief; and Twenty-Second Ground for Relief, *infra*.  Both

the state and the defense devoted considerable time in closing arguments to the

185

DNA evidence.  The defense employed a chart during closing argument that included page 3 of Defense Exhibit L, (Tr. at 1970), from the LabCorp Amended Certificate of Analysis regarding the bedding removed from Sheeler's bedroom. The analysis was prepared by Clement and identified by her during her testimony. (Tr. at 1730.)  Page 3 of that Certificate listed the thirteen loci that are profiled in a DNA analysis along with Davis' profile of those 13 loci, Sheeler's profile of those 13 loci and two individual samples' profiles those 13 loci obtained from the bedding.  That exhibit established that there was not an exact match between Davis' profile and either of the samples, much less an exact individualized identification of Roland Davis as the perpetrator of the crime.

493.   This evidence as well as the testimony relating to the shared DNA between paternal relatives created a reasonable doubt about the statistics used by the state's experts to suggest that there was only a 1 in 37 quadrillion or 1 in 6 billion chance of this DNA belonging to someone other than Davis.  The jury even requested the chart during deliberations.  (Tr. at 1970.)  Such a request strongly suggests that the jury was focused on this evidence.  The prosecution's improper argument ridiculing the defense theory was not only prejudicial but infringed on his right to effective counsel, his right to present a defense, and his right to a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

**F.    The prosecutor improperly requested a conviction to bring justice.**

494.   A prosecutor may not call for the jury to convict in response to public

demand.  Although appeals to act as the community conscience are not *per se*

impermissible, if "calculated to incite the passions and prejudices of the jurors"

such appeals may be impermissible.  *See United States v. Solivan*, 937 F.2d 1146,

1151 (6th Cir. 1991).  A case-by-case analysis is required.  *Id.*

495.   Here the prosecutor tied a finding of guilt to the jury's duty to give Elizabeth

Sheeler justice:

> The second person this case is about is because I've met
> that burden, because the Defendant has had his right to a
> jury trial, let's make this case about Elizabeth Sheeler
> getting justice because the government has done what the
> government is expected under the Constitution to do."

(Tr. at 1857–58.)

496.   The prosecutor reiterated this "justice for Elizabeth Sheeler" theme in

rebuttal:  "Elizabeth Sheeler is asking you on this evidence to convict her murderer

and so am I."  (Tr. at 1918.)  Implying that justice for the victim can be obtained

only by convicting *this* Defendant, regardless of the evidence, is clearly improper.

497.   The prosecutor repeated this theory in the penalty phase arguments:

"[J]ustice is a two-way street . . . he has had his side of the highway.  Give

Elizabeth Sheeler hers."  (Tr. at 2241.)   Roland Davis cannot be punished for

exercising his constitutional right to trial any more than he may be punished for

187

exercising his right to remain silent.  *See* Sixteenth Ground for Relief, Subsection

D, *supra.*  Premising "justice" for the victim on the fact that Davis exercised his

right to a jury trial denigrates and chills the exercise of that constitutional right to

trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.[42]

### G.    The prosecutor engaged in other improper conduct during the penalty phase.

498.    The prosecutor engaged in other egregious misconduct throughout the

penalty phase as well.

### 1.    The prosecutor made improper comments during his opening statement.

499.    In his opening statement, the prosecutor explained to the jury it would only

be considering three specifications even though it had found Davis guilty of four.

The prosecutor stated:

> The fact that that fourth one isn't there doesn't mean that
> you guys did anything wrong, because you didn't.  It's
> just a legal thing that's impossible to explain.  It's
> probably not appropriate for me to explain why the fourth
> one isn't here, but you may not rely upon the fourth one.
> Okay.  Its [sic] nothing you guys did wrong.  Its [sic]
> nothing that the defendant or the Judge just decided today
> we're going to take away this one.  Its [sic] legal issues
> that don't concern you.

---

[42] To the extent that counsel failed to object to the prosecutor's ongoing requests
for justice for the victim, counsel's performance fell far below the prevailing
norms, and was therefore unreasonable depriving Davis of the effective assistance
of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See*
Eighteenth Ground for Relief, *infra.*

(Tr. at 2017.)

500.   No explanation should have been given, and if an explanation was needed, it should have come from the court.[43]  This argument acted to focus the jury on an aggravating circumstance they could not legally consider.  Moreover, permitting this "explanation" to come from the prosecutor put the prosecutor in a position of instructing the jury—a role reserved exclusively for the court.

### 2.    The prosecutor improperly suggested to the jury that it could not consider certain mitigating evidence.

501.   The prosecutor improperly suggested to the jury that it could not consider much of the mitigating evidence presented by Davis, through improper cross examination of defense witnesses and during argument.  The Supreme Court has clearly established that in capital cases, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also DePew v.*

---

[43] To the extent that counsel for Davis did not object to the improper argument, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

189

*Anderson*, 311 F.3d 742, 748 (6th Cir. 2002) (holding "[t]he Eighth Amendment mitigation requirement also applies to the actions of prosecutors.").

502.   Davis' brother, Dana Davis, testified to the difficult circumstances of Roland and his childhood, including his father's alcoholism and domestic violence.  (Tr. at 2083–90.)  He also testified that when his mother left his father and moved them to Florida, Roland took care of him and his brother and eventually got a job and contributed to the family finances.  (Tr. at 2091–92.)

503.   During cross examination, the prosecutor, using Dana's testimony about Roland's contribution to the family finances, repeatedly and improperly questioned Dana about Roland's child-support arrearages.  (Tr. at 2113–14.)[44]  This was an attempt by the prosecutor to prejudicially portray Davis as a deadbeat father, which was wholly irrelevant to the issues Davis raised in the penalty phase.  No witness attempted to portray Davis as a great father or as current in his child-support obligations and accordingly, this cross examination was improper and prejudicial.

504.   This was not an isolated occurrence.  The prosecutor repeatedly engaged in improper cross examination of Dana Davis, and other penalty phase witnesses.

---

[44] To the extent that counsel for Davis did not object to the improper argument, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

The state brought up an alleged law suit by one of Davis' employers[45]—also wholly irrelevant to the issues—again offered merely to portray Davis as a bad person.  The state also suggested Davis tried to buy himself back into someone's favor[46] which was, again, totally irrelevant to the penalty phase issues.

505.   The state elicited testimony from Dolly Sidle about Sharon Davis' "strength of character," her husband's ability to overcome his drinking problem with counseling and hard work, and the fact that these issues can be overcome with counseling.  (Tr. at 2146–47.)  This was improper cross examination, as it was irrelevant to the issues, and because Sidle was not qualified as an expert to give opinions about overcoming issues of domestic violence, alcoholism and abuse and/or their lasting effects on the psychological makeup of a child.  The state used Sidle to portray Davis as having a weak character and as a man who refused to get help for his problems.[47]

---

[45]"With respect to that payment, isn't it a fact that Callander Cleaners had to sue him to get that money . . . ."  (Tr. at 2122.)

[46]"But it wouldn't be uncommon at all for Mr. Davis to try to do something to buy himself back into someone's favor. . . . How about buying $1,200 worth of drums for his ex-girlfriend's son as a way to get back into his—Terri's favor.  That's something we would expect from your brother, correct?"  (Tr. at 2123.)

[47]To the extent that counsel for Davis did not object to all of these comments and improper argument, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

506.   The state continued with these same improper themes in the cross
examination of Susan McGuire.  McGuire testified that she was one of five kids
living with an abusive stepfather from age five through age sixteen.  (Tr. at 2162–
63.)  The state again elicited testimony that counseling helped McGuire and then
asked her if the abuse made her grow up and "go out and kill [somebody]?"  (Tr. at
2163.)  This type of questioning is always improper.  It was asked solely to inflame
the jury.

507.   The prosecutor's questioning of McGuire misled the jurors to believe that
they could not consider any evidence that did *not* relate to Davis' guilt or
innocence of the offense, and/or that a nexus must exist between the crime and any
evidence offered as mitigation for such evidence to, in fact, be considered
mitigation evidence.

508.   The prosecutor argued this same theme in closing.  He repeatedly suggested
there was no mitigating evidence, (Tr. at 2227, 2229, 2238, 2241–42, 2275–76),
and this deliberately limited the "mitigation" the jury could consider to factors that
provided an explanation for the crime.  The prosecutor then argued that there was
no explanation for the crime, and therefore there was no mitigation.

509.   Similarly, the prosecutor repeatedly argued that nothing that occurred in
Davis' childhood was mitigating:

> What he and his siblings and his mother endured was
> wrong by anyone's definition then or now, but it doesn't

192

> mitigate in any way, shape or form what he does 30 years
> later.

(Tr. at 2231);

> [O]ne of the things that was strikingly absent from the
> testimony about how his father would physically abuse
> his mother in the children's presence, strikingly absent is
> a connection . . . [a] connection between that time in his
> life to the year 2000 when he stabs to death an 86-year
> old woman, Not just a 30 year gap I've already
> mentioned, but we might have a connection a rational
> connection between that upbringing and killing someone.

(Tr. at 2231.)

510.   The prosecutor continued this improper line of argument that there was not

nexus between the offense and Davis' offered mitigation evidence and thus there

was *no* mitigation for the jury to consider.  The prosecutor argued "[t]here is no

connection and therefore, there is no mitigation.  (Tr. at 2234.)  He also asserted

"[a]nd you know why you haven't heard it, there is no connection, and therefore,

there is no mitigation."  (Tr. at 2277.)  He also emphasized "[n]o connection, folks,

and therefore, no mitigation."  (Tr. at 2281.)

511.   The prosecutor improperly argued that the evidence presented did not

explain why Davis committed the crimes and therefore was not mitigating

evidence.  Mitigation is not an "excuse" for aggravated murder.  *See Eddings v.*

*Oklahoma*, 455 U.S. 104, 113 (1982).  It is not limited to an explanation for the

murder.  The Eighth Amendment requires the jury in a capital case to fully

193

consider and give effect to all relevant proffered mitigating evidence of the defendant's history, background, character, record, and the circumstances of the offense. *Id*. at 113–14. The jury must consider the defendant's relevant evidence for its full mitigating effect. *Johnson v. Texas*, 509 U.S. 350, 366 (1993). Under Ohio law, mitigation evidence is any evidence to be considered in determining the appropriateness of a life sentence.

### 3. The prosecutor improperly argued the absence of mitigating factors as a non-statutory aggravating circumstance.

512. The prosecutor also improperly argued that the nature and circumstances of the offense was aggravating.

> Now, the aggravating circumstances are, as I noted earlier, just the kidnapping, the aggravated robbery and the aggravated burglary. You can nonetheless look at the nature and circumstances of the offense not as aggravating circumstances, but to see if there is anything mitigating there. Is there anything mitigating about the nature and circumstances of the offense. I submit to you there's nothing mitigating about stabbing to death an 86-year old woman in the sanctity of her own home, to leave her die in her—bleeding to death because you want to steal from her and/or sexually impose yourself upon her against her wishes. I defy any one of you to come up with anything mitigating in the circumstances and nature of the offense. Anything.

(Tr. at 2229.)

513. He continued:

> In this particular case, ladies and gentlemen, on what you've heard, the complete absence of mitigating

194

> circumstances and the nature—excuse me, mitigating
> factors and the nature and circumstances of the offense,
> combined with what you heard yesterday that didn't deal
> with any events taking place in the last three decades to
> speak of, there is no mitigation.

(Tr. at 2241.)

514.   Davis never argued that the nature and circumstances of the offense should

be considered as mitigating.  This argument, addressing the nature and

circumstances of the offense as aggravating, was improper when the defense never

requested the jury consider them as mitigating.

515.   The prosecutor made the same argument about with mental illness:

> There's been no indication that the Defendant is anything
> other than he was held back in school a couple of times,
> but no medical diagnosis of some huge mental disorder
> that wasn't of his choosing, some organic this or that.

(Tr. at 2279.)

516.   The defense never argued that Davis suffered from a mental illness or

mental disorder that should be considered as mitigating.  The prosecutor

improperly argued the absence of mitigating factors that the defense never claimed

existed.  This was a sham argument.  It was a way to put the absence of mitigating

factors in front of the jury as a non-statutory aggravating circumstance.

517.   The state made the same argument about youth—another statutory

mitigating factor on which the defense did not rely and did not raise.  The state

constructed a strawman argument beginning in voir dire and repeated it throughout

195

voir dire and then brought it back up in closing argument to argue that the jurors

had agreed that an 18-year-old might be less culpable than a 35-year-old, Davis

was a 35-year-old man, and, therefore, he deserved death.

518.  The state repeatedly used an example of two persons committing the same

crime but one being 18 with mental health problems and no family support and the

other being a defendant with all kinds of opportunities, jobs and family support.

The prosecutor repeatedly used this example to explain what mitigation is

supposed to be[48] and then used it in closing argument:

> Remember the situation I think I gave all of you in the
> jury selection process when you were in here six at a
> time, and I asked you to—I gave you a scenario of these
> two identical aggravated robberies.  The convenient store
> two blocks this way and another convenient store two
> blocks this way.  And I asked you to presuppose that the
> crimes were identical in all respects.  And I asked each
> and every one of you, well, can you see if they're
> identical that there might be reasons to impose the death
> penalty in one case but not the other.  And some of you
> thought about it and came up with—most of you, I think
> came up with what would be a normal human reaction
> for most people is, well, it's the same crime, same
> punishment.  And then we talked about, well, what if this
> guy was 18 years old when he committed the offense and
> from the age of 10 all he ever knew was the life of crime.
>
> This guy over here was 35 and had all the options in the
> world.  I submit this Defendant, Roland Davis, is more
> like this guy over here.  Not because he didn't have some
> abusive childhood, witnessing his mother being

---

[48] (*See* Tr. at 479–82; 598–606; 661–65; 699–703; 743–47.)

> assaulted, no but because for 30 years he's been out of
> that.  For 30 years he's not had to deal with that.  For 30
> years he's had an opportunity to work, to make
> something of himself.

(Tr. at 2239–40.)[49]  *See also* Eighteenth Ground for Relief, *infra*.

519.   It is improper for the state to argue the non-existence of statutory mitigating factors not raised by the defense.

520.   The prosecutor's closing argument was especially prejudicial because it went uncorrected.  The prosecutor repeatedly argued that Davis' mitigation deserved no weight because it failed to explain the crime.  The question before the jury at the penalty phase was whether Roland Davis would be sentenced to death or to life imprisonment.   The jury had to decide if the factors in mitigation made a sentence of life imprisonment appropriate rather than a sentence of death.  Because the prosecutor's prejudicial misconduct went uncorrected, it was necessarily viewed as a correct statement by the jury.  *See Donnelly*, 416 U.S. at 645.

521.   Davis had every right to present evidence in mitigation—and to have his jury fully consider and give effect to his mitigation evidence—in an effort to spare his life.  Indeed, that is the very purpose of presenting the mitigating evidence.

---

[49] To the extent that counsel for Davis initially brought up a similar example in voir dire and to the extent that defense counsel did not object to the improper argument, counsel's performance was not in keeping with the prevailing professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See* Eighteenth Ground for Relief, *infra*.

Davis and defense counsel had an obligation to present this evidence.  *See Coleman v. Mitchell*, 268 F.3d 417, 450 (6th Cir. 2001).  He presented evidence of his abusive childhood, including an alcoholic father who physically and mentally abused his mother and his siblings as well as Davis.  He presented evidence that, for a period of time, he was abandoned by both his mother and father and placed in an orphanage.  The prosecutor's consistent but improper characterization of what constitutes "mitigation" in general, and Davis' mitigation evidence specifically, prevented his jury from being able to fully consider and give effect to Davis' mitigation evidence.

### H.  The state improperly withheld *Brady* material.

522.  The state failed to disclose any and all evidence favorable to Roland Davis.  As a result, Davis was denied his constitutional rights to due process, equal protection, and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments.

523.  The state has a duty to disclose any and all evidence favorable to the accused.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This duty does not just apply to the prosecution, but it extends to all of the entities acting on the government's behalf.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  In other words, the police, Highway Patrol, and DRC are obligated to turn over all exculpatory and impeachment evidence, as well.  *See United States v. Bagley*, 473 U.S. 667, 676

(1985) ("Impeachment evidence . . . falls with the *Brady* rule."). *See also*, *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).

524. The state's evidence included the testimony of inmate Richard Hummel. (Tr. at 1385–1410.) Hummel testified that he met Davis in the Licking County Jail, and that Davis informed him that he stabbed and killed the victim. (Tr. at 1389–91, 1393–96.) According to Hummel, he came forward with this information because the victim was eighty-six years old and that it was a moral thing for him. (Tr. at 1397.) Mr. Hummel also implied that he did not receive any benefit from the state for his testimony against Davis. (Tr. at 1399.)

525. Davis filed a Motion to Be Furnished with Statements, Promises, Inducements, or Rewards to Any State Witness; and a Motion for Disclosure of Impeaching Information. (*See* Motions filed December 10, 2004). *See Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 111 (1976).

526. However, the state never revealed that Hummel had violated his probation. Violation of parole or probation is proper impeachment information. *See Davis v. Alaska*, 415 U.S. 308, 315–320 (1974).

527. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. Impeachment evidence "if

disclosed and used effectively, . . . may make the difference between conviction and acquittal." *Id.* at 676. Thus, the impeachment evidence described above is material to Davis' defense.

### I.   Conclusion

528.   From start to finish, the prosecutor resorted to improper tactics in order to secure Davis' conviction and death sentence, including witness-vouching, commenting on Davis' silence, and shifting the burden of proof to Davis, improper cross examination and argument to inflame the passions and prejudice of the jury, the repeated introduction of victim impact evidence, denigration of the defense and strawman arguments that have long been condemned for their likelihood to mislead and prejudice a jury, and improper characterization of Davis' mitigation evidence that prevented the jury from being able to fully consider and give effect to his mitigation evidence. Furthermore, the misconduct was extensive and prejudicial. From the voir dire through the mitigation hearing, the prosecutor failed to conform his conduct to constitutional standards.

529.   Prosecutorial improprieties must be viewed as a whole. *See Berger*, 295 U.S. at 89 ("Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."); *Young*, 470 U.S.

at 11 (holding that a prosecutor's conduct must be analyzed in context to determine if defendant was denied a fair trial).

530.   In sum, viewed cumulatively, the prosecutorial misconduct in this case "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The extent of the misconduct requires vacation of Davis' conviction and sentence as obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

531.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

532.   This Court should issue the writ.

**Seventeenth Ground for Relief:**

**DAVIS WAS DENIED HIS RIGHT TO DUE PROCESS AND TO A FAIR TRIAL WHEN THE STATE FAILED TO DISCLOSE MATERIAL, FAVORABLE EVIDENCE.**

533.   Exculpatory evidence must be provided by the prosecution to the defense in discovery.  Exculpatory evidence includes evidence that can be used for impeachment.  *Kyles v. Whitley*, 514 U.S. 419 (1995); *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *United States v. Agurs*, 427 U.S. 97, 111 (1976); *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935).  Prior to trial, Davis filed a motion to disclose exculpatory and impeachment information.  (*See* Defense Motions filed December 10, 2004.)

534.   The State failed to disclose that its jailhouse informant, Richard Hummel, had violated his probation.  (Post Conviction Pet., Ex. M.)  Hummel testified that Davis provided information indicating he had killed Elizabeth Sheeler while Hummel and Davis were both in the county jail.  Davis also filed a motion to disclose any promises, rewards or inducements offered to State's witnesses.  Hummel denied being offered anything in exchange for his testimony.

535.   The trial court overruled this post conviction ground for relief and failed to permit either an evidentiary hearing or discovery on this issue.

536.   The evidence obviously would have been important to use on cross examination since it shows a failure to keep his word which is impeachment material.  *Davis v. Alaska*, 415 U.S. 308, 315, 320 (1974); *Pointer v. Texas*, 380 U.S. 400, 405 (1965).

537.   The State was required to disclose this information to Davis because the Confrontation Clause of the Sixth Amendment provides criminal defendants with the right to confront, face to face, the witnesses giving evidence against them. *Lilly v. Virginia*, 527 U.S. 116 (1999).  Inherent in the right to confront one's accusers is the right to cross examine them, particularly the witness' propensity for truthfulness.  *Coy v. Iowa*, 487 U.S. 1012 (1988); *Davis*, 415 U.S. at 315, 320.

538.   There were no other witnesses who testified that Davis had made inculpatory statements.  Davis spoke to the police several times for over eight hours without giving any inculpatory statements.  It was critical for Davis and his counsel to have a complete opportunity to investigate and then cross examine Hummel, with all the information available for impeachment.  The importance of Hummel's testimony combined with the State's agents attempting to influence another inmate (Damien Turner) into providing informant testimony, (Post Conviction Pet., Ex. A), made this evidence material to the defense.

539.   The state also failed to disclose material exculpatory and impeachment evidence regarding the unreliability of hair, blood spatter, bodily fluids, trace,

fingerprint, DNA, and other forensic evidence presented by their forensic expert witnesses, and to subsequently correct any material misrepresentation even after trial, as they were constitutionally required to do.

540.   The evidence relating to the unreliability of the "science" underlying the hair identification, blood spatter, bodily fluids, trace, fingerprint, DNA and other forensic evidence presented by the expert witnesses in this case is material and exculpatory because it creates legitimate doubt as to the accuracy and reliability of any supposedly scientific identification of Roland Davis as the perpetrator of the crimes for which he was convicted.  *See* Sixth, Sixteenth  Grounds for Relief, *supra*; Eighteenth, Twenty-Second Grounds for Relief, *infra*.  Similarly, the scientific defects in the analyses performed in this case are material and exculpatory.  *See id.*

541.   Disclosure of the material exculpatory and impeachment evidence regarding the unreliability of hair, blood spatter, bodily fluids, trace, fingerprint, DNA, and other forensic evidence presented by the state's expert witnesses would have impeached each witness's credibility and testimony that was so key to Davis' conviction and sentence.

542.   Consequently, there is a reasonable probability that the result of the proceeding would have been different, and the withheld evidence could reasonably

204

be taken to put the whole case in such a different light as to undermine confidence in the verdict.

543.   The failure to disclose this information undermines confidence in Davis' convictions and requires relief.

544.   The failure to disclose the foregoing material and information constitutes violations of *Brady*, *Bagley*, *Giglio*, and/or *Napue*, and denied Roland Davis due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

545.   To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

546.   This Court should issue the writ.

# INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS FOR RELIEF

## Eighteenth Ground for Relief:

### ROLAND DAVIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

547.   The Fifth, Sixth, Eighth, and Fourteenth Amendments guarantee a criminal defendant the right to the effective assistance of counsel.  This right is violated when counsel's performance falls below an objective standard of reasonableness as measured by the prevailing professional norms at the time, and the client is prejudiced by counsel's breach of duty.  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482-84 (2010); *Porter v. McCollum*, 130 S. Ct. 447, 452–56 (2009) (per curiam); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000); *Strickland v. Washington*, 466 U.S. 668, 686–87 (1984).

548.   "Guides" to determining the reasonableness of Davis' counsel's performance can be found in such things as the 2003 edition of the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (hereinafter ABA *Guidelines*) and other sources that similarly reflect or describe the professional norms of practice prevailing when the representation took place.  *See Padilla*, 130 S. Ct. at 1482–83 (listing myriad sources useful to identify "prevailing professional norms"); *Bobby v. Van Hook*, 130 S. Ct. 13, 16–17 (2009) (per curiam).

549.   The test for judging counsel's effectiveness under *Strickland* is well established:  First, the defendant must show that counsel's performance was deficient, *i.e.*, that it fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.  Second, the defendant must demonstrate that the deficient performance prejudiced the defense, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  *Id.* at 694.

550.   "It is past question that the rule set forth in *Strickland* qualifies as 'clearly established federal law.'"  *Williams*, 529 U.S. at 391.  The analysis under the *Strickland* standard "of necessity requires a case-by-case examination of the evidence."  *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring). *Strickland* requires an assessment of the aggregate impact of counsel's deficient actions when evaluating whether such failures are prejudicial.  *Strickland*, 466 U.S. at 695–96.

551.   While tactical or strategic errors generally are not found to constitute deficient performance, when the purported strategy of counsel is unreasonable or is unreasonable because it is based on insufficient information or investigation and has the effect of substantially denying a legal defense or denying the defendant the benefit of substantial and compelling mitigation, such strategy is outside existing

professional norms, thus depriving the defendant of effective counsel.  *Wiggins*, 539 U.S. at 535; *see also, e.g.*, ABA *Guidelines*.

552.   It was only after a full investigation of all the mitigating circumstances that counsel could make a reasoned, informed, tactical decision about which information should be used in the penalty phase.  *Wiggins*, 539 U.S. at 525; *Strickland*, 466 U.S. at 690–91.  Any decisions related to mitigation that counsel reached without any prior investigation or based on an unreasonably truncated investigation are not informed strategic trial decisions.  *See Wiggins*, 539 U.S. at 536.

553.   When counsel offers no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel, a federal habeas court may not invent such a strategy by engaging in "a *post hoc* rationalization of counsel's conduct" in lieu of relying on "an accurate description of [counsel's] deliberations prior to" that failure.  *Id.* at 526–27.

**A.     Davis was denied the effective assistance of counsel during the pre-trial stage.**

**1.     Counsel failed to recognize, request, or show the need for expert and investigative assistance.**

554.   Trial counsel failed to recognize or request or demonstrate the need for the investigative and expert assistance reasonably necessary for counsel to fully and thoroughly investigate the state's case, Davis' life history and background and to

fully present that life history and background, and explain the effect of that history on his development at the penalty phase of the trial.

555.   Obtaining expert and investigative assistance under *Ake v. Oklahoma*, 470 U.S. 68, 78–79 (1985), and Ohio law, *State v. Broom*, 533 N.E.2d 682, 691 (Ohio 1988), required counsel to request and demonstrate a particularized need for that assistance.  To the extent Davis' trial counsel failed to request or to make a particularized demonstration of the need for expert and investigative assistance, such failure fell below the prevailing professional norms for counsel representing indigent capital defendants in 2005, and as such was unreasonable thereby denying Davis the effective assistance of counsel.  *See Strickland*, 466 U.S. at 686–87.

556.   Trial counsel likewise failed to request funding for expert and investigative assistance *ex parte*.  The state responded to Davis' request and requested that any appointments be subject to financial caps.  (Status Hr'g Tr. at 3–4 (May 20, 2005).)

557.   Defense counsel is responsible for determining what resources are needed and demonstrating to the court the necessity of authorizing funds for those resources.  Moreover, because the defense should not be required to disclose privileged communications or strategy to the prosecution in order to secure these resources, it is counsel's obligation to insist upon making these requests *ex parte* and *in camera*.  *See, e.g.*, ABA *Guidelines*, Commentary to Guideline 4.1.  The failure of counsel to make these requests *ex parte* fell below the prevailing

professional norms and was therefore, unreasonable and denied Davis the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

558.  But for counsel's deficient performance, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

559.  Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **2.    Counsel failed to sufficiently object to the restraints on Davis during trial, and failed to request a hearing on the need for restraints on Davis during trial.**

560.  Prior to trial, counsel filed a Motion to Permit Accused to Appear at All Proceedings Without Restraints.  The court overruled this motion, and ordered Davis to wear the "Band It" device, stating that "[a]t trial, . . . the Defendant shall appear to be unrestrained.  However, the Defendant shall be shackled or restrained in some manner so as not to appear restrained."  (Entry No. 18, filed May 25, 2005.)

561.  Davis was tried while improperly, unreasonably and visibly shackled and/or restrained and required to wear a stun belt, even when the air conditioning was broken in the courtroom in July.

562.   The trial court's order, issued without the court first holding a hearing on the need to shackle or restrain Davis, violated Davis' right to a fair trial, to the effective assistance of counsel, to present a defense and to present mitigation and have that mitigation evidence considered and given effect by the jury.  *See* First Ground for Relief, *supra*.

563.   Counsel had a duty to know the relevant caselaw, to assert all available defenses and arguments, and to object to the court's failure to hold a hearing.  *See, e.g.*, ABA *Guidelines*, Guideline 10.8.

564.   Counsel did not object to the court's entry or cite caselaw such as *Deck v. Missouri*, 544 U.S. 622, 624 (2005), *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986), or *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970), which require a hearing before any type of shackling is permitted.  Counsel did not waive a hearing but merely requested the least intrusive method of restraint if their motion were overruled.

565.   Counsel's performance fell below the prevailing professional norms when counsel failed to object to the use of the "Band It" device during the trial phase or the penalty phase.  Likewise, counsel's performance fell below the prevailing professional norms in effect at both phases when counsel failed to know and argue to the court the relevant principles and controlling caselaw in this area.  Counsel's performance also fell below the prevailing professional norms at both phases when

counsel failed to request a hearing to determine whether it was necessary to use these excessive security measures throughout Davis' trial.

566.  Counsel should have objected to the court's order, demanded that the court comply with the controlling law, and insisted on a hearing to determine whether it was necessary to use these excessive security measures throughout Davis' trial.

567.  There is a reasonable probability that the state would not have been able to sustain its burden to show a compelling need to restrain Davis independent of the crime for which he was standing trial.  There was no evidence Davis had caused or threatened to cause any disruption in the courtroom.  Likewise, Davis had no incidents of violence while in the county jail.  (*See* Joint Stipulation No. 13, Licking County Jail Records, submitted in penalty phase.)  Davis did not have a history of committing violent crimes.

568.  Counsel failures resulted in Davis being forced to wear the Band It restraint device without any individualized determination of a compelling need for him to be restrained, to his prejudice.  The device caused Davis to have to wear a sweater in June/July because he could not button his shirt over the bulky device.  This was exacerbated by the fact that the air conditioning in the courtroom was broken at various times during trial, making Davis' bulky attire even more noticeably unusual and thus drawing attention to the Band-It, making the jury more likely to convict and impose death.

569.   But for counsel's failures, there is a reasonable probability that the outcome would have been different and Davis would not have been forced to wear the Band It restraint device, visible to the jury, without sufficient justification.

570.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **3.    Counsel failed to investigate, prepare, and litigate their Motion in Limine regarding the admissibility of DNA evidence and instead prejudiced Davis by stipulating to the admission of the evidence.**

571.   Counsel failed to investigate, prepare, and litigate their Motion in Limine To Preclude The Use Of Or Reference To DNA Evidence.  This motion attacked the scientific foundation for the admission of DNA evidence.  Rather than offering witnesses and/or testimony at the hearing, counsel stipulated to an agreement by which they agreed on every issue that was raised by the motion.  (Mot. in Limine Hr'g Tr. at 4 (June 13, 2005).)  The state offered ten exhibits without objection and without requiring live testimony about the validation studies for the DNA testing that was done in this case.  (*Id.* at 5.)  Counsel conceded every issue they had raised in their motion, in exchange for no consideration from the prosecutor.

572.   Although a trial court may not be required to hold a preliminary hearing on the admissibility of DNA evidence, once the court granted a hearing, counsel had an obligation to prepare for, and present evidence to support their contention that

the DNA evidence in this case was not admissible.  Instead, counsel stipulated every fact necessary for the Court to overrule the Motion without an evidentiary hearing.  (*See* Joint Ex. No.1, Stipulation of Parties.)

573.   The obligation to actually offer evidence in support of the Motion in Limine, became even more important when counsel failed to contest or even require the state to establish the qualifications of the persons collecting, transporting or storing the evidence from which the DNA was obtained or the scientific support for the forensic evidence.  *See* Sixth, Sixteenth and Seventeenth Grounds for Relief, *supra*; Twenty-Second Ground for Relief, *infra*; *see also, e.g.*, ABA *Guidelines*, Guideline 10.8.B.1 ("Counsel who decide to assert a particular legal claim should: present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction.").

574.   While the DNA evidence may have been admissible and questions regarding its reliability go to the weight of the evidence rather than its admissibility, the proffered DNA evidence was still subject to attack in light of rapidly changing DNA technology.  *See See* Sixth, Sixteenth and Seventeenth Grounds for Relief, *supra*; Twenty-Second Ground for Relief, *infra*.  Not every new DNA technology is necessarily reliable or valid and therefore is always subject to a *Daubert* challenge.  In fact, DNA obtained from Y-STR testing is a recent development,

214

may not have been previously tested in Ohio courts, and must be assessed for potential contextual bias and analyst error in any case.  Whether this new technology remains valid and reliable is subject to debate among scientific and legal minds.  Counsel's failure to actually contest any part of the DNA evidence at the preliminary hearings fell far below the prevailing professional norm for counsel representing capital defendants in 2005.  As such, counsel's actions were unreasonable and denied Davis the effective assistance of counsel.

575.   But for counsel's deficient performance, there is a reasonable probability that the DNA evidence would have been excluded or required to be accurate and that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

576.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 4.    Counsel failed to move for a change of venue.

577.   Davis' counsel had a duty under the prevailing professional norms to move for a change of venue in light of the tremendous amount of prejudicial pretrial publicity surrounding Davis' case.

578.   Counsel unreasonably failed to move for a change of venue, however, to Davis' prejudice.  *See* Second and Fourth Grounds for Relief, *supra*.

215

579.   But for counsel's deficient performance, there is a reasonable probability that a fair and impartial jury would have been seated in another venue, untainted by pretrial publicity and that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

580.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial by a fair and impartial jury and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **5.     Counsel failed to challenge the venire to ensure a fair cross-section of the community.**

581.   Counsel had a duty to insure that the jury that tried Roland Davis was drawn from and represented a fair cross-section of the community.  *See, e.g.*, ABA *Guidelines*, Guideline 10.8.

582.   Counsel unreasonably failed to investigate or challenge the venire to ensure a fair cross-section of the community, however, to Davis' prejudice.  *See* Third Ground for Relief, *supra*.

583.   Counsel's deficient performance undermined confidence in the result of the trial, by permitting Davis to be tried by a jury that was not drawn from a fair cross-section of the community.

584.   But for counsel's deficient performance, there is a reasonable probability that Davis would have been tried by a jury drawn from a fair cross-section of the

216

community, and that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

585.  Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 6. Counsel's performance fell below the prevailing professional norms for counsel in a capital case during the jury selection process.

586.  Counsel's performance throughout the jury selection process fell far below the prevailing professional norms for counsel in a capital case in 2005, in part because of the unreasonable restrictions requested by the state and granted by the trial court, and in part because of counsel's own failures.  Counsel did not zealously demand the right to fully examine jurors on their ability to fully consider a sentence of death, on their ability to consider theories of defense and/or mitigation, or their ability to fully consider a life sentence.  Counsel failed to fully inquire into the knowledge the prospective jurors had of the facts of the case. Counsel failed to rehabilitate prospective jurors with scruples against the death penalty.  *See* Fourth Ground for Relief, *supra*.  To the extent that counsel failed to zealously argue for the right to conduct such questioning and to more fully demand a complete and thorough voir dire, Davis was deprived of the effective assistance of counsel.

217

587.   Roland Davis was entitled to a fair and impartial jury that could follow the law and fairly consider all of the available punishments at the sentencing phase, *Morgan v. Illinois*, 504 U.S. 719, 735–36 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85–87 (1988), just as the state is entitled to a jury that will fairly consider the death penalty, *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 522–23 (1968).  Counsel's failure to fully question these prospective automatic death penalty jurors on their ability to fully consider a life sentence was unreasonable as were the trial court's prohibitions and limitations on such questioning.

588.   Counsel failed to consistently and effectively question prospective jurors on their attitudes regarding elderly victims and the ability to put such attitudes aside.

589.   Counsel's failure to zealously pursue questioning about what facts jurors knew of the case prevented counsel from making informed and reasoned decisions concerning challenges for cause as well as peremptory challenges.

590.   But for counsel's deficient performance, there is a reasonable probability that a less biased jury would have been seated and that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

591.   Counsel's failure to properly conduct jury selection and voir dire resulted in a jury that was not fair and impartial and was not able to give Davis a fair trial,

thus depriving Davis of the effective assistance of counsel, due process and a fair and reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### B. Davis was denied the effective assistance during the trial phase.

#### 1. Counsel entered into excessive stipulations to witnesses' qualifications, evidence, and facts.

592.   Counsel volunteered a blanket stipulation of the qualifications of Det. Elliget.  (Tr. at 1034–35.)[50]  Such a stipulation permitted the state to avoid proving Det. Elliget's qualifications or basis for his 'expert' opinions and chain of custody for numerous items.  *See* Seventh Ground for Relief, *supra*.

593.   Counsel also stipulated several factual matters that supported the state's theory.  For example, counsel for Davis stipulated the Yellow Cab work records— thereby permitting the state to argue that he was out of work at the time of Sheeler's death.  (Tr. at 1831.)  Counsel entered into this stipulation, despite the fact that the records were incomplete and these incomplete records could not establish when Davis worked at Yellow Cab or whether or not Davis was working at the time of Sheeler's death.  (*See* Joint Stipulation No. 3.)  Counsel stipulated to testimony of Elladean Hicks that she last spoke with Sheeler late on the night of

---

[50] "I'm more than happy to stipulate to Detective Elliget's qualifications.  He and I have spoken on numerous different occasions and we would agree and stipulate that he is an expert in criminology and crime scene investigation, collection of evidence . . . [a]nd preservation."  (Tr. at 1034–35.)

the July 10 thereby assisting the state in proving the time of the murder. (Joint Stipulation No. 2, Tr. at 1139.) Counsel agreed to a total of ten joint stipulations in the trial phase. This drastically reduced the State's burden of proof.

594. These repeated stipulations at trial created an atmosphere that suggested defense counsel was agreeing with the state in its theory, that the result of the trial was a foregone conclusion, and that the least defense counsel could do for the jury was make the trial shorter. Counsel conducted no adversarial testing of any of this stipulated evidence, all of which was critical to the state's case. (*See also* Tr. at 1202 (defense counsel remarked, "[w]e're all about stipulations").) As such, counsel's performance fell far below the prevailing professional norms for counsel representing capital defendants in 2005, and was unreasonable. *See, e.g.*, ABA *Guidelines*, Guidelines 10.7; 10.9.1.

595. But for counsel's deficient performance in stipulating to critical evidence, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

596. Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 2. Counsel permitted the state to introduce an unidentified tape recording that was never played in open court but was given to the jury during deliberations.

597.   Counsel acquiesced in the admission as evidence of unidentified tape recordings never played in the courtroom and the submission of the tapes and related transcript to the jury—for the first time during its deliberations.  *See* Eleventh and Twelfth Grounds for Relief, *supra*.  As such, defense counsel acquiesced in the presentation of evidence on defendant's guilt in the absence of Davis and his counsel.  Such acquiescence permitted evidence to be presented against Davis without any record of what that evidence was, what the jury heard, whether the jury reviewed portions of or the entire transcript, or whether the jury replayed portions of the tape.  In addition, the tape itself contains inadmissible and prejudicial hearsay statements.  Permitting the jury to hear this unidentified and inflammatory tape recording was objectively unreasonable conduct falling below the prevailing professional norms to the prejudice of Davis.

598.   Under *Strickland*, a defendant must show that but for counsel's deficient performance, there is a reasonable probability of a different outcome.  There are, however, some deficiencies that give rise to a presumption of prejudice.  *See United States v. Cronic*, 466 U.S. 648, 658–59 (1984).  The complete denial of counsel is one of the most obvious cases where such a presumption of prejudice would arise.  *Id.* at 659.  It is hard to conceive of a more critical stage of a capital

221

trial than the taking of evidence on the defendant's guilt.  The absence of counsel

during the presentation of the audiotape of the interview of Davis was

presumptively prejudicial.  Permitting the presentation of the tape recordings

during deliberations at the penalty phase was as clear a denial of Davis'

fundamental right to counsel.

599.   Trial counsel's failures actually prejudiced Davis by permitting inadmissible

testimony to be presented through these audiotapes.  A review of the audiotapes

reveals prejudicial—untrue—hearsay evidence presented repeatedly through the

detective, including the claim that Davis' semen was present in Sheeler's

apartment, and that someone identified him leaving the apartment.

600.   These statements by the detectives were untrue and were hearsay.  The tapes

should have been reviewed.  The inadmissible evidence should have been objected

to and redacted prior to or during the presentation of the audiotape in open court.

Permitting the jury to hear these blatantly inadmissible statements without

challenge, prejudiced Davis at both the trial and penalty phases.

601.   Counsel's failure to be present during the presentation of evidence against

Davis was unreasonable.

602.   But for counsel's deficient performance, there is a reasonable probability

that because the jury would not have heard this tainted testimony, at least one juror

would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

603.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 3. Counsel failed to effectively object to the exclusion of state's witness Meghan Clement's written analysis.

604.   Counsel had a duty to raise all available legal claims and objections. *See, e.g.*, ABA *Guidelines*, Guidelines 10.8, 10.11.

605.   The trial court refused to admit Defense Exhibit L, an Amended Certificate of Analysis prepared by the state's expert Meghan Clement.  The court continued to refuse to admit the exhibit even after the jury requested it during deliberations. *See* Sixth Ground for Relief, Sixteenth Ground for Relief, Seventeenth Ground for Relief, *supra*; Eighteenth Ground for Relief; Twenty-Second Ground for Relief, *infra*.

606.   Trial counsel proffered the exhibit and objected to the trial court's exclusion. To the extent that trial counsel had not researched the admissibility of this exhibit, prepared argument to rebut the trial court's reasoning, and more zealously objected to its exclusion, counsel's performance fell below the prevailing professional norms for counsel representing capital defendants in 2005.  Davis was prejudiced

because the jury was denied access to this crucial defense exhibit during deliberations, even though the jury requested it during deliberations.

607.   But for counsel's deficient performance, there is a reasonable probability that at least one juror, based on a review of Defense Exhibit L, would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

608.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **4.     Counsel failed to investigate, to present evidence to challenge the state's case, to present a viable defense, and to defend the case as related to the state's DNA and other forensic evidence and witnesses.**

609.   Counsel had a duty to make a reasonable investigation of the case *before* settling on a trial strategy or, at the least, to conduct sufficient inquiries to make an informed decision about whether further investigation was needed. *See Wiggins*, 539 U.S. at 525; *Strickland*, 466 U.S. at 690–91.

610.   Counsel also had a duty to conduct a reasonable investigation in order to present the most persuasive case that they could, including a pretrial investigation into the availability of independent, objective sources to support his defense.

611.   Counsel also had a duty to raise all available legal claims and objections. *See, e.g.*, ABA *Guidelines*, Guidelines 10.8, 10.11.

224

612.  Counsel's performance fell far below prevailing professional norms when:

1)   counsel failed to involve an expert in DNA or any other forensic evidence, even though the trial court authorized funding for a DNA expert to assist Davis' defense;

2)   counsel failed to thoroughly and reasonably investigate, including the DNA and other forensic evidence and any forensic expert witnesses, before settling on their trial strategy of advancing third-party-culpability as the central theory without employing independent DNA and other forensic experts to overcome the state's unrebutted DNA and other forensic evidence testimony;

3)   counsel failed to investigate and present forensic evidence in support of the third-party-culpability theory and a cogent challenge to the state's DNA evidence;

4)   counsel failed to investigate and exploit weaknesses in the state's DNA evidence and other forensic evidence, including contextual bias in the testing and analysis process;

5)   counsel failed to thoroughly and reasonably investigate before trial to determine what forensic evidence might be available for them to introduce, or how expert testimony might support the theory they had chosen, or rebut any forensic evidence the state might present that would rebut this theory;

6)   counsel failed to thoroughly and reasonably investigate and consult forensic experts who could assist during trial in such matters as how to effectively cross examine the state's forensic evidence witnesses in light of the numerous problems with forensic evidence highlighted in the NAS Report, including such things as contextual bias, or to counter the state's

225

forensic expert testimony with expert testimony of his own.

7)    counsel failed to ensure through pretrial motions or contemporaneous objections that improper and incorrect testimony from the state's expert witnesses was not given to the jury;

8)    counsel failed to object when the state and its DNA experts misled the jury by repeatedly declaring a "match"—which is improper individualization unsupported by the science—between the evidence and DNA test results, "matching" the evidence to either Sheeler or Roland Davis, or used similarly misleading individualization language himself, (*see* Tr. at 870; 1566; 1588; 1589–90; 1597–98; 1600–01; 1602–03; 1604; 1623; 1625; 1631–32; 1686; 1688; 1689–90; 1692; 1693; 1695–96; 1765);

9)    counsel failed to ensure that the prosecution and its witnesses were not permitted to testify to a "match" between Roland Davis and the DNA test results, and/or to ensure that the prosecution and its witnesses were only permitted to testify about the odds of exclusion rather than implying that the DNA tests resulted in individualized identification determinations that purported to "confirm" Roland Davis as the perpetrator of the crime, (*see id.*);

10)    counsel failed to rebut the fallacy in the state's DNA case that Randy Davis—Roland Davis' brother— could not be the source of the DNA found at the crime scene simply because Roland and Randy Davis were not identical twins, despite the defense's central theory of third-party culpability in the form of Roland Davis, (*see, e.g.*, Tr. at 1799);

11)    counsel failed to confront the state's DNA evidence by pointing out and emphasizing that the statistical probabilities of excluding Roland Davis offered by the state's experts were much lower when a male relative

226

or a sibling, such as Randy, is put into the equation. Again, this was especially prejudicial to Davis because defense counsel offered Randy as an alternate suspect;

12) counsel failed to confront the evidence of statistical probabilities from the state's experts—aimed at identifying Roland Davis with DNA evidence—through use of the "product rule";

13) counsel failed to inform the jury—and rebut the state's case—by way of mathematical concepts and genetic inheritance rules. Counsel should have demonstrated to the jury that the odds of the DNA from the crime scene excluding Roland Davis were far less than that to which the State's experts testified;

14) counsel failed to reduce witness Ramen Tejwani's opinion of "1 in 547" million to as low as 1.33 or 1 in 128 by way of expert testimony. Similarly, counsel could have reduced witness Meghan Clement's opinion of "1 in 97.1 quadrillion" by a factor of a trillion, but failed to do this as well; and/or

15) counsel failed to ensure that the presumption of innocence was followed, in accordance with mathematical statistical inferences in Davis' favor, through cross examination, closing argument, development and presentation of testimony from a defense expert, and proffered jury instructions.

(*See* Post Conviction Pet., Ex. X at 26–27, Aff. of Gregory Meyers.)

613. Under the prevailing professional norms, counsel had an obligation to do all of these things, but failed. Counsel's failures, individually and in the aggregate, constituted deficient performance.

614.    Davis was prejudiced because the overwhelming (but misleading) statistical probabilities misleadingly testified to by the state's experts created a false certainty that Davis had to be guilty based on DNA evidence.  The experts repeatedly testified that Sheeler "matched" the evidence, and that, similarly, Davis "matched" the evidence—not that he and his paternal relatives could not be excluded—thus creating the scientifically unsupported and unsupportable impression of a precise, individualized identification of Roland Davis as the perpetrator.  *See* Sixth, Sixteenth, Seventeenth Grounds for Relief, *supra*; Eighteenth and Twenty-Second Ground for Relief, *infra*.

615.    The state's DNA evidence was questionable, overstated, and based on a flawed statistical database and flawed methodology.  *See id.*; *see also*, Mot. for New Trial, Ex. 1, Aff. of Dr. Laurence Mueller.

616.    The DNA evidence relied on by the state at trial was questionable.  Roland Davis was identified as a suspect by using a database search.  The state's DNA experts, however, did not account for the database "hit" in their statistical analysis of the DNA test results.  There is no mention of major sources of uncertainty in DNA profiling, namely laboratory error or contextual bias.  Meghan Clement, one of the state's DNA experts, testified that it was impossible for non-identical twin siblings to have the same DNA.  This testimony was simply incorrect or false.  The genetic profiles developed from the bed sheets were mixed samples, with a partial

profile, and the statistical analysis of the weight of this evidence by the state's DNA experts overstated its value. (Mot. for New Trial, Ex. 1, Aff. of Dr. Laurence Mueller, at ¶ 4.)

617. Through consultation with and the use of a DNA expert such as Dr. Mueller, and other forensic evidence experts, trial counsel could and should have been prepared to properly object during direct examination of the state's forensic expert witnesses; could and should have otherwise prevented the state from eliciting misleading but highly prejudicial testimony; could and should have been able to employ expert advice as to how to effectively cross examine the state's forensic expert witnesses; and could and should have presented expert testimony of their own to undercut the weight and credibility of the state's forensic evidence, and to bolster their third-party-culpability theory.

618. But for counsel's deficient performance, there is a reasonable probability that, having heard accurate DNA evidence and other forensic evidence, at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

619. Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 5. Counsel failed to investigate and failed to present a viable defense to the charges Davis faced.

620.   Counsel had a duty to investigate, consider and present all available legal claims and defenses. *See, e.g.*, ABA *Guidelines*, Guidelines 10.7, 10.8.

621.   Counsel failed to offer viable defenses to the charges Davis faced, including a defense to the state's circumstantial evidence, or an alibi defense. (Post Conviction Pet., Exs. C, D, K, L, S, V, W.)

622.   Counsel unreasonably failed to investigate and present evidence that Davis acquired money around the time of the murder and robbery after being paid to deliver drugs in Indiana.  Evidence that Davis was paid money as a drug mule would have rebutted the state's circumstantial proof of guilt that Davis suddenly had money in July 2000 because he robbed the victim.  The jury heard evidence that Davis was not employed at that time.  This made his purchase of a $1,200 drum set and other items suspect.  Evidence that Davis was paid $8,000 as a drug mule would have explained why Davis had money to spend in July 2000, despite the lack of regular employment.

623.   Counsel's performance also fell below prevailing professional norms when counsel unreasonably failed to investigate and challenge a purported identification of him made by two witnesses in Annie's Place Restaurant in Newark, Ohio.  The witnesses testified that Davis was a patron in the restaurant in the early summer of 2003, and that Davis was suspiciously interested in a reward poster regarding

Sheeler's death and whether a sex offense was committed.  The owner of the restaurant, Tari Paxson, also testified that Davis was there asking about the poster when the air conditioning was being repaired, which would seemingly verify the date Davis was there based on the air conditioning repair bill.

624.   The man identified by the witnesses was not Davis, however, and the date of the air conditioning repair slip described by Paxson would verify that Davis was in Florida at that time.

625.   A sufficient investigation by counsel would have revealed this alibi for Davis, thus undercutting the strong inference of guilt created by the testimony of the witnesses from Annie's Place.

626.   Counsel unreasonably failed to perform any such investigation.  Failing to investigate an alibi that would place Davis in another state at the time he was purportedly asking suspicious questions at Annie's Place cannot be a reasoned trial strategy.

627.   Moreover, Davis has a distinctive speech pattern and a stutter.  Neither witness testified that the man identified in Annie's Place had an unusual speech pattern or stutter.  Counsel unreasonably failed to exploit this glaring omission on cross examination of either witness which failure was rooted in counsel's unreasonable failure to investigate.

628.   Counsel failed to investigate and subsequently call Damien Turner to testify.

231

629.   Counsel also failed to thoroughly and reasonably investigate DNA or other forensic evidence and any forensic expert witnesses, before advancing third-party-culpability as a defense even though they had not consulted or employed an independent DNA or other forensic expert to overcome the state's evidence.

630.   Counsel likewise failed to investigate and present forensic evidence in support of the third-party-culpability theory or a cogent challenge to the state's DNA evidence.

631.   Counsel failed to investigate and exploit weaknesses in the state's DNA evidence, including contextual bias.

632.   Counsel failed to thoroughly and reasonably investigate before trial to determine what forensic evidence might be available for them to introduce, or how expert testimony might support the theory they had chosen, or rebut any forensic evidence the state might present.

633.   Counsel failed to investigate and consult forensic experts who could assist during trial in such matters as effectively cross examining the state's forensic evidence witnesses, including regarding contextual bias, or countering the state's forensic expert testimony with their own expert testimony.

634.   Counsel failed to ensure that improper and incorrect testimony from the State's expert witnesses was not provided to the jury.

635.   Davis was prejudiced by counsel's deficient performance because the jury did not hear critical alibi evidence and evidence that would have rebutted the State's circumstantial evidence of Roland Davis as the perpetrator.

636.   But for counsel's deficient performance, there is a reasonable probability that, having been provided evidence to challenge the state's evidence and theory of guilt, at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

637.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 6.   Counsel failed to investigate and subsequently call Damien Turner to testify.

638.   Counsel had a duty to investigate and present all available legal claims and defenses.  *See, e.g.*, ABA *Guidelines*, Guidelines 10.7, 10.8.

639.   Counsel failed to investigate and subsequently call Damien Turner as a witness.  Turner's testimony would have undercut the weight and credibility of the prosecution's witness, Richard Hummel, who testified that he met Davis in the Licking County Jail and that Davis informed him that Davis stabbed and killed Sheeler.  (Tr. at 1389; 1391; 1393–96.)

640.   During his testimony, Hummel implied that he did not receive any benefit from the State of Ohio in exchange for his testimony against Davis.

233

641.   Hummel was a key witness.  His credibility was questionable.  *See* Seventeenth Ground for Relief, *supra*; Twenty-First Ground for Relief, *infra*. Davis could have challenged Hummel's credibility with Turner's testimony.  (*See* Post Conviction Pet., Ex. A.)

642.   Davis informed trial counsel that Turner had told Davis that Det. Vanoy offered to make "some of Turner's charges go away if Turner testified that [Davis] confessed to killing Mrs. Sheeler."  (*Id.* at ¶14.)

643.   Trial counsel failed to investigate Turner, and then failed to call Turner to testify in Davis' defense.

644.   Counsel's failures were unreasonable, and could not have been reasoned trial strategy, especially because Turner's testimony would have impeached the credibility of one of the prosecution's main witnesses.

645.   Davis was prejudiced by trial counsel's unreasonable failure to investigate thoroughly and to call Turner as a witness because counsel's failures deprived Davis of the opportunity to challenge Hummel's character for truthfulness.  *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'") (internal citation omitted).

646.   But for counsel's deficient performance in failing to investigate Turner, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

647.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 7.   Counsel failed to object to numerous instances of prosecutorial misconduct at both the trial and penalty phases.[51]

648.   Claims of prosecutorial misconduct require courts to assess both the culpability of the prosecutor, that is, whether the conduct was intentionally prejudicial, as well as whether that prejudice was realized.  *See Boyle v. Million*, 201 F.3d 711, 717–18 (6th Cir. 2000).  Here, there can be no question that the prosecutor's misconduct was intentional or that Davis was prejudiced by the prosecutor's misconduct.

649.   Although prosecutorial misconduct may occur at any point in the trial, it is especially dangerous during closing argument.  *See Donnelly v. DeChristoforo*,

---

[51] Davis has raised the misconduct of the prosecutor as separate substantive Grounds for Relief.  *See* Thirteenth and Sixteenth Grounds for Relief, *supra*, Rather than repeat the entire substantive prosecutorial misconduct argument here, Davis relies on the argument contained in the Thirteenth and Sixteenth Grounds for Relief.  To the extent that counsel failed to object or request curative instructions for this prosecutorial misconduct as outlined in the Thirteenth and Nineteenth Grounds for Relief.  Davis was deprived of the effective assistance of counsel.

416 U.S. 637, 646–47 (1974) (capital defendant is entitled to a determination of his guilt and sentence which is free from prosecutorial misconduct that renders the proceeding fundamentally unfair).  The prosecutor here engaged in what can only be described as deliberate and repeated misconduct.  To the extent that counsel failed to object and failed to request curative instructions, counsel's performance fell far below prevailing professional norms.  *See Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000).  Davis was prejudiced by the jury being exposed to the prosecutor's inflammatory evidence and arguments.

650.   But for counsel's deficient performance in failing to object to the prosecutorial misconduct, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

651.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 8.   Counsel failed to object to Detective Vanoy's commentary about his interrogation and his opinion testimony.

652.   Counsel failed to object to the improper testimony of Det. Vanoy.  *See* Fifth Ground for Relief, *supra*.  Detective Vanoy was not qualified to present the entire thought process of the Newark Police Department behind the investigation and interrogation.  Detective Vanoy was not qualified to give his opinion about the

truthfulness of Davis' statements or his opinion of Davis' thought processes during the interrogations.  This testimony was beyond the scope of any purported expertise of Det. Vanoy and usurped the role of the jury to make such determinations.  Counsel's failure to object to Det. Vanoy giving his dissertation and opinion on the interrogation of Roland Davis fell far below prevailing professional norms and prejudiced Davis by permitting the jury to hear Det. Vanoy's unqualified opinion testimony about Davis' veracity and his guilt.

653.   But for counsel's deficient performance in failing to prevent the unqualified opinion testimony of Det. Vanoy, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt, or that death was the appropriate punishment.

654.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 9.    Counsel failed to object to improper jury instructions.

655.   Counsel had a duty to investigate and raise all available legal claims, know the law, and advocate for correct or favorable jury instructions.  *See, e.g.*, ABA *Guidelines*, Guidelines 10.7, 10.8.

656.   The trial court in its trial phase instructions failed to give an instruction forbidding the jury from stacking inferences; failed to instruct the jurors to find

unanimously that Davis either committed kidnapping, aggravated robbery *or* aggravated burglary; gave incorrect purpose and causation instructions; and gave an instruction of "beyond a reasonable doubt" that relieved the state of its burden of proof.  *See* Fifteenth Ground for Relief, *supra*.

657.   Counsel failed to object to these faulty instructions.

658.   Counsel's failure to object to these incorrect instructions and failure to offer correct instructions fell below the prevailing professional norms and was therefore unreasonable.

659.   Davis was prejudiced when his jury was instructed to deliberate his guilt or innocence based on incorrect and misleading instructions.

660.   But for counsel's deficient performance, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting guilt.

661.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### C.   Davis was denied the effective assistance of counsel at the penalty phase.

#### 1.   Counsel failed to investigate, develop, present, and explain compelling mitigating evidence at the penalty phase.

662.   Trial counsel had a duty under the prevailing professional norms to conduct a thorough investigation of Davis' background for mitigating evidence, and to

238

present relevant mitigating evidence, especially when that mitigation evidence was compelling. *See Porter*, 130 S. Ct. at 452–53 (citing *Williams*, 529 U.S. at 396 (in turn citing the ABA *Guidelines*)).

663.   Counsel had a duty to thoroughly investigate any mitigation evidence arising from Davis' psychosocial history and elsewhere, in order to prepare and present the comprehensive and compelling mitigation theory that should have been readily apparent from the abusive childhood that Roland Davis endured. *See Wiggins*, 539 U.S. at 521–22.

664.   This duty included an obligation to develop a comprehensive and compelling mitigation theory before the start of voir dire, and to advance that theory at every opportunity throughout the duration of the trial.

665.   Counsel also had a duty to humanize Davis before the jury. *See Lockett v. Ohio*, 438 U.S. 586, 602–05 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

666.   Counsel also had a duty to present expert testimony and/or argument to explain the evidence in mitigation and its significance to explaining Davis' development and participation in these offenses. *See Johnson v. Bagley*, 544 F.3d 592, 600–01 (6th Cir. 2008).

667.   It was only after a full investigation of all the mitigating circumstances that counsel could make a reasoned, informed, tactical decision about which

239

information should be presented in the penalty phase. *Wiggins*, 539 U.S. at 525; *Strickland*, 466 U.S. at 690–91. Any decisions related to mitigation that counsel reached without any prior investigation or based on an unreasonably truncated investigation are not informed strategic trial decisions. *See Wiggins*, 539 U.S. at 536.

668. Counsel's investigation, development, presentation and explanation of mitigation evidence fell far below the prevailing professional norms, and were not informed strategic trial decisions.

> ### a. Counsel failed to thoroughly investigate the vast ocean of mitigation evidence that presented blatant red flags for investigation.

669. A number of witnesses had important information that could have been presented at the penalty phase, but counsel either failed to ask important questions when interviewing the witnesses, or failed to ask the appropriate questions during the penalty phase. Had they thoroughly investigated, counsel could have presented compelling mitigation evidence:

> 1) Due to the abuse inflicted on her, Davis' mother could not develop a bond with Davis or her kids which affected Davis later in life.
>
> 2) Davis had a long history of head trauma. He often had self-inflicted injuries from banging his head on the head board. Davis' mother ignored the loud sounds created by Davis banging his head. Davis' father would often beat him about the head with his hands and a stick.

3) Davis had a perforated ear drum which was very painful.  His parents failed to obtain prompt medical treatment for him, which resulted in further damage to his ear and his hearing.  It also exaggerated and/or caused his speech impediment.  Other children in school often made fun of Davis because of this, causing him psychological damage that also went untreated.  Davis had limited social skills and as a result, few or no friends.

4) Davis' father told his children they did not need to go school and refused to help Davis or the other children with their school work.

5)  Davis often took physical abuse from his father in an effort to get him to stop beating Davis' mother.

(*See* Post Conviction Pet., Exs. K, L, S, W.)

670.   But counsel failed to investigate any of this compelling mitigation evidence, and/or failed to develop the significance of this evidence and how any and all of it affected Davis' development such that it made him less culpable than necessary for the death penalty.

671.   Counsel likewise failed to present evidence of, or any argument about, the significance of the fact that Davis was abandoned in a Children's Home at a young age when his mother left his father.  Critically, there was virtually no discussion of the impact of such a devastating event on the development of a young person.

672.   The "red flags" inherent in an abusive childhood such as Davis' could not be reasonably ignored by counsel, but instead required counsel's independent investigation.  *See Porter*, 130 S. Ct. at 453; *Wiggins*, 539 U.S. at 524-26; 534–36.

241

This only made counsel's failures to fully investigate the compelling mitigating evidence that much more egregious.

673.   These failures were unreasonable and thus could not have been based on reasonable strategic considerations.  Counsel did not properly investigate to present a complete defense at sentencing.  This was not a legitimate trial "strategy."  *See Wiggins*, 539 U.S. at 521–22.

674.   But for counsel's deficient performance in failing to present compelling mitigating evidence, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting whether death was the appropriate punishment, and would have voted for a sentence less than death.

675.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **b.    Counsel failed to obtain the expert and investigative assistance that was reasonably necessary to investigate and present the compelling mitigating details of Davis' life history.**

676.   Counsel failed to obtain all of the expert and investigative assistance that was reasonably necessary to investigate and present the compelling story of Roland Davis' life history.

677.   For example, counsel failed to investigate, consult with, or present evidence from a mental health expert, even though the court authorized the expenditure of funds for such an expert to help prepare for the penalty phase.

678.   Although a wealth of relevant mitigating evidence could have been presented through an experienced mental health professional, *see* Eighteenth Ground for Relief, *supra/infra*, no mental health expert testified at the penalty phase.

679.   Testimony from a competent forensic psychologist or other mental health expert would have provided the jury and the trial court with insight into Davis' background and a scientific explanation of how this background affected his psychological makeup as an adult.

680.   Testimony from a competent forensic psychologist or other mental health expert also would have provided the jury and the trial court with insight into how Davis' psychological makeup contributed to this crime.

681.   This would have provided powerful mitigating evidence contrary to the prosecutor's repeated assertions that Davis' background had no mitigation value to this offense because it did not explain or excuse the crime.  (Tr. at 2273–78; Sent. Hr'g Tr. at 32.)

682.   In addition to failing to consult with or provide testimony from a mental health expert, counsel failed to consult with or provide testimony from other

experts necessary to conduct a full investigation and then present and explain the strongest mitigation picture to the jury.

683.   These failures were unreasonable and thus could not have been based on reasonable strategic considerations.  Counsel did not properly investigate to present a complete defense at sentencing.  This was not a legitimate trial "strategy."  *See Wiggins*, 539 U.S. at 521–22.

684.   But for counsel's deficient performance in failing to present this type of compelling mitigating evidence, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting whether death was the appropriate punishment, and would have voted for a sentence less than death.

685.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **c.    Counsel failed to develop a comprehensive mitigation theory before trial that could be advanced through all stages of the trial.**

686.   Counsel failed to develop, in advance of voir dire, a comprehensive mitigation theory that could be advanced through all stages of the trial, despite an obligation to do so under the prevailing professional norms.

687.   Indeed, the trial transcript demonstrates that counsel had no comprehensive mitigation theory even at the start of the *sentencing* phase, let alone at the start of

the trial phase.  (*See, e.g.*, Tr. at 2025 ("Perhaps, through the evidence that you will be presented, we have witnesses that we will call to the stand, you will find something that suggests that death would be inappropriate to this defendant in this case.").)

688.   This absence of a theme or strategy became more apparent throughout the penalty phase when trial counsel stipulated much of the evidence, failed to offer any explanation of the relevance of the evidence, and failed to object to the repeated instances of prosecutorial misconduct which acted to improperly limit the mitigation and to focus the jury on non-statutory aggravating circumstances.[52]

689.   These failures were unreasonable and thus could not have been based on reasonable strategic considerations.  Counsel did not properly investigate to present a complete defense at sentencing.  This was not a legitimate trial "strategy."  *See Wiggins*, 539 U.S. at 521–22.

690.   But for counsel's deficient performance in failing to present this type of compelling mitigating evidence, there is a reasonable probability that at least one juror would have had a reasonable doubt respecting whether death was the appropriate punishment, and would have voted for a sentence less than death.

---

[52] As noted above, Davis has raised the misconduct of the prosecutor as a separate substantive Ground for Relief.  *See* Sixteenth Ground for Relief, *supra*.  Rather than repeat the entire substantive claim relevant to the penalty phase, it is incorporated by reference here.

691.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **d.    Counsel failed to effectively humanize Davis for the jury, and failed to effectively present and explain the wealth of mitigation evidence so that the jury could properly consider and give effect to the evidence in deliberations.**

692.   Counsel failed to investigate, develop, and/or present available mitigation evidence to the jury that would have humanized Davis.  Relevant and compelling information about Davis' social history was not discovered, presented and/or sufficiently explained to the jury.

693.   Relatedly, counsel failed to effectively present and explain the overwhelming mitigation evidence so that the jury could properly consider and give effect to the mitigation evidence in their deliberations.

694.   Despite the critical importance of objective mitigation evidence such as the various records from Davis' background, counsel stipulated to a variety of records in the penalty phase.  (*See* Joint Stipulation No. 11, Medical records; Joint Stipulation No. 12, Licking County Children's Home Records; Joint Stipulation No. 13, Licking County Jail records; Joint Stipulation No.14, Newark Public School records; Tr. at 2221–24.)

695.   For example, Joint Stipulation 14 established that Davis' IQ was tested at 81 in 1970, which places Davis in the Borderline Intellectual functioning range.  This

246

is a significant factor that should have been explained to the jury.  But counsel offered only the records containing this information, and offered no further information or explanation about what that score meant, expert or otherwise.

696.   Counsel offered no testimony or explanation about the content or meaning of the records to properly establish the most favorable context for the jury's consideration of this vital mitigation evidence, or to help the jury understand the meaning of the evidence.  This minimized the impact of the compelling mitigating evidence contained in these records.

697.   Counsel's failure was compounded when counsel failed to present any psychologist, psychiatrist or mental health expert to discuss the contents of these records or the significance of the information contained in the records to Davis' development or to explaining the crime.

698.   Counsel also did not explain the content or meaning of these records in closing argument.  Without a mental health expert or counsel explaining the contents of these records as well as the significance of the record, or the events documented in the records, this critical evidence was meaningless to the jury.  *See Johnson v. Bagley*, 544 F.3d 592, 600–01 (6th Cir. 2008).

699.   It was unreasonable and could not have been a reasoned trial strategy to simply obtain a pile of records, then dump them in the jury's hands without organizing the files or explaining to the jury how or why they are relevant.  *See id.*

700.   It was similarly unreasonable to expect the jury to review the records on their own, identify those that were significant to explaining or understanding Davis' background and the nature and extent of his developmental problems, and then synthesize the implication of those elements with a complex issue like whether Davis was deserving of the death penalty. *See id.*

701.   These failures were unreasonable and thus could not have been based on reasonable strategic considerations.

702.   Each of these distinct but related failures by counsel, individually and in the aggregate, prejudiced Davis.

703.   Davis was prejudiced by counsel's failures because the jury was deprived of hearing compelling mitigating evidence of the type that juries often rely on in imposing a sentence less than death.

704.   He was also prejudiced because the jury, without expert testimony or any explanation from counsel to establish the context and significance of the mitigation evidence including the objective records evidence, was unable to give full consideration and effect to all of his mitigation evidence.

705.   Had counsel fulfilled their obligations to thoroughly and completely investigate Davis' background, to develop a comprehensive mitigation theory that was presented to the jury at every opportunity from the start of trial, to consult with and present testimony from experts to help explain the context and import of the

information about Davis' background, to humanize Davis for the jury, and to present and explain the entire mitigation picture, the picture the jury ultimately considered would have been substantially different.

706.   The jury would have been presented with not only an outline of Davis' childhood but also the compelling details as well as an explanation of how this brutal and abusive upbringing affected his development, and may have contributed to his behavior here.

707.   Given the compelling nature of the available mitigation evidence that counsel failed to uncover for lack of sufficient investigation, there is a reasonable probability that at least one juror hearing this compelling mitigating evidence would have concluded that a sentence less that death was appropriate.

708.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, the chance to have his sentencing jury give full consideration and effect to his mitigation evidence, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

> **2.    Counsel failed to investigate and present compelling mitigation evidence from a mental health expert.**

709.   Trial counsel had a duty to conduct a thorough investigation of Davis' background for mitigating evidence, and to present relevant mitigating evidence, especially when that mitigation evidence was compelling. *See Porter*, 130 S. Ct. at 452–53 (citing *Williams*, 529 U.S. at 396 (in turn citing the ABA *Guidelines*)).

249

710.   Counsel had a duty to thoroughly investigate any mitigation evidence arising from Davis' psychosocial history and elsewhere, in order to prepare and present the comprehensive and compelling mitigation theory that should have been readily apparent from the abusive childhood that Roland Davis endured.  *See Wiggins*, 539 U.S. at 521–22.  This included a duty to investigate Davis' mental health history for potential mitigating factors.

711.   Counsel also had a duty to employ experts in investigating and developing mitigation evidence right, and to present expert testimony at the penalty phase to assist the jury in understanding the import of the mitigating evidence.  *See, e.g.*, ABA *Guidelines*, Guideline 10.11.F.2.

712.   Counsel's investigation, development, presentation and explanation of mitigation evidence fell far below the prevailing professional norms, and were not informed strategic trial decisions.

713.   Counsel failed to investigate and present mitigation evidence from a mental health expert, despite the fact that the trial court approved funds for such an expert to assist in Davis' defense.  Relevant and highly persuasive mitigation evidence could have been presented had counsel investigated and presented readily available testimony from a mental health expert.

714.   Similarly, Davis' mitigation evidence, including the additional mitigation evidence, could have been presented to the jury in a way that would have allowed

250

the jury to understand the evidence's context and import had counsel called a

mental health expert to testify.  (Post Conviction Pet., Ex. V.)

715.   Specifically, Davis' background and mental health history could have been

explained to the jury:

> 1)   A culmination of his early, adolescent, and adulthood experiences has shaped the person Davis is today and was at the time the offenses occurred.

> 2)   The witnessing of violence during childhood and adolescence from his father against his mother has significantly affected Davis, creating greater risk for violent behavior in his adult life.

> 3)   The ongoing difficulties with interpersonal relationships is likely due to a psychological and emotional struggle between [Davis'] father's violent behavior and his mother's passive behavior. Distressing sentiment has ensued, which his history has shown has manifested itself externally against others at times as domestic violence and internally with regard to his apparently genuine desire to help others.

> 4)   [Davis'] dependency on others for decision-making is likely due to insecurities and self-esteem issues developed throughout his life, as a result of unsupportive experiences with his father and others.

> 5)   Experiences Davis had and the way he processed them are independent of those of his siblings and further seemingly affected him in some similar, but also very different ways.

(Post Conviction Pet., Ex. V, ¶ 92.)

716.   Testimony from a mental health expert would have provided the sentencer with insight into Davis' background and record relevant to his family, medical, educational, psychological and employment histories, his positive character traits, his ability to adjust to incarceration, and the abuse and neglect he experienced in his formative years.

717.   The testimony of a mental health expert would also have provided a reasoned connection between the childhood abuse that Davis suffered and the crime.  (Post Conviction Pet., Ex. V, ¶¶ 72–86, 92–94.)

718.   This would have rebutted the prosecutor's penalty phase argument—and the conclusion of the trial court—that the abuse Davis endured as a youth had no mitigating value because it was too remote in time from the offense, and that it had no connection to the offense.  (*See, e.g.*, Tr. at 2273–78; *see also* Sent. Hr'g Tr. at 32.)

719.   A mental health expert would have demonstrated that the evidence indeed provided a causal connection for the crime.  (Post Conviction Pet., Ex. V, ¶¶ 72–86, 92–94.)

720.   Employing a mental health expert from the inception of their representation of Davis would have allowed counsel to conduct a thorough background investigation and then to exercise their reasonable professional judgment in determining the mitigation evidence to present during the penalty phase of the trial.

252

Conversely, failing to employ a mental health expert rendered counsel's investigation, if any, into myriad avenues of mitigation evidence insufficient.

721.   Davis' counsel unreasonably failed to investigate, develop, and/or present to the jury any of this critical mitigation evidence from a mental health expert.  Given the importance of Davis' mental health and psychosocial background to understanding the crime and to accurately painting a compelling mitigation picture, which counsel failed to investigate and present for lack of employing a mental health expert, there is a reasonable probability that a competent attorney aware of the evidence would have introduced it at sentencing.

722.   Furthermore, but for counsel's deficient investigation, development, presentation and explanation of mitigation evidence through a mental health expert, there is a reasonable probability that all of the aforementioned evidence would have provided at least one juror with sufficient mitigating circumstances upon which to vote for a sentence less than death.

723.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, the chance to have his sentencing jury give full consideration and effect to his mitigation evidence, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 3.        Counsel failed to object to improper jury instructions.

724.   Counsel had a duty to pursue all legal claims and objections, to know the law, and to advocate for correct or favorable jury instructions, and to object to improper jury instructions.  *See, e.g.*, ABA *Guidelines*, Guidelines 10.8, 10.11.

725.   The trial court in its penalty phase instructions failed to limit consideration of the trial phase evidence in the penalty phase; failed to properly allocate the burden of proof; failed to properly define the burden of proof; refused to instruct on residual doubt and mercy; and gave incorrect parole instructions.  *See* Fifteenth Ground for Relief, *supra*.

726.   Counsel failed to object to these faulty instructions.

727.   Counsel's failure to object to these incorrect instructions and failure to offer correct instructions fell below the prevailing professional norms and was therefore unreasonable.  *See,* Ohio R. Crim. P. 30.

728.   Davis was prejudiced when his jury, in deciding between a sentence of life and death, was instructed to deliberate that momentous decision under incorrect and misleading instructions.

729.   But for counsel's deficient performance, there is a reasonable probability that at least one juror would have voted for a sentence less than death.

### D.    Conclusion

730.   Counsel repeatedly failed to put the state's case to any adversarial testing. Their performance suggested acquiescence in any tool or procedure that shortened the trial and made things go smoothly—hardly a legitimate goal in a system that relies on adversarial testing.  For all of the reasons set forth above, individually and cumulatively, Davis was denied the effective assistance of counsel throughout the trial and penalty phases.

731.   But for counsel's deficient performance at the trial phase, there is a reasonable probability that all of the aforementioned evidence and advocacy would have provided at least one juror with reasonable doubt respecting guilt.

732.   Furthermore, but for counsel's deficient performance at the penalty phase, there is a reasonable probability that all of the aforementioned evidence and advocacy would have provided at least one juror with sufficient mitigating circumstances upon which to vote for a sentence less than death.

733.   Counsel's errors rendered Davis' trial fundamentally unfair and denied Davis a defense, due process, a fair trial, the chance to have his sentencing jury give full consideration and effect to his mitigation evidence, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments

734.   To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable

applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

735.   This Court should issue the writ.

## SYSTEMIC GROUNDS FOR RELIEF

**Nineteenth Ground for Relief:**

**THE DEATH SENTENCE IMPOSED ON ROLAND DAVIS IS DISPROPORTIONATE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

736.   The sentence of death imposed on Roland Davis compared to others convicted of similar crimes is disproportionately severe and therefore arbitrary and capricious under the Fifth, Sixth Eighth and Fourteenth Amendments.

**A.    Davis' substantive Eighth Amendment right to a death sentence that was not imposed in an arbitrary or capricious manner was violated.**

737.   The guiding principal underlying Eighth Amendment jurisprudence is that sentences of death may not be imposed in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 239, 249 (1972) (Douglas, J., concurring).  The death sentence imposed on Roland Davis could not be more arbitrary or capricious.  This is a fundamentally unfair outcome.  The Fifth, Sixth, Eighth, and Fourteenth Amendments require that there must be a meaningful basis upon which to distinguish between those few cases in which the death penalty is justified and the many cases in which it is not.  *Gregg v. Georgia*, 428 U.S. 153, 188–89 (1976); *Furman*, 408 U.S. at 313 (White, J., concurring).  Here, no such rational basis exists.

738.   Sentences must be proportional and not disparate, a requirement that is most stringently imposed in capital cases.  *Harmelin v. Michigan*, 501 U.S. 957, 997

257

(1991) (Kennedy, J., concurring); *see also Gregg*, 428 U.S. at 187 ("When a defendant's life is at stake, the Court has been particularly sensitive to ensure that every safeguard is observed.").  The proportionality of a given death sentence is subject to review by the federal courts.  *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion).

739.   A state may not leave the decision of whether a defendant lives or dies to the unfettered  discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman*, 408 U.S. at 309–10 (Stewart, J., concurring).  Therefore, some form of meaningful review is required to prevent potentially arbitrary imposition of the death penalty.

### B.   The Ohio Supreme Court's refusal to consider life sentences in Davis' proportionality review denied him due process.

740.   The sentence imposed on Roland Davis is disproportionately severe in comparison to the sentences imposed on others similarly situated.

741.   The Supreme Court of Ohio has refused to consider life sentences when conducting proportionality review.  *See, e.g.*, *State v. Eley*, 672 N.E.2d 640, 651 (Ohio 1996); *State v. Steffen*, 509 N.E.2d 383, 395 (Ohio1987).  The Supreme Court of Ohio also failed to consider life sentences in conducting Davis' proportionality review.  *See State v. Davis*, 880 N.E.2d 3186 (Ohio 2008).  The

258

failure to correct a grossly disproportionate and therefore arbitrary and capricious death sentence violates clearly established federal law, and deprived Davis of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### C.    Ohio has created a liberty interest in proportionality review.

742.    In enacting its death penalty scheme in 1981, the Ohio Legislature included Ohio Rev. Code § 2929.05, requiring the state reviewing courts to conduct proportionality review.

743.    While state court proportionality review is not constitutionally required, *Pulley v. Harris*, 465 U.S. 37, 42–43 (1984), Ohio has required proportionality review as part of the appellate review process, Ohio Rev. Code § 2929.05(A).  The state thereby created a liberty interest that cannot be ignored or administered in an arbitrary manner.  *See Evitts v. Lucey*, 469 U.S. 387, 395–96 (1985).  Therefore, all required components of the appellate review system for death penalty cases— including this statutorily mandated proportionality review—must be enforced within the requirements of due process and equal protection.  *Evitts*, 469 U.S. at 403–04.

744.    The Supreme Court of Ohio has generally limited its proportionality review to a comparison to other "similar" cases where the death sentence was imposed, *see Steffen*, 509 N.E.2d at 394–95, and did so in Davis' case as well, *see Davis*, 880 N.E.2d at 186.  The Supreme Court of Ohio did not conduct any comparison to

"similar" cases where death was not imposed.  Instead, it merely listed cases where similar aggravating circumstances were found, ignoring whether those so-called "similar" cases also had additional aggravating circumstances, or whether some or substantial mitigating evidence had been presented, or whether there was in fact any similarity between the cases.

745.   The failure to compare this case to cases where death was not imposed did not provide the "meaningful appellate review [that] ensur[es] that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991).  The Ohio Supreme Court's limitation of its review to other cases where death had also been imposed has resulted in zero death sentences being found disproportionate—out of more than two hundred cases reviewed.  This method makes it impossible for the court to determine if this is the only case in which death was imposed out of the hundreds where death was not imposed.  *State v. Marshall*, 613 A.2d 1059, 1071 (N.J. 1992).

746.   While the Supreme Court of Ohio has lauded the proportionality review of Ohio Rev. Code § 2929.05(A) as a "meaningful function which reduces the arbitrary and capricious imposition of death sentences," *State v. Jenkins*, 473 N.E.2d 264, 279 (Ohio 1984), it has failed to conduct such a proportionality review and therefore has failed to correct the clearly disproportionate arbitrary and capricious sentence imposed here.  The Supreme Court of Ohio ignored the

260

fundamental purpose of proportionality review, return to the pre-*Furman* era of arbitrary and capricious death sentences, and permitting the indiscriminate imposition of a disproportionate sentence on Roland Davis in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.[53]

### D.    Conclusion

747.    The death sentence imposed on Roland Davis is constitutionally disproportionate and cannot stand as compared to others similarly situated.  It is this type of irrational, arbitrary, and disproportionate application of the death penalty that has been roundly condemned since *Furman.*

748.    To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

749.    This Court should issue the writ.

---

[53] Ohio's proportionality statutes specifically require that the Ohio Supreme Court "shall" create a data base, and that it "shall" conduct proportionality review using that data base.  Ohio Rev. Code §§ 2929.021 & 2929.03.  *See Jenkins*, 473 N.E.2d at 302–04.  Thus in Ohio, as compared to the Tennessee statute at issue in *Coe v. Bell*, 161 F.3d 320, 351–52 (6th Cir. 1998), the Legislature has created a specific liberty interest by requiring the Supreme Court of Ohio to conduct a rational proportionality review by statute  as well as by federal constitutional mandate.

**Twentieth Ground for Relief:**

**THE OHIO SENTENCING REVIEW PROCESS AS IMPLEMENTED DENIED ROLAND DAVIS AN ADEQUATE SAFEGUARD AGAINST THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY. THE DEATH PENALTY IN THIS CASE IS INAPPROPRIATE UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

750.   When it re-enacted the death penalty in 1981, the Ohio Legislature,

established safeguards to ensure that the death penalty was not arbitrarily and

capriciously imposed.  These safeguards include:  1) a separate weighing by the

trial court of the statutory aggravating circumstances against the mitigating factors

and a written explanation of why death was appropriate in a separate sentencing

opinion, Ohio Rev. Code § 2929.03(F), and 2) a separate and independent review

by the Supreme Court of Ohio to ensure that the statutory aggravating

circumstances outweigh the mitigating factors beyond a reasonable doubt and that

the sentence was appropriately and proportionately applied.  Ohio Rev. Code

§ 2929.05.

751.   Neither court complied with the statutory mandates, permitting an arbitrary

and capricious imposition of a sentence of death on Roland Davis, under the Fifth,

Sixth, Eighth, and Fourteenth Amendments.

752.   Ohio Rev. Code § 2929.03(F) requires the trial court to review the statutory

aggravating circumstances that the jury had found proven beyond a reasonable

doubt; the mitigating factors that have been presented and that appear in the

evidence; the mitigating factors found to exist by the trial court; and the reasons
why the aggravating circumstances outweigh the mitigating factors beyond a
reasonable doubt and that death is the appropriate sentence.

753.   The trial court failed to explain why the aggravating circumstances
outweighed the mitigating factors beyond a reasonable doubt.  The trial court
simply stated that it was affording "great weight" to the aggravating circumstances.
It then proceeded to state, in great detail, facts that do not constitute statutory
aggravating circumstances, specifically, including the fact that the victim was 86
years old, that Davis apparently took advantage of his prior relationship with the
victim, and that the theft offense have taken  a "not insignificant amount of time."
None of these constitute or are even relevant to the statutory aggravating
circumstances that had been found by the jury and that the trial court was permitted
to consider.  Ohio Rev. Code § 2929.03(F); *Ring v. Arizona*, 536 U.S. 584, 609
(2002).

754.   The trial court inappropriately gave much less weight to Davis' tragic
childhood because he was 47 years old.  The court minimized Davis' limited
intellectual ability because he was able to remain employed, again an inappropriate
conclusion.  The court also found that Davis' low educational ability did not carry
much weight because it was related to his poor family environment in his
childhood.  This is not only speculative, it is irrelevant to whether his low IQ

constitutes a mitigating factor.  *See Atkins v. Virginia*, 536 U.S. 304, 320–21

(2002).  The trial court did not explain why very little or no weight was given to

any particular piece of mitigation (other than that Davis was 47 years old) or why

the mitigation as a whole was outweighed by the statutory aggravating

circumstances.

755.   The trial court's opinion virtually ignored the presence of substantial

mitigating factors such as Davis' abandonment for months by both parents and his

grandparents although his grandparents had taken one of the children, his being

bullied and made fun of by other children due to his stuttering, his father abusing

him verbally by calling him a "retard", and the compelling additional mitigating

evidence presented concerning the deplorable conditions of his childhood and the

effects of these events on his development.

756.   The trial court failed to ensure that there was an individualized sentencing

determination or to ensure that no arbitrary and capricious factors had entered into

the jury's decision making process.  Due to the trial court's inadequate review of

the statutory and constitutional requirements to ensure against the arbitrary and

capricious misapplication of the death penalty, no proper appellate review can now

be conducted.

757.   The evidence presented on Davis' behalf is the type of evidence that courts

have recognized as mitigating.  *See Rompilla v. Beard*, 545 U.S. 374, 390–91

(2005); *Wiggins v. Smith*, 539 U.S. 510, 534–35 (2003).  Family history and background or a poor family environment is a mitigating factor.  The cumulative weight of these factors outweighs the statutory aggravating circumstances in this case.  The sentence of death is thus inappropriate.

758.   Ohio's statutes do not require the court imposing life imprisonment to identify the mitigating factors or to explain how the statutory aggravating circumstances outweigh the mitigating factors.  Without this information, no relevant comparison of cases is possible and thus no meaningful appellate review can be effected.  *See State v. Murphy*, 747 N.E.2d 765, 813 (2001) (Pfeifer, J., dissenting) ("When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality.  The lowest common denominator becomes the standard.").

759.   The review of Davis' death sentence by the Supreme Court of Ohio pursuant to Ohio Rev. Code § 2929.05 was no more thorough or complete.  The Court reviewed the aggravating factors and the evidence presented in mitigation, but then concluded that his was a "horrific crime" before rejecting summarily the significance of all of the mitigating evidence presented.

760.   The court gave some mitigating weight to his abusive childhood and his limited intellectual functioning and his lack of disciplinary infractions while

265

incarcerated.  *State v. Davis*, 880 N.E.2d 31, 86 (Ohio 2008).  The Court rejected

giving this factor any significant weight, however, because "there was no evidence

of any significant connection between Davis' childhood abuse and his murder of

Sheeler."  *Id.*  The Court concluded without further explanation:  "we find that the

aggravating circumstances outweigh the mitigating factors beyond a reasonable

doubt.  Davis' murder of Sheeler during the course of a burglary, robbery, and

kidnapping are grave circumstances.  In contrast Davis' mitigating evidence has

little significance."  *Id.* at 87.

761.   The review by the Supreme Court of Ohio failed to give appropriate weight

to the compelling mitigating factors presented and gave unwarranted weight to the

statutory aggravating circumstance as "grave circumstances."  The review of the

Supreme Court of Ohio failed to provide any check on the arbitrary and capricious

imposition of the death penalty under the Fifth, Sixth, Eighth and Fourteenth

Amendments.

762.   The sentence of death imposed on Roland Davis is inappropriate.  The

history, character and background of Roland Davis do not excuse the death of

Elizabeth Sheeler, but they do operate to mitigate the appropriate sentence.

Imposing the death sentence on Roland Davis is inappropriate because of the

existence of these compelling mitigating factors.[54]  Reweighing of the aggravating circumstances against the strong mitigating evidence, the inevitable conclusion is that the death is inappropriate under the Fifth, Sixth, Eighth and Fourteenth Amendments.

763.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

764.   This Court should issue the writ.

---

[54] While some mitigating factors were presented, additional compelling mitigating factors were not presented, because counsel failed to investigate, failed to adequately present mitigating factors, and failed to present an explanation of the records or the history of Roland Davis through a mental health professional or otherwise.  *See* Eighteenth Ground for Relief, *supra*.  Davis was denied the effective assistance of counsel at the penalty phase.

## Twenty-First Ground for Relief:

**DAVIS WAS DENIED DUE PROCESS AND EQUAL PROTECTION BECAUSE OHIO'S POST CONVICTION PROCEDURES DID NOT PROVIDE HIM WITH AN ADEQUATE CORRECTIVE PROCESS TO FULLY AND FAIRLY VINDICATE HIS FEDERAL CONSTITUTIONAL CLAIMS IN THE STATE COURTS UNDER PRINCIPLES OF COMITY AND FEDERALISM.**

765.   It is well-settled that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).  Specifically, when a State creates a corrective process, the same should be "swift and simple and easily invoked," should "eschew rigid and technical doctrines of forfeiture, waiver, or default," and should "provide for full fact hearings to resolve disputed factual issues." *Case v. Nebraska*, 381 U.S. 336, 346–47 (1965) (Brennan, J., concurring).

766.   Under principles of comity and federalism, Ohio defendants such as Davis are required to provide the Ohio courts the first opportunity to correct federal constitutional violations.  Accordingly, Ohio has chosen to act in the field of post conviction relief in part to provide state prisoners with some "defined method by which they may raise claims of denial of federal rights." *State v. Calhoun*, 714 N.E.2d 905, 909 (Ohio 1999) (quoting *Young v. Ragen*, 337 U.S. 235, 239 (1949)). While this type of review is not constitutionally mandated, *see Murray v.*

*Giarratano*, 492 U.S. 1 (1989), nevertheless, the post conviction procedure must, in accordance with *Evitts*, comport with, and be enforced to effectuate due process.

767.   In Ohio, every aspect of post conviction relief is discretionary.  An evidentiary hearing on the petition is not automatic; instead the trial court must first determine "whether there are substantive grounds for relief."  Ohio Rev. Code § 2953.21(C).  This requires the petitioner to "set forth sufficient operative facts to establish substantive grounds for relief."  *Calhoun*, 714 N.E.2d at 905.  To determine if substantive grounds for relief exist, the Ohio statute requires the trial court to consider "supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the Davis, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."  Ohio Rev. Code § 2953.21(C).  The trial court can deny a petition without even holding an evidentiary hearing if the trial court does not find grounds for granting relief.  Ohio Rev. Code § 2953.21(E); *Calhoun*, 714 N.E.2d at 905.

768.   In sum, the Ohio post conviction process does not automatically require an evidentiary hearing, or any other form of discovery, and yet the process places a heavy burden on an inmate such as Davis to set forth "operative facts" warranting further review.  Indigent inmates face the insurmountable burden of collecting evidence in support of valid claims prior to the filing of a petition without the

269

means to collect information critical to their claims.  Absent funds for the reasonable and necessary expert and investigative assistance to properly investigate, prepare, and litigate the post conviction petition in the abbreviated period of time available provided by the statute of limitations, Ohio Rev. Code § 2953.21, it was impossible for Davis to fully and fairly develop the factual bases for his claims and to fully and fairly present those claims to the state courts.

769.   After filing his post conviction petition, Davis attempted to further meet his burden by requesting a full and fair opportunity to be heard by moving for discovery, an evidentiary hearing, and expert assistance, all of which were reasonably necessary to developing the factual bases and supporting affidavits and other documentary evidence for the trial court to consider.  (*See* Licking County Case No. 2004 CR 00464, Motion for Discovery and Evidentiary Hearing filed 7/20/2006; Motion for DNA Test filed 7/20/2006; and Motion for Appropriation of Funds for Dr. Robert L. Smith, Clinical Psychologist filed 7/20/2006.)

770.   Davis requested authorization to depose his trial attorneys to more fully develop his numerous claims of the denial of effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), *see* Eighteenth Ground for Relief, *supra*, Twenty-Second Ground for Relief, *infra*, and his claim of undisclosed exculpatory and impeachment information under *Brady v. Maryland*, 373 U.S. 83 (1963), *see* Seventh Ground for Relief, Sixteenth Ground for Relief, Seventeenth

270

Ground for Relief, Eighteenth Ground for Relief, *supra*, and Twenty-Second Ground for Relief, *infra*. Davis also requested authorization to depose the state's witness Richard Hummel to further develop his *Brady* claim. Furthermore, Davis requested authorization to depose Damien Turner on the question of whether the Newark police solicited testimony from Turner incriminating Davis while Turner was incarcerated. *See* Seventeenth Ground for Relief, Eighteenth Ground for Relief, *supra*. Davis stated that he gave this information to trial counsel, but counsel did not investigate this claim, another reason Davis requested leave to depose his trial counsel. A deposition of Turner could have lead to evidence bolstering Davis' *Brady* claim related to Turner.

771. Davis requested leave to depose Licking County Sheriff's Deputies Marcus Ramsey and Anthony Phillips to fully develop his claim that he was required to wear an electric shocking device during the trial. Likewise, Davis requested leave to depose law enforcement personnel responsible for the custody and care of the electric shocking device. *See* First Ground for Relief, *supra*.

772. Consultation with clinical psychologist Dr. Robert Smith would have permitted Davis to prove the psychological effects on Davis resulting from his being forced to wear the electrical shocking device at trial. (Post Conviction Pet., Exs. N, O, P, Q, R.) *See* First Ground for Relief, *supra*.

773.    Additionally, Davis requested leave to discover records that may have entitled him to relief on the merits of his claims.  Specifically, he requested leave to obtain records maintained by Tari Paxson, which would have bolstered his actual innocence claim by demonstrating that he could not have been present at a restaurant where he was supposedly identified on the date of the purported identification.  *See* Eighteenth Ground for Relief, *supra*.

774.    If Davis was permitted to obtain records of the manuals and documents regarding the electrical shocking device, the records could have bolstered his claims related to being forced to wear an electrical shocking device.  *See* First Ground for Relief, *supra*.

775.    Finally, the requested DNA testing of Davis' brother's blood sample, the same brother Davis offered as an alternative suspect at trial, was needed to fully develop Davis' claims of ineffective assistance of counsel and actual innocence. *See* Sixth Ground for Relief, Sixteenth Ground for Relief, Seventeenth Ground for Relief, and Eighteenth Ground for Relief, *supra*; Twenty-Second Ground for Relief, *infra*.

776.    Discovery was necessary to develop the factual bases for Davis' claims. Nevertheless, the trial court denied all of his discovery requests and ultimately denied Davis' petition, criticizing the lack of evidence submitted by Davis. (Licking County Case No. 2004 CR 00464, 11/14/2007 Judgment Entry, ¶¶ 11,

15.)  In upholding the trial court's decision, the Fifth District Court of Appeals routinely emphasized that the only evidence Davis submitted was his own affidavits, or documents that were not authenticated.  *State v. Davis*, 2008 Ohio App. LEXIS 5718, 2008-Ohio-6841, at ¶¶ 40, 51, 94, 115–20, 139, 150 (Ohio Ct. App. Dec. 23, 2008).  Authorizing funds for expert and investigative assistance and permitting Davis to conduct depositions and conduct other discovery would have provided the necessary tools for Davis to develop the factual bases for his federal constitutional claims.

777.   In essence, the Ohio courts' conclusions that Davis was required to prove the effect or prejudice of his claims, without permitting him to conduct discovery, or obtain expert or investigative assistance, emphasizes the flaws in Ohio's post conviction process.  As a result, Davis was denied equal protection, due process, and a full and fair opportunity to present and litigate his federal constitutional claims in state post conviction proceedings, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as constitutional principles of comity and federalism.  Ohio's post conviction process did not provide Davis an adequate and independent means by which to vindicate his federal constitutional rights in the state court system.  The amended post conviction petition and supporting exhibits, if fully developed through discovery, would have been sufficient to entitle him to relief.  *See Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997).

273

778.   While Davis' post conviction claims could have benefited from further development through discovery, Davis, at a minimum, pleaded sufficient operative facts supported by credible evidence *dehors* the record to entitle him to a hearing. *See Calhoun*, 714 N.E.2d at 910 (quoting *State v. Jackson*, 413 N.E.2d 819, 823 (Ohio 1980)).  Accordingly, the trial court's refusal to hold an evidentiary hearing when Davis met his burden denied him due process and a full and fair opportunity to adjudicate the merits of his federal constitutional claims.

779.   The Ohio post conviction statute denied Davis due process and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because the statute fails to provide an adequate corrective process to fully and fairly vindicate Davis' federal constitutional rights in state court.  Davis requests a full and fair opportunity to present all of his claims to this Court in habeas corpus and to have the opportunity to conduct discovery, the opportunity to amend the petition, the opportunity (and the ability) to fully investigate the claims and to present evidence in support of his claims to this Court without any deference being given to the factual findings of the state courts.

780.   To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

781.   This Court should issue the writ.

## Twenty-Second Ground for Relief:

**DAVIS WAS DENIED DUE PROCESS BECAUSE THE TRIAL COURT IMPROPERLY DENIED HIS MOTION FOR LEAVE TO FILE A NEW TRIAL MOTION, THUS DENYING HIM ANY OPPORTUNITY TO DEMONSTRATE HIS ACTUAL INNOCENCE BASED ON NEWLY DISCOVERED EVIDENCE.**

782.   Under Ohio Rule of Criminal Procedure 33(B), a new trial motion based on newly discovered evidence must be filed within 120 days of the verdict, unless:

> It is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

*See also State v. Petro*, 76 N.E.2d 370 (Ohio 1947); Ohio Rev. Code §§ 2945.79(F); 2945.80.

783.   On October 31, 2008, Davis moved the trial court for leave to file a Motion for a New Trial.  He argued under Rule 33(B) that he was unavoidably prevented from discovering his new evidence within 120 days of the jury verdict.  Davis also proffered his substantive new-trial motion with requests for discovery and an evidentiary hearing to demonstrate his actual innocence.  Davis supported his motion with an affidavit from Dr. Laurence Mueller, an expert in DNA science. *See* Ohio R. Crim. P. 33(A)(6).  Dr. Mueller concluded that the State's DNA evidence was questionable, overstated, and based on a flawed statistical database.

276

(Motion for New Trial, Ex. 1.)  Davis argued in his Motion that Dr. Mueller's newly discovered evidence would demonstrate his actual innocence.

784.   On January 30, 2009, the trial court denied Davis' Motion for Leave to File a Motion for a New Trial, finding that Davis was not unavoidably prevented from discovering his new evidence within the 120-day limit of Rule 33(B).  (Licking County Case No. 2004 CR 00464, 1/30/2009 Judgment Entry, p.4.)

785.   The Fifth District Court of Appeals subsequently concluded that the trial court did not have jurisdiction to consider Davis' motion after his direct appeal was final.  The Supreme Court of Ohio has accepted jurisdiction to review the Fifth District's decision.  *State v. Davis*, 922 N.E.2d 227 (Mar. 3, 2010) (Table).  The case remains pending as of the filing of this petition.

786.   Davis' new trial motion alleged that he was denied the effective assistance of counsel because counsel failed to properly challenge the state's DNA evidence and that had they challenged the DNA evidence with experts such as Dr. Mueller's evidence, there was a reasonable probability that the outcome would have been different because he was actually innocent.

787.   Davis could not raise this claim at trial because his trial counsel could not be expected to present evidence of their own deficient performance.  *Massaro v. United States*, 538 U.S. 500, 503 (2003); *Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008).

788.   Davis could not have raised this claim in his direct appeal to the Supreme Court of Ohio, as the new evidence was not in the record on appeal.  This claim depended upon the affidavit of Dr. Mueller.  His affidavit is evidence outside the record which could not be considered on direct appeal.  *See State v. Ishmail*, 377 N.E.2d 500, 502 (1978); *see also State v. Hawkins*, 612 N.E.2d 1227, 1235 (1993) (new trial motion is proper when new evidence "has been discovered since the trial") (citation omitted).

789.   The availability of post conviction review under Ohio Rev. Code § 2953.21 *et seq*. presented no bar to the trial court's review of Davis' claims.  Ohio Rule of Criminal Procedure 33 has a 120-day deadline.  The post conviction statute requires that the defendant's petition must be filed within 180 days after the record is filed in the direct appeal.  Ohio Rev. Code § 2953.21(A)(2).  Thus, even a timely post conviction petition may be properly filed outside the 120-day window provided in Rule 33.

790.   Additionally, Davis was entitled to further review because trial counsels' error resulted in a wrongful conviction.  As the State asserted in its brief opposing Davis' post conviction appeal, under Ohio law, "[a] claim of actual innocence is not a ground for post conviction proceedings."  *State v. Roland Davis*, No. 08-CA-16 (Ohio Ct. App. Aug. 19, 2008) (Brief of Plaintiff-Appellee State of Ohio, at 26).  Accordingly, Ohio provided no vehicle for vindicating his claim of actual

innocence based on newly discovered evidence.  Davis was unavoidably prevented from presenting this new evidence to support his actual innocence claim within 120 days of the verdict.  Likewise, Davis was entitled to further review of his new trial motion because his new evidence demonstrated that his convictions and death sentence resulted in a miscarriage of justice as the result of counsel's complete abdication of their duty to challenge the state's critical DNA evidence—a failure that resulted in the conviction of an innocent man in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  *See Schlup v. Delo*, 513 U.S. 298, 326–27 (1995).

791.   "When a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause."  *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).  Ohio has adopted Ohio Rule of Criminal Procedure 33.  The rule provides a vehicle whereby an actually innocent defendant can seek a new trial to vindicate his innocence upon the discovery of new evidence.  Absent the ability to raise his actual innocence under Rule 33, Davis would be foreclosed from any means of vindicating his innocence.

792.   To comport with due process, Rule 33 must be interpreted to permit a trial court to consider a motion for a new trial where a claim of actual innocence based on newly discovered evidence is raised.  *See Evitts*, 469 U.S. at 401.

279

793.   Davis presented the trial court with new evidence that undermined the reliability of his conviction.  Without the ability to vindicate his actual innocence under Rule 33, Davis would have no remedy for vindicating his wrongful convictions and unconstitutional sentences in violation of the constitutional guarantees of due process.

794.   To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.[55]

795.   This Court should issue the writ.

---

[55] As noted, this claim remains pending before the Supreme Court of Ohio, which accepted jurisdiction to hear the claim.  Upon that court's final determination of the claim, Davis will amend this petition to reflect the Supreme Court of Ohio's decision, in accordance with the agreement between the Court and the parties noted at ECF 11.

**Twenty-Third Ground for Relief:**

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL. OHIO REV. CODE ANN.
§§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, 2929.05,
AND 2929.06 ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO
ROLAND DAVIS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION. FURTHER, OHIO'S
DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER
INTERNATIONAL LAW.

796. The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment. The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 667 (1962). Punishment that is "excessive" constitutes cruel and unusual punishment. *Coker v. Georgia*, 433 U.S. 584, 591–92 (1977). The underlying principle of governmental respect for human dignity is the guideline to determine whether this statute is constitutional. *See Rhodes v. Chapman*, 452 U.S. 337, 361 (1981); *Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 100 (1958). The Ohio death sentencing scheme violates this bedrock principle.

### A. Davis' death sentence represents arbitrary and unequal punishment.

797. The Fourteenth Amendment guarantees equal treatment of similarly situated persons, including the protection against cruel and unusual punishment. *Furman*, 408 U.S. at 249 (Douglas, J., concurring). A death penalty imposed in violation of

the equal protection guarantee is a cruel and unusual punishment.  *Id.*  Any

arbitrary imposition of the death penalty also offends the Eighth Amendment.  *Id*.

798.   Ohio's scheme allows the death penalty to be imposed in an arbitrary and

discriminatory manner because prosecutors have virtually uncontrolled charging

discretion which has resulted in the discriminatory imposition of death throughout

the state.  Mandatory death penalty statutes are impermissible because they lack

standards for seeking or imposing death sentences and have no provision for

judicial review of the charging decision.  *Woodson v. North Carolina*, 428 U.S.

280, 301–02 (1976).  Ohio's prosecutors likewise have uncontrolled discretion

removed from judicial review—a scheme which likewise violates this

constitutional check on arbitrariness.

799.   Ohio's system imposes death in a racially discriminatory manner.  Blacks

and those who kill white victims are much more likely to be sentenced to death.

While African-Americans constitute around twelve percent of Ohio's population,

*see* U.S. Census Bureau, *Ohio Profile of General Demographic Characteristics:*

*2000*, at 1 (2000)[56], over fifty-one percent of Ohio's death row inmates are

African-American, *see* Ohio Pub. Defender Office, *Death Penalty Proportionality*

---

[56] *available at* http://factfinder.census.gov/servlet/QTTable?_bm=y&-
geo_id=04000US39&-qr_name=DEC_2000_SF1_U_DP1&-
ds_name=DEC_2000_SF1_U

*Statistics*, at 1 (May 14, 2010)[57]; *see also* Supreme Court of Ohio, *The Report of the Ohio Commission on Racial Fairness* at 37–38 (1999).  While few Caucasians are sentenced to death for killing African-Americans, nearly forty African-Americans sit on Ohio's death row for killing a Caucasian.  Ohio Pub. Defender Office, *Death Penalty Proportionality Statistics, supra*, at 1.

800.   Ohio courts have not evaluated the implications of these racial disparities. While the General Assembly created an appellate review process for post conviction review of this disparity, this Court has never implemented a plan to track the race of the offender or the victims as is required by Ohio Rev. Code § 2953.21(A)(2).  In short, Ohio law provides no check against race discrimination in capital sentencing.  *See* Second Ground for Relief, Third Ground for Relief, Fourth Ground for Relief, *supra*.

801.   Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest.  *State v. Pierre*, 572 P.2d 1338, 1357–58 (Utah 1977) (Maughan, J., concurring and dissenting); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J., concurring).  Where fundamental rights are involved, personal liberties cannot be broadly stifled "when the end can be more narrowly achieved."  *Shelton v. Tucker*, 364 U.S. 479, 488 (1960).  To take a life,

---

[57] *available at* http://www.opd.ohio.gov/DP_ResidentInfo/dp_Proportionality.pdf

the state must show that it is the "least restrictive means" to a "compelling governmental end." *O'Neal*, 339 N.E.2d at 678–79.

802.   The death penalty is neither the least restrictive nor an effective means of deterrence.  Both isolation of the offender and retribution can be effectively served by less restrictive means.  Society's interests do not justify the death penalty.

**B.     Ohio's system employs unreliable sentencing procedures.**

803.   Due process and equal protection prohibit arbitrary and capricious imposition of the death penalty.  *Gregg v. Georgia*, 428 U.S. 153, 188, 193–95 (1976); *Furman*, 408 U.S. at 255, 274.  Ohio's scheme does not require the state to prove that death is the only appropriate penalty.

804.   The unconstitutionally vague language "that the aggravating circumstances . . . outweigh the mitigating factors" invites arbitrary and capricious jury decisions.  "Outweigh" permits juries to decide life and death questions based on the lesser standard of proof by a preponderance of the evidence.  The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors.  This creates an unacceptable risk of arbitrary or capricious sentencing.

805.   Additionally, the jury is not given "specific and detailed guidance" and be provided with "clear and objective standards" for the consideration of mitigating

circumstances.  *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *Gregg*, 428 U.S. at 198.

806.  The weight to be assigned to a given mitigating factor is within the individual decision-maker's discretion.  *State v. Fox*, 631 N.E.2d 124, 132 (1994). Permitting so much discretion inevitably leads to arbitrary and capricious judgments.  The scheme further permits juries to ignore constitutionally relevant mitigating factors:  youth or childhood abuse, mental disease or defect, level of involvement in the crime, or lack of criminal history.  While the federal constitution may allow states to shape consideration of mitigation, Ohio's capital scheme fails to provide adequate guidelines to the sentencer, and therefore, fails to assure against arbitrary, capricious, and discriminatory results.

**C.    The Ohio scheme impermissibly burdened Davis' right to a jury.**

807.  The Ohio scheme imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial.  A defendant who pleads guilty or no contest benefits from a trial judge's discretion to dismiss the specifications "in the interest of justice."  Ohio R. Crim. P. 11(C)(3).  Accordingly, a capital indictment may be dismissed regardless of aggravating circumstances. There is no corresponding provision for a capital defendant who elects to proceed to trial before a jury.  This disparity needlessly burdens the defendant's exercise of his right to a trial by jury.  *Lockett v. Ohio*, 438 U.S. 586, 617 (1978) (Blackmun,

285

J., concurring).  Since *Lockett*, this infirmity has not been cured and Ohio's statute remains unconstitutional.

**D.     Ohio Rev. Code §§ 2929.03 (D)(1) and 2929.04 are unconstitutionally vague.**

808.   The reference in Ohio Rev. Code § 2929.03(D)(1) to "the nature and circumstances of the aggravating circumstance" necessarily incorporates the nature and circumstances of the offense into the factors to be weighed in favor of death. The "nature and circumstances of the offense" are, however, statutory mitigating factors under Ohio Rev. Code § 2929.04(B).  Ohio Rev. Code § 2929.03(D)(1) makes Ohio's death penalty weighing scheme unconstitutionally vague because it gives the sentencer unfettered discretion to weigh a statutory mitigating factor as an aggravator.

809.   Ohio Rev. Code § 2929.04(B) tells the sentencer that "the nature and circumstances of the offense" are factors that must be weighed only as mitigation. *See State v. Wogenstahl*, 662 N.E.2d 311, 321–22 (Ohio 1996).  However, the clarity and specificity of Ohio Rev. Code § 2929.04(B) is eviscerated by Ohio Rev. Code § 2929.03(D)(1) because factors that are strictly mitigating become part and parcel of the aggravating circumstances.

810.   Despite wide latitude, Ohio has carefully circumscribed its selection factors into mutually exclusive categories.  *See* Ohio Rev. Code § 2929.04(A) & (B); *Wogenstahl*, 662 N.E.2d at 321–22.  Ohio Rev. Code § 2929.03(D)(1) makes Ohio

286

Rev. Code § 2929.04(B) vague because it incorporates the nature and circumstances of an offense as an aggravating circumstances contrary to the clear language of § 2929.03(D)(1).  The "nature and circumstances" of any offense become "too vague" to guide the jury in its weighing or selection process.  Ohio Rev. Code § 2929.03(D)(1) therefore makes Ohio Rev. Code § 2929.04(B) unconstitutionally vague and thereby arbitrary.

811.   Ohio Rev. Code § 2929.03(D)(1) is also unconstitutional on its face because it makes the selection factors in § 2929.04(A) too vague.  § 2929.04(A) give clear guidance as to the selection factors that may be weighed against the defendant's mitigation.  Only these statutory aggravating circumstances that were proven beyond a reasonable doubt may be weighed against the factors in mitigation.  However, Ohio Rev. Code § 2929.03(D)(1) eviscerates the narrowing achieved.  By referring to the "nature and circumstances of the aggravating circumstance," § 2929.03(D)(1) gives the sentencer "open-ended discretion" to impose the death penalty.  *See Cartwright*, 486 U.S. at 362.  That reference allows the sentencer to impose death based on these factors plus any other fact in evidence arising from the nature and circumstances of the offense that the sentencer considers aggravating.  This eliminates the guided discretion provided by Ohio Rev. Code § 2929.04(A).  *See Stringer v. Black*, 503 U.S. 222, 232 (1992).

287

**E.      Ohio's scheme impermissibly lacks individualized sentencing.**

812.   The Ohio sentencing scheme also requires proof of aggravating circumstances at the trial phase with no separation from the question of determination of guilt or innocence of the underlying murder.  The failure to divide the determination of guilt/innocence from the determination of aggravating circumstances upon which the death penalty may be premised prohibits a sufficiently individualized determination of sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments.  *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983); *Barclay v. Florida*, 463 U.S. 939, 958 (1983); *Woodson*, 428 U.S. at 304–05.

**F.      The Ohio system unconstitutionally creates a mandatory death penalty and impermissibly fails to require a thorough appropriateness analysis.**

813.   The Ohio scheme precludes the jury and the judge from exercising their mercy and imposing a life sentence even if they find that the aggravating circumstances outweigh the mitigating factors.  Ohio Rev. Code §§ 2929.03 and 2929.04 require death.  The sentencer is prohibited from exercising discretion to impose a life sentence.  The Eighth Amendment places substantive and procedural restrictions on the ability to impose death sentence, but the state may place none on the authority to impose a life sentence.  *Gregg*, 428 U.S. at 199.  ("[T]o minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the

288

sentencing authority would focus on the particularized circumstances of the crime and the defendant.") *Gregg* requires that the state must establish constitutionally sufficient guidelines for determining when a sentence of death may be appropriate. Nothing requires the sentencing authority to actually impose a sentence of death. Any such requirement would run afoul of the ban on mandatory death sentences. *Woodson*, 428 U.S. at 301–02.

814.   To adequately assure individualized sentencing, a capital sentencing scheme must provide a "mercy" option even in the absence of any mitigating circumstances.  The sentencer must retain the authority to determine that the death sentence is not appropriate for any given defendant under any given set of circumstances.  The jury must be free to "determine whether death is the appropriate punishment."  *Barclay*, 463 U.S. at 950.

815.   The Ohio statutes do not permit the jury to make an appropriateness determination and thus deny the authority to exercise mercy for any reason.  If the sentencer determines that the aggravating circumstances outweigh the mitigating factors, the sentencer is mandated to impose a death sentence.  Ohio Rev. Code § 2929.03(D).  While the Supreme Court of Ohio has observed that a "jury is not precluded from extending mercy to a defendant," *State v. Zuern*, 512 N.E.2d 585, 593 (Ohio 1987), the jurors were not informed of this authority.

**G.    Ohio's statutory death penalty scheme violates international law.**

816.   International law binds each of the states that comprise the United States. Ohio is bound by international law whether found in treaty or in custom.  Because the Ohio death penalty scheme violates international law, Davis' capital convictions and sentences cannot stand.

### 1.    International law binds the state of Ohio.

817.   "International law is a part of our law[.]"  *The Paquete Habana*, 175 U.S. 677, 700 (1900).  A treaty made by the United States is the supreme law of the land.  U.S. Const. art. VI.  Where state law conflicts with international law, it is the state law that must yield.  *See Zschernig v. Miller*, 389 U.S. 429, 440 (1968); *Clark v. Allen*, 331 U.S. 503, 508 (1947); *United States v. Pink*, 315 U.S. 203, 230 (1942); *Kansas v. Colorado*, 206 U.S. 46, 48 (1907); *The Paquete Habana*, 175 U.S. at 700; *The Nereide*, 13 U.S. (9 Cranch) 388, 422 (1815); *Asakura v. Seattle*, 265 U.S. 332, 341 (1924).  In fact, international law creates remediable rights for United States citizens.  *Filartiga v. Pena-Irala*, 630 F.2d 876, 877–88 (2nd Cir. 1980); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1539–40 (N.D. Cal. 1987).

### 2.    Ohio has obligations under international charters, treaties, and conventions.

818.   The United States' membership and participation in the United Nations (U.N.) and the Organization of American States (OAS) creates obligations in all fifty states.  Through the U.N. Charter, the United States committed itself to

promote and encourage respect for human rights and fundamental freedoms.  U.N.

Charter art. 1, para. 3.  The United States bound itself to promote human rights in

cooperation with the United Nations.  *Id*. at art. 55–56.  The United States again

proclaimed the fundamental rights of the individual when it became a member of

the OAS.  OAS Charter, art. 3.

819.   The United Nations has sought to achieve its goal of promoting human

rights and fundamental freedoms through the creation of numerous treaties and

conventions.  The United States has ratified several of these including:  the

International Covenant on Civil and Political Rights (ICCPR) ratified in 1992, the

International Convention on the Elimination of All Forms of Racial Discrimination

(ICERD) ratified in 1994, and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment (CAT) ratified in 1994.

Ratification of these treaties by the United States expressed its willingness to be

bound by these treaties.  Pursuant to the Supremacy Clause, the ICCPR, the

ICERD, and the CAT are the supreme laws of the land.  As such, the United States

must fulfill the obligations incurred through ratification.

820.   Ohio is not fulfilling the United States' obligations under these conventions.

Rather, Ohio's death penalty scheme violates each convention's requirements and

thus must yield to the requirements of international law.

### 3. Ohio's statutory scheme violates the ICCPR's and ICERD's guarantees of Equal Protection and Due Process.

821. Both the ICCPR and the ICERD guarantee equal protection of the law. ICCPR art. 2, paras. 1, 3, 14, 26; ICERD art. 5(a). The ICCPR further guarantees due process via Articles 9 and 14, which include numerous considerations: a fair hearing, (ICCPR art. 14, para.1), an independent and impartial tribunal (*id*. at para. 1), the presumption of innocence (*id*. at para. 2), adequate time and facilities for the preparation of a defense (*id*. at para. 3(a)), legal assistance (*id*. at para. 3(d)), the opportunity to call and question witnesses (*id*. at para. 3(e)), the protection against self-incrimination (*id*. at para. 3(g)), and the protection against double jeopardy (*id*. at para. 7). However, Ohio's statutory scheme fails to provide equal protection and due process to capital defendants as contemplated by the ICCPR and the ICERD.

822. Ohio's statutory scheme denies equal protection and due process in several ways. It allows for arbitrary and unequal treatment in punishment. Ohio's sentencing procedures are unreliable. Ohio's statutory scheme fails to provide individualized sentencing. Ohio's statutory scheme burdens a defendant's right to a jury. Ohio's requirement of mandatory submission of reports and evaluations precludes effective assistance of counsel. Ohio Rev. Code § 2929.04(B)(7) arbitrarily selects certain defendants who may be automatically eligible for death upon conviction. Ohio's proportionality and appropriateness review is wholly

inadequate.  As a result, Ohio's statutory scheme violates the ICCPR's and the

ICERD's guarantees of equal protection and due process.  This is a direct violation

of international law and of the Supremacy Clause of the United States Constitution.

### 4. Ohio's statutory scheme violates the ICCPR's protection against arbitrary execution.

823.   The ICCPR speaks explicitly to the use of the death penalty.  The ICCPR

guarantees the right to life and provides that there shall be no arbitrary deprivation

of life.  ICCPR art. 6, para. 1.  It allows the imposition of the death penalty only for

the most serious offenses.  *Id.* at para. 2.  Juveniles and pregnant women are

protected from the death penalty.  *Id.* at para 5.  Moreover, the ICCPR

contemplates the abolition of the death penalty.  *Id*. at para. 6.

824.   Several aspects of Ohio's statutory scheme allow for the arbitrary

deprivation of life.  Punishment is arbitrary and unequal.  Ohio's sentencing

procedures are unreliable.  Ohio's statutory scheme lacks individualized

sentencing.  The (A)(7) aggravator maximizes the risk of arbitrary and capricious

action by singling out one class of murders who may be eligible automatically for

the death penalty.  The vagueness of Ohio Rev. Code §§ 2929.03(D)(1) and

2929.04 similarly render the sentencing process arbitrary and unreliable.  Ohio's

proportionality and appropriateness review fails to distinguish those who deserve

death from those who do not.  As a result, executions in Ohio result in the arbitrary

deprivation of life and thus violate the ICCPR's death penalty protections.  This is

a direct violation of international law and a violation of the Supremacy Clause of the United States Constitution.

### 5. Ohio's statutory scheme violates the ICERD's protections against race discrimination.

825. The ICERD, speaking to racial discrimination, requires that each state take affirmative steps to end race discrimination at all levels. ICERD art. 2. It requires specific action and does not allow states to sit idly by when confronted with practices that are racially discriminatory. However, Ohio's statutory scheme imposes the death penalty in a racially discriminatory manner. A scheme that sentences blacks and those who kill white victims more frequently and that disproportionately places African-Americans on death row is in clear violation of the ICERD. Ohio's failure to rectify this discrimination is a direct violation of international law and of the Supremacy Clause.

### 6. Ohio's statutory scheme violates the ICCPR's and the CAT's prohibitions against cruel, inhuman or degrading punishment.

826. The ICCPR prohibits subjecting any person to torture or to cruel, inhuman or degrading treatment or punishment. ICCPR art. 7. Similarly, the CAT requires that states take action to prevent torture, which includes any act by which severe mental or physical pain is intentionally inflicted on a person for the purpose of punishing him for an act committed. *See* CAT arts. 1–2. As administered, Ohio's death penalty inflicts unnecessary pain and suffering, in violation of both the

ICCPR and the CAT.  Thus, there is a violation of international law and the

Supremacy Clause of the United States Constitution.

> **7.     Ohio's obligations under the ICCPR, the ICERD, and the CAT are not limited by the reservations and conditions placed on these conventions by the Senate.**

827.   While conditions, reservations, and understandings accompanied the United

States' ratification of the ICCPR, the ICERD, and the CAT, those conditions,

reservations, and understandings cannot stand for two reasons.  Article 2, § 2 of the

United States Constitution provides for the advice and consent of two-thirds of the

Senate when a treaty is adopted.  However, the United States Constitution makes

no provision for the Senate to modify, condition, or make reservations to treaties.

The Senate is not given the power to determine what aspects of a treaty the United

States will and will not follow.  Its role is to simply advice and consent.

> **8.     Ohio's obligations under the ICCPR are not limited by the Senate's declaration that it is not self-executing.**

828.   The Senate indicated that the ICCPR is not self-executing.  However, the

question of whether a treaty is self-executing is left to the judiciary.  *Frolova v.*

*Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) (citing

Restatement (Second) of Foreign Relations Law of the United States, § 154(1)

(1965)).  It is the function of the courts to say what the law is.  *See Marbury v.*

*Madison*, 5 U.S. (1 Cranch) 137, 146–48 (1803).

### 9.    Ohio has obligations under customary international law.

829.   International law is not merely discerned in treaties, conventions and

covenants.  International law "may be ascertained by consulting the works of

jurists, writing professedly on public law; or by the general usage and practice of

nations; or by judicial decision recognizing and enforcing that law." *United States*

*v. Smith*, 18 U.S. 153, 160–61 (1820).  Regardless of the source "international law

is a part of our law[.]" *The Paquete Habana*, 175 U.S. at 700.

830.   The judiciary and commentators recognize the Universal Declaration of

Human Rights (DHR) as binding international law.  The DHR "no longer fits into

the dichotomy of 'binding treaty' against 'non-binding pronouncement,' but is

rather an authoritative statement of the international community." *Filartiga*, 630

F.2d at 883 (internal citations omitted); *see also* William A. Schabas, *The Death*

*Penalty as Cruel Treatment and Torture* (Northeastern Univ. Press 1996).

831.   The DHR guarantees equal protection and due process (arts. 1, 2, 7, 11),

recognizes the right to life (art. 3), prohibits the use of torture or cruel, inhuman or

degrading punishment (art. 5) and is largely reminiscent of the ICCPR.  Each of

the guarantees found in the DHR are violated by Ohio's statutory scheme.  *See*

discussion *infra* §§ 1–8.  Thus, Ohio's statutory scheme violates customary

international law as codified in the DHR and cannot stand.

832.   However, the DHR is not alone in its codification of customary international law.  Courts must look to "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law" in ascertaining international law.  *Smith*, 18 U.S. at 160–61.  Ohio must be cognizant of the fact that its statutory scheme violates numerous declarations and conventions drafted and adopted by the United Nations and the OAS, which may, because of the sheer number of countries that subscribe to them, codify customary international law.  *See id*.  Included among these are:

    1)    The American Convention on Human Rights, drafted by the OAS and entered into force in 1978.  It provides numerous human rights guarantees, including:  equal protection (arts. 1, 24), the right to life, (art. 4, para 1), prohibition against arbitrary deprivation of life (id.), imposition of the death penalty only for the most serious crimes (art. 4, para. 2), no re-establishment of the death penalty once abolished (id. at para .3), prohibits torture, cruel, inhuman or degrading punishment (art. 5, para. 2), and guarantees the right to a fair trial (art. 8).

    2)    The United Nations Declaration on the Elimination of All Forms of Racial Discrimination proclaimed by United Nations General Assembly resolution 1904 (XVIII) in 1963.  It prohibits racial discrimination and requires that states take affirmative action in ending racial discrimination.

    3)    The American Declaration of the Rights and Duties of Man adopted by the Ninth International Conference of American States in 1948.  It includes numerous human rights guarantees: the right to life (art. 1),

297

equality before the law (art. 2), the right to a fair trial (art. 16), and due process (art. 26).

4)   Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment adopted by the United Nations General Assembly in Resolution 3452 (XXX) in 1975.  It prohibits torture, defined to include severe mental or physical pain intentionally inflicted by or at the instigation of a public official for a purpose including punishing him for an act he has committed, and requires that the states take action to prevent such actions.  See id. at arts. 1, 4.

5)   Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty adopted by the United Nations Economic and Social Council in Resolution 1984/50 in 1984.  It provides numerous protections to those facing the death penalty, including: permitting capital punishment for only the most serious crimes, with the scope not going beyond intentional crimes with lethal or other extremely grave consequences (1), requiring that guilt be proved so as to leave no room for an alternative explanation of the facts (4), due process, and the carrying out of the death penalty so as to inflict the minimum possible suffering (9).

6)   The Second Optional Protocol to the ICCPR, aiming at the abolition of the death penalty, adopted and proclaimed by the United Nations General Assembly in Resolution 44/128 in 1989.  This prohibits execution (art. 1, para. 1) and requires that states abolish the death penalty (id. at para. 2)).

833.   These documents are drafted by the people *Smith* contemplates and are

subscribed to by a substantial segment of the world.  As such they are binding on

the United States as customary international law.  A comparison of §§ 1–9 clearly

298

demonstrates that Ohio's statutory scheme is in violation of customary international law.

### H.  Lethal Injection.

834.   The judgment requiring that Roland Davis be executed violates the Fifth, Sixth, Eighth and Fourteenth Amendments because the death penalty as administered by lethal injection violates his constitutional right to protection from cruel and unusual punishment.

835.   The death penalty in Ohio is carried out by means of lethal injection.  Ohio Rev. Code § 2949.22(B).  "[T]he mere fact that the Legislature has spoken on the issue of the method of execution does not preclude or in any manner limit [a] court's evaluation of the selected method to determine whether it comports with the constitutional prohibition against cruel and unusual punishment."  *Dawson v. Georgia*, 554 S.E.2d 137, 139 (Ga. 2001).  In addition, prior rulings by a court regarding the constitutionality of a method of execution cannot be deemed determinative of the issue, since the Supreme Court has recognized that considerations of cruel and unusual punishment "must draw meaning from evolving standards of decency that mark progress of a maturing society."  *Trop*, 356 U.S. at 101.  This was illustrated in Ohio with the enactment of H.B. 362, in 2001, outlawing electrocution as a method of execution in Ohio, even though the Ohio Supreme Court had repeatedly declared electrocution to be constitutional.

299

836.   Death by lethal injection violates the due process protection of life, and constitutes cruel and unusual punishment because it inflicts torturous, gratuitous, and inhumane pain, suffering, and anguish upon the person executed by these means.

837.   As a form of execution, while seemingly less violent than electrocution when one envisions a "being-put-to-sleep" effect, lethal injection is itself fraught with painful and torturous effects on the executed.  ". . . .The much-vaunted and increasingly popular technique of lethal injection may well improve upon hanging, electrocution, and the gas chamber, in the same way as these improved upon burning at the stake, disemboweling, and drawing and quartering.  But such improvement if it exists, is only incremental."  William A. Schabas, *The Death Penalty as Cruel Treatment and Torture* at 200–10 (Northeastern Univ. Press 1996).

838.   Lethal injection, in Ohio, consists of two alternative methods of administrating drugs.  Under the state's primary execution method, sodium thiopental (an anesthetic) is injected intravenously to execute the prisoner.  Alternatively, under the state's new and singular method, hydromorphone and midazolam are administered intramuscularly to cause death.  These methods have not been proven to be more humane or less painful methods of execution, and instead present a substantial risk of serious pain to the condemned inmate..In the

300

first method, the drug is fed intravenously into the prisoner, who is strapped down. The Ohio Department of Rehabilitation and Corrections has steadfastly refused to use trained physicians or nurses to establish IV access as part of their written execution policy, although a physician has participated in at least one recent execution attempt in Ohio.  This results in medically untrained executioners responsible for inserting intravenous tubes into prisoners whose veins are often difficult to locate, even for medically trained personnel.[58]  These same medically untrained executioners are likewise responsible for administering the fatal dose or doses of lethal chemical, although they are prohibited from administering anesthetic under the terms of their licensure.  The state does not consistently follow its own execution policy, and indulges substantial deviations from the policy during administration of executions, creating a substantial risk of the condemned inmate suffering a substantial risk of severe pain.

839.   The issue of pain experienced by the executed individual has been addressed by the Supreme Court, which has ruled, under the Eighth Amendment, that the death penalty must result in "the mere extinguishment of life" and that "torture or a lingering death" is unconstitutional.  *In Re Kemmler*, 136 U.S. 436, 447 (1890).

---

[58] The recent executions of Joseph Clark and Romell Broom, *inter alia*, demonstrated the difficulties of untrained personnel botching the job and causing serious pain and suffering to the inmate and those in attendance.  Clark's execution took almost two hours to complete.  Broom's execution was halted after two hours by a reprieve from the Governor.

The jurisprudence of the Eighth Amendment has been consistent in its prohibition against all unnecessary cruelty.  *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1878) and *Louisiana ex rel. Francis v. Reswebeer*, 329 U.S. 459, 463 (1947).

840.   Roland Davis' death sentence entails execution by a method that violates his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. *See Baze v. Rees*, 553 U.S. 35, 47–52 (2008).

## I.      Conclusion

841.   Ohio's death penalty scheme fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur.  The procedures actually promote the imposition of the death penalty and, thus, are constitutionally intolerable. Ohio's death sentencing scheme therefore violates the Fifth, Sixth, Eighth and Fourteenth Amendments and international law.

842.   To the extent that the Supreme Court of Ohio adjudicated the federal constitutional merits of these claims, its adjudications were contrary to, or unreasonable applications of, clearly established federal law, and/or based on unreasonable determinations of the facts.

843.   This Court should issue the writ.

## **PRAYER FOR RELIEF**

WHEREFORE, Roland Davis requests that this court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the court deems appropriate:

1.  That this Court declare Roland Davis' convictions to have been obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the United States Constitution as well as the various treaties and charter obligations of the United States;

2.  That this Court declare that Roland Davis' sentence of death was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and other provisions of the United States Constitution as well as the various treaties and charter obligations of the United States;

3.  That this Court grant Davis leave to amend this petition;

4.  That this Court grant Davis leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his convictions and sentences;

5.  That this Court grant Davis the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts asserted in this petition;

6.  That this Court order that the Warden provide and file a complete copy of the state court record pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

7.  That this Court permit expansion of the Record with any documents necessary to resolution of the Petition for Habeas Corpus;

8.  That this Court order that the Warden file an answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

9.  That this Court grant Davis an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases;

10.    That this Court grant such other relief as law and justice require.

                                Respectfully submitted,

                                David Stebbins (0005839)
                                  *Trial Attorney*
                                Carol A. Wright (0029782)
                                Allen L. Bohnert (0081544)
                                Assistant Federal Public Defenders
                                10 West Broad Street, Suite 1020
                                Columbus, OH 43215
                                Telephone:  614.469.2999
                                Fax:  614.469.5999
                                David_Stebbins@fd.org
                                Carol_Wright@fd.org
                                Allen_Bohnert@fd.org

                                Kort Gatterdam (0040434)
                                CARPENTER LIPPS & LELAND LLP
                                280 Plaza, Suite 1300
                                280 North High Street
                                Columbus, Ohio 43215
                                Telephone:  614.365.4100
                                Facsimile:  614.365.9145
                                gatterdam@carpenterlipps.com

                                By: /s/ David C. Stebbins
                                *Lead Counsel, Trial Counsel for*
                                *Roland Davis*

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 2242, I, Roland Davis, petitioner herein, hereby verify that the allegations contained herein are true and accurate to the best of my knowledge.

_Roland Davis_     _6-15-10_
Roland Davis, # 499-211    Date

305

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 15, 2010, I electronically filed the foregoing Petitioner Roland T. Davis' Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 with the Clerk Court using the CM/ECF system, which will send notification of such filing to the following at their e-mail addresses on file with the Court:

Charles.wille@ohioattorneygeneral.gov
Seth.kestner@ohioattorneygeneral.gov

/s/David C. Stebbins
Counsel for Petitioner